UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALTAGRACIA J. PEGUERO,

Plaintiff,

v.

AMERICAN EXPRESS COMPANY, THE SKLOVER GROUP, INC. and FEDERAL INSURANCE COMPANY,

Defendants.

Civil Action No. 05-10995-RCL

**DEFENDANT FEDERAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF IT'S MOTION TO DISMISS AND COMPEL ARBITRATION**

Defendant Federal Insurance Company ("Federal") respectfully submits this memorandum in support of its motion to dismiss this proceeding and compel arbitration of Plaintiff Altagracia Peguero's ("Peguero") claims.[1] Arbitration will resolve every issue in this litigation.

## INTRODUCTION

Peguero's claims belong in arbitration. Peguero has brought this action to recover a $1.5 million insurance benefit allegedly due her under a Catastrophic Injury and Accidental Disability insurance policy (the "Plan") that was underwritten by Federal. In her First Amended Complaint, Peguero alleges generally that she is entitled to receive the full $1.5 million insurance benefit because she "became permanently and totally disabled" as a result of an accident. Amended Cmplt. ¶¶ 13, 14, 38-41 (attached hereto as Exhibit 1). After evaluating her claim, Federal paid Peguero benefits under the Plan, but concluded

---

1 Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants American Express Company, The Sklover Group, Inc., and Federal, by their undersigned attorneys, timely removed the Action on May 13, 2005.

that she was not permanently and totally disabled and, accordingly, denied her claim for $1.5 million. *Id*. at ¶ 15, Ex. B. Peguero pleads five causes of action against Federal purporting to assert her alleged rights under the Plan and seeking a payment of $1.5 million in benefits thereunder, including claims for fraud and deceit, violation of M.G.L. ch. 175 § 110E, violation of M.G.L. ch. 93A §§ 2 and 9, breach of contract and promissory estoppel. *Id*. at ¶¶ 24-47.

The contract of insurance between Peguero and Federal — as set forth in full in the Benefit Plan Description (attached hereto as Exhibit 2) — contains an arbitration provision that is specifically enforceable under the Federal Arbitration Act ("FAA"), 9 U.S.C.A. §§ 1-16 (2005). Under that agreement, all of Peguero's claims constitute a "dispute under the policy" and are therefore arbitrable. Accordingly, Federal is entitled to an order from this Court dismissing the First Amended Complaint, or, in the alternative, an order staying this proceeding until Peguero's claims have been arbitrated in accordance with the arbitration provision in the Benefit Plan Description. *Id*. at § 3. Federal is also entitled to an order under Section 4 of the FAA compelling Peguero to proceed with the arbitration of her claims in the manner provided for in the Benefit Plan Description. *Id*. at § 4.

**STATEMENT OF MATERIAL FACTS**

Peguero purchased insurance coverage under the Plan "[i]n or around August 2002." Amended Cmplt. ¶¶ 8-11. Upon her enrollment in the Plan, Peguero was sent, among other things, a Benefit Plan Description which contains the contract of insurance and fully discloses the precise benefits and terms of coverage available under the Plan. *Id*. at Ex. B; Ex. 2.

The Benefit Plan Description contains the following broad arbitration provision:

> In the event of a dispute under the policy, either we, the Insured Person, on in the event of Loss of Life, the Insured Person's beneficiary may make a written demand for arbitration. In that case, we and the Insured Person… will each select an arbitrator. The two arbitrators will select a third. If they cannot agree within fifteen (15) days, either we or the Insured Person … may request the choice of arbitrator be submitted to the American Arbitration Association. The arbitration will be held in the state of the Insured Person's principal residence.

Ex. 2 at 11 (found within Section VII, covering "Common Policy Conditions"); *see* amended cmplt. Ex. B.

The transaction here involves interstate commerce, thus making it subject to the FAA: Peguero resides in Massachusetts; defendants American Express Company ("American Express"), Federal and The Sklover Group, Inc. ("Sklover"), are headquartered in New York, New York, Warren, New Jersey and Westbury, New York, respectively. *See* 9 U.S.C.A. § 2; Amended Cmplt. ¶¶ 1-4; Notice of Removal ¶¶ 4-7 (attached hereto as Exhibit 3).

Peguero claims that on December 25, 2002, while the Plan was in effect, she was involved in a motor vehicle accident. Amended Cmplt. ¶ 13. The accident allegedly resulted in Peguero suffering a "permanent total disability" as defined under the Plan's coverage terms as set forth in the Benefit Plan Description, and led to Peguero submitting a claim to Federal. *Id*. at ¶ 14. Believing that Peguero's injury, though serious, did not satisfy the Plan's definition of "permanent total disability," Federal paid Peguero $500.00, the benefit for which she was eligible under the Accidental Dismemberment portion of the Plan. *Id*. at ¶ 15, Ex. B.

On June 8, 2004, Peguero, through her attorney, sent American Express, Sklover and Federal a demand letter pursuant to M.G.L. ch. 93A §§ 2 and 9. Amended Cmplt. ¶ 17; *id*. at Ex. A. On August 4, 2004, Federal responded in writing to the demand letter, explaining that, among other things, it "totally fulfilled" its responsibility to Peguero, and offered "to accommodate [Peguero] by engaging in an expeditious resolution of the dispute pursuant to the mandatory arbitration provision in the Benefit Plan Description and to consider any alternative dispute resolution approach you suggest prior to the hearing before the Arbitrator(s)." *Id*. at ¶ 21, Ex. B.

Despite Federal's August 4, 2004 offer to arbitrate her dispute, Peguero filed this lawsuit. In her First Amended Complaint, Peguero asserts five causes of action: (1) fraud and deceit (concerning, generally, the validity of the Plan's coverage terms and the way in which those coverage terms were expressed and represented in written materials), amended cmplt. ¶¶ 24-29; (2) violation of M.G.L. ch. 175 § 110E (same), *id*. at ¶¶ 30-32; (3) violation of M.G.L. ch. 93A §§ 2 and 9 (same), *id*. at ¶¶ 33-37; (4) breach of contract with respect to Federal's denial — which was proper — of Peguero's claim for the $1.5 million insurance benefit for "permanent and total disability" under the terms of the Plan, *id*. at ¶¶ 38-41; and (5) promissory estoppel (again, concerning, generally, the validity of the Plan's coverage terms and the way in which those coverage terms were expressed and represented in written materials), *id*. at ¶¶ 42-47.

## ARGUMENT

### I. THE FAA ENTITLES DEFENDANTS TO DISMISSAL OF THIS PROCEEDING AND AN ORDER COMPELLING PEGUERO TO ARBITRATE ALL OF HER CLAIMS

#### A. Under the FAA and the Parties' Contract, All of Peguero's Claims Are Subject to Arbitration

Section 2 of the FAA provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (2005). The FAA, 9 U.S.C.A. §§ 1-16 (2005), "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement falling within the coverage of the Act." *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp*., 460 U.S. 1, 24 (1983). Under Section 2 of the FAA, an arbitration provision falls within the scope of the FAA if it is contained in "a contract evidencing a transaction involving commerce." 9 U.S.C.A. § 2 (2005). The term "commerce" is defined by Section 1 of the FAA as encompassing "commerce among the several States," *id*. at § 1, and the term "involving commerce," as used in Section 2 of the FAA, has been held to be co-extensive with the full extent of Congress's commerce power. *Allied-Bruce Terminix Cos*. v. *Dobson*, 513 U.S. 265, 273-77 (1995). Therefore, "[c]ommerce" in this context is to be broadly construed. *Societe Generale de Surveillance, S.A.* v. *Raytheon European Mgmt. & Sys. Co.,* 643 F.2d 863, 867 (1st Cir. 1981).

The Plan plainly is "a contract evidencing a transaction involving [interstate] commerce" and is therefore within the purview of the FAA because it is a contract between citizens of different states. *See generally Prima Paint Corp*. v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 & 401 n.7 (1967); *Allied-Bruce Terminix*, 513 U.S. at 273-77. The fact that insurance coverage under the Plan was issued to a Massachusetts resident by an out-of-

state insurance company is by itself sufficient to render the Plan within the purview of the FAA. *See Williams* v. *HealthAlliance Hosps., Inc*., 158 F. Supp. 2d 156, 159 (D. Mass. 2001).

The FAA evidences a strong federal policy favoring arbitration. *Williams*, 158 F. Supp. 2d at 159 (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). And given this strong policy, any doubt over whether a particular dispute is covered by an arbitration agreement should be resolved in favor of arbitration. *Id.*; *see also*, *AT & T Techs., Inc*. v. *Communications Workers*, 475 U.S. 643, 650 (1986). When a valid arbitration clause exists, the party opposing arbitration must show "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id*; *Danieli & C. Officine Meccaniche S.p.A.* v. *Morgan Constr. Co.*, 190 F. Supp. 2d 148, 154 (D. Mass. 2002). Moreover, any "[d]oubts should be resolved in favor of coverage…. Such a presumption [of arbitrability] is particularly applicable where the clause is broad." *AT & T Techs., Inc.*, 475 U.S. at 649. *See Raytheon Co.* v. *Donovan*, 208 F. Supp. 2d 99, 104 (D. Mass. 2002).

The broad language of the Benefit Plan Description's arbitration provision requires that this proceeding be dismissed. Clearly, Peguero is asserting claims evidencing "a dispute under the policy," including but not limited to, breach of contract claims (Fourth Cause of Action) and other claims concerning, generally, the validity of the Plan's coverage terms and the way in which those coverage terms were expressed and represented in written materials (all other causes of action). Amended Cmplt. ¶¶ 24-47. *See Raytheon Co.*, 208 F. Supp. 2d at 106 (compelling arbitration of claims "arising under" an agreement).

All of Peguero's claims alleged in the First Amended Complaint are arbitrable no matter how they are characterized. Peguero asserts claims under various legal headings, but she seeks as a remedy enforcement of what she claims are the Plan's terms, *i.e.*, her expectation that she is entitled to the Plan's $1.5 million insurance benefit. *See Acevedo Maldonado* v. *PPG Indus.*, 514 F.2d 614, 616 (1st Cir. 1975) (rejecting the labeling of controversies arising out a contract so as to exclude them from arbitration); *Myrick* v. *GTE Main Street Inc.*, 73 F. Supp. 2d 94, 95-96 (D. Mass. 1999) (finding all disputes arising out of a contractual relationship to be arbitrable). Peguero's breach of contract claim relies on precisely the same contract of insurance that contains the arbitration provision at issue here. Peguero's statutory claims are likewise arbitrable. *See*, *e.g.*, *Wolff* v. *Fidelity Brokerage Servs.*, LLC, No. 012690BLS, 2002 WL 31382606, at *2-3 (Mass. Super. Ct. Sept. 5, 2005) (finding that M.G.L. ch. 93A claims are arbitrable in those circumstances covered by the FAA).

**B. Because All of Peguero's Claims Are Arbitrable, Federal is Entitled to an Order Dismissing This Proceeding and Compelling Peguero to Proceed to Arbitration Under Section 4 of the FAA**

Section 4 of the FAA instructs that any "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction… for an order directing that such arbitration proceed in the manner provided for in such agreement. 9 U.S.C.A. § 4 (2005). Accordingly, under the FAA, it is well established that this Court may dismiss a complaint without prejudice pending arbitration where, as here, all claims are subject to arbitration. *Bercovitch* v. *Baldwin Sch., Inc.*, 133 F.3d 141, 156 n.21 (1st Cir. 1998) ("a court may dismiss, rather than stay, a case when all

of the issues before the court are arbitrable"); *Mattox* v. *Decision One Mortgage Co.*, LLC, No. Civ. A. 01-10657-GAO, 2002 WL 31121087, at *3-4 (D. Mass. Sept. 26, 2002) (compelling arbitration and dismissing the complaint); *see also Moses H. Cone Hosp.*, 460 U.S. 1 at 29; *Scott* v. *Farm Family Life Ins. Co*., 827 F. Supp. 76 (D. Mass 1993).

Given that the underlying dispute and all claims in Peguero's First Amended Complaint are arbitrable, no purpose would be served by merely staying this action. Rather, the proceeding should be dismissed. *See Sea-Land Serv., Inc.* v. *Sea-Land of Puerto Rico, Inc.*, 636 F. Supp. 750, 757 (D.P.R. 1986) (dismissing action without prejudice where the court determined that all issues were arbitrable and retaining jurisdiction and staying the action served no purpose); *see also Pegasystems, Inc*. v. *Ernst & Young LLP*, No. CA002667F, 2001 WL 717101, at *3 (Mass. Super. Ct. Apr. 5, 2001) (finding that where all claims contained in plaintiff's complaint are subject to arbitration and there are no live controversies before the Court, the appropriate procedure is dismissal of the action without prejudice.)

In the event that this Court does not dismiss this action in favor of arbitration, this Court should stay the case. An order staying the proceeding in favor of arbitration is warranted by Section 3 of the FAA, which states as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such as agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C.A. § 3 (2005).

**CONCLUSION**

For the foregoing reasons, Federal is entitled to, and respectfully requests, the entry of an order (1) dismissing this action without prejudice, or, in the alternative, staying the proceeding in favor of arbitration, and (2) compelling Peguero to proceed with the arbitration of her claims.

Dated: Boston, Massachusetts
May 31, 2005

RIEMER & BRAUNSTEIN LLP

By: *<u>/s/ Mark W. Corner</u>*______________________
Mark W. Corner (BBO#550156)

Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

H. Christopher Boehning
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Defendant Federal Insurance Company*
894536.1

**EXHIBIT 1**

Commonwealth of Massachusetts
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket



# SUCV2005-01190
## Peguero v American Express Company Inc et al

| | | | |
|---|---|---|---|
| **File Date** | 03/28/2005 | **Status** | Needs review for service (acneserv) |
| **Status Date** | 03/28/2005 | **Session** | D - Civil D, 3 Pemberton Square, Boston |
| **Origin** | 1 | **Case Type** | A02 - Goods sold/delivered under contract |
| **Lead Case** | | **Track** | F |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 06/26/2005 | **Answer** | 08/25/2005 | **Rule12/19/20** | 08/26/2005 |
| **Rule 15** | 08/25/2005 | **Discovery** | 01/22/2006 | **Rule 56** | 02/21/2006 |
| **Final PTC** | 03/23/2006 | **Disposition** | 05/22/2006 | **Jury Trial** | Yes |

**PARTIES**

**Plaintiff**
Altagracia J Peguero
Active 03/28/2005

**Private Counsel 551298**
Kevin Donius
Corcoran, Fitzgerald & Hennessy,
500 Granite Street
Milton, MA 02186
Phone: 617-696-5700
Fax: 617-696-6704
Active 03/28/2005 Notify

**Defendant**
American Express Company Inc
Served: 04/26/2005
Served (answr pending) 05/06/2005

**efendant**
klover Group Inc
erved: 04/21/2005
erved (answr pending) 05/06/2005

**efendant**
ederal Insurance Company
rved: 04/15/2005
rved (answr pending) 05/09/2005

**ENTRIES**

| | Paper | Text |
|---|---|---|
| 3/2005 | 1.0 | Complaint & jury demand on complaint (all issues) |
| 3/2005 | | Origin 1, Type A02, Track F. |
| 3/2005 | 2.0 | Civil action cover sheet filed |

01 246867 y y y y y y

Commonwealth of Massachusetts
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket



## SUCV2005-01190
## Peguero v American Express Company Inc et al

| Date | Paper | Text |
|---|---|---|
| 4/19/2005 | 3.0 | Amended complaint of Altagracia J Peguero (jury reqstd) |
| 5/06/2005 | 4.0 | SERVICE RETURNED: Sklover Group Inc(Defendant) (via U.S. Mail) |
| 5/06/2005 | 5.0 | SERVICE RETURNED: American Express Company Inc(Defendant) (In hand to G. Brown) |
| 5/09/2005 | 6.0 | Affidavit & Return Receipt Returned re: (Proof of Service) re: Federal Insurance Company(Defendant) (Certified Mail 4/19/05) |

EVENTS

COMMONWEALTH OF MASSACHUSETTS
MASSACHUSETTS TRIAL COURT

SUFFOLK, ss.

SUFFOLK SUPERIOR COURT
CIVIL ACTION NO. 05-1190

ALTAGRACIA J. PEGUERO,
Plaintiff,

v.

AMERICAN EXPRESS COMPANY, THE SKLOVER GROUP, INC. and FEDERAL INSURANCE COMPANY,
Defendants.

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

2005 APR 19 A 11:57

## I. PARTIES

1. The Plaintiff, Altagracia J. Peguero, is an individual who at all times material hereto has resided at 1 Shandon Road, Apartment 215, Dorchester, Massachusetts.

2. The Defendant, American Express Company ("American Express"), is a corporation duly organized and existing under the laws of the State of New York, which has at all times material hereto maintained its principal place of business at 200 Vesey Street, New York, New York. At all times material hereto, American Express has conducted business in the Commonwealth of Massachusetts.

3. The Defendant, The Sklover Group, Inc. ("Sklover"), is a corporation duly organized and existing under the laws of the State of New York, which has at all times material hereto maintained its principal place of business at 400 Post Avenue, Suite 103, Westbury, New York. At all times material hereto, The Sklover Group has conducted business in the Commonwealth of Massachusetts.

4. The Defendant, Federal Insurance Company ("Federal Insurance"), is a corporation duly organized and existing, upon information and belief, under the laws of the State of New Jersey, which has at all times material hereto maintained its principal place of business at 15 Mountain View Road, Warren, New Jersey. At all times material hereto, Federal Insurance Company has conducted business in the Commonwealth of Massachusetts.

GENERAL FACTUAL ALLEGATIONS

5. American Express, Sklover and Federal Insurance (collectively, "the Defendants") devised a scheme pursuant to which American Express and Sklover would market a so-called Accident Disability Policy (the "Policy"), underwritten by Federal Insurance, to

American Express customers. Upon information and belief, Sklover as an insurance broker arranged this joint undertaking.

6. The Policy, arranged by Sklover, marketed by the Defendants, and underwritten by Federal Insurance, provides coverage, as interpreted by the Defendants, so minimal as to be illusory and unconscionable.

7. As part of the scheme devised by the Defendants, the Policy was to be advertised and marketed in a manner intended to deceive customers regarding the coverage provided.

8. In or around August 2002, the Plaintiff received solicitations and promotional materials by mail from American Express regarding the Policy.

9. The solicitations and promotional materials the Plaintiff received contained misrepresentations and were misleading, unfair, and deceptive in that they falsely led the Plaintiff to believe she would be entitled to a payment of $1.5 Million dollars if she were to become disabled.

10. The solicitations and promotional materials were false, misleading, unfair and deceptive, in violation

of M.G.L. c.93A and M.G.L. c.175, §110E, because, among other things they:

a) utilized a misleading policy name;

b) emphasized in oversized, bold letters "Financial Security" and stated "You're covered with up to $1.5 Million if an accident leaves you permanently disabled";

c) stated, without qualification or further definition, that "This plan will pay you a $1.5 Million lump sum benefit in the event a catastrophic accident leaves you totally and permanently disabled, and unable to work";

d) minimized and obscured exceptions, reductions, and the limitations of the policy by listing them in small print on the back of the solicitation;

e) failed to provide a conspicuous, unambiguous definition of disability; and

f) promoted for sale an unconscionable insurance policy with illusory coverage of no real economic value.

11. In reliance upon the false, misleading, unfair and deceptive representations contained in the solicitations and promotional materials, the Plaintiff purchased the Policy and paid the premiums therefor.

12. The Plaintiff was never provided a plan summary or the Accident Disability Policy by the Defendants.

13. On December 25, 2002, the Plaintiff became permanently and totally disabled when her right dominant arm was amputated in a motor vehicle rollover accident.

14. Following her accident, the Plaintiff applied to Federal Insurance for the total disability benefits payable under the Policy.

15. In response to her application, Federal Insurance informed the Plaintiff that she was entitled to $500.00 under the Policy and that under the Policy she would not be deemed "permanently and totally disabled" unless she had lost the use of one hand and one foot, both hands, sight in both eyes, hearing in both ears, or the ability to speak.

16. Had the Plaintiff been aware of this definition of total and permanent disability, she would not have purchased the Policy.

17. On June 8, 2004, the Plaintiff's attorney served the Defendants by certified mail with a Demand for Relief Pursuant to Massachusetts General Laws Chapter 93A, §§2 and 9, (the "First Demand Letter"). A copy of the First Demand Letter dated June 8, 2004 is attached as Exhibit A.

18. American Express made no written offer of settlement in response to the First Demand Letter.

19. Sklover made no written offer of settlement in response to the First Demand Letter.

20. Plaintiff's attorney granted Federal Insurance an extension to respond to the First Demand Letter until August 4, 2004.

21. On August 4, 2004, Federal Insurance responded to the First Demand Letter, which response contained no offer of settlement. A copy of Federal Insurance's August 4, 2004 response letter is attached as Exhibit B.

22. On November 10, 2004, the Plaintiff's attorney served American Express by certified mail with a Second Demand for Relief Pursuant to Massachusetts General Laws Chapter 93A §§2 and 9 (the "Second Demand Letter") by certified mail. A copy of the Second Demand Letter is attached as Exhibit C.

23. American Express made no written offer of settlement in response to the Second Demand Letter.

## CAUSES OF ACTION

FIRST CAUSE OF ACTION
(Against American Express, Federal Insurance and Sklover for Fraud/Deceit)

24. The Plaintiff re-alleges and incorporates herein by reference the factual allegations contained in Paragraphs one through twenty-three above.

25. The Defendants knowingly misrepresented the provisions of the Policy to the Plaintiff by, among other things, sending her solicitations and promotional materials that:

a) utilized a misleading policy name;

b) emphasized in oversized, bold letters "Financial Security" and stated "You're covered with up to $1.5 Million if an accident leaves you permanently disabled";

c) stated, without qualification or further definition, that "This plan will pay you a $1.5 Million lump sum benefit in the event a catastrophic accident leaves you totally and permanently disabled, and unable to work";

d) minimized and obscured exceptions, reductions, and the limitations of the policy by listing them in small print on the back of the solicitation;

e) failed to provide a conspicuous, unambiguous definition of disability; and

f) promoted for sale an unconscionable insurance policy with illusory coverage of no real economic value.

26. The Defendants knowingly misrepresented the provision of the Policy to the Plaintiff for the purpose of inducing her to purchase it.

27. In reasonable reliance upon the Defendants' misrepresentations of the Policy provisions, the Plaintiff purchased the Policy.

28. As a direct and proximate result of her reliance upon the Defendants' misrepresentations, the Plaintiff did not purchase other disability insurance which would have provided benefits to her when she became disabled by the loss of her arm.

29. As a direct and proximate result of her reliance upon the Defendants' misrepresentations, the Plaintiff paid premiums for illusory insurance coverage.

WHEREFORE, the Plaintiff, Altagracia J. Peguero, demands judgment against the Defendants, American Express Company, Federal Insurance Company, and The Sklover Group, Inc. in an amount to be determined by a jury at trial, plus, costs, interest, and all other relief the Court deems just and appropriate.

**SECOND CAUSE OF ACTION**

(Against American Express, Federal Insurance and Sklover For Violation of M.G.L. c.175, §110E)

30. The Plaintiff re-alleges and incorporates herein by reference the factual allegations contained in paragraph one through twenty-three above.

31. By knowingly misrepresenting the provisions of the Policy as set forth above, and by minimizing, obscuring, and rendering ambiguous the definitions of disability and the amounts payable under the Policy in its advertisements, the Defendants violated M.G.L. c.175, §110E, and the regulations promulgated thereunder.

32. As a consequence of the Defendants' breach of M.G.L. c.175, §110E, pursuant to that statute, the Plaintiff is entitled to $1.5 Million, the amount she reasonably anticipated she would have recovered had she not been deceived, plus reasonable costs and attorney fees.

WHEREFORE, the Plaintiff, Altagracia J. Peguero, demands judgment against the Defendants, American Express Company, Federal Insurance Company, and The Sklover Group, Inc. in an amount to be determined by a jury at trial, plus costs, interest, attorney fees and all other relief the Court deems just and appropriate.

**THIRD CAUSE OF ACTION**

(Against American Express, Federal Insurance and Sklover For Violation of M.G.L. c.93A, §§2 and 9)

33. The Plaintiff re-alleges and incorporates herein by reference the factual allegations contained in paragraph one through twenty-three above.

34. By knowingly misrepresenting the Policy provisions as set forth above and by minimizing, obscuring, and rendering ambiguous the definition of disability and the amounts payable under the Policy, the Defendants falsely, deceptively, and unfairly advertised the Policy in violation of M.G.L. c.93A, §§ 2 and 9, and the regulations promulgated thereunder.

35. As set forth above, in Paragraphs 17 through 23, the Defendants were served with proper and legally sufficient demands for relief under M.G.L. c.93A.

36. The Defendants failed to make timely, reasonable, written offers of settlement in response to the demands for relief.

37. By virtue of the Defendants' breach of M.G.L. c.93A, §§2 and 9, the Plaintiff is entitled compensatory damages, treble damages, attorney fees, costs, interest, and such other relief as the Court deems just and appropriate.

WHEREFORE, the Plaintiff, Altagracia J. Peguero, demands judgment against the Defendants, American Express

Company, Federal Insurance Company, and The Sklover Group, Inc. in an amount to be determined by a jury at trial, plus costs, interest, treble damages, attorney fees and all other relief the Court deems just and appropriate.

**FOURTH CAUSE OF ACTION**

(Against American Express, Federal Insurance and Sklover For Breach of Contract)

38. The Plaintiff re-alleges and incorporates herein by reference the factual allegations contained in paragraphs one through twenty-three above.

39. Pursuant to the contract for insurance entered into between American Express, Federal Insurance, Sklover, and the Plaintiff, the Plaintiff was entitled to a payment of a $1.5 Million lump sum if she became permanently and totally disabled.

40. The Plaintiff became disabled on or about December 25, 2002.

41. The Defendants breached the contract between them and the Plaintiff by refusing to pay her the $1.5 Million lump sum benefit after she became disabled.

WHEREFORE, the Plaintiff, Altagracia J. Peguero, demands judgment against the Defendants, American Express Company, Federal Insurance Company, and The Sklover Group, Inc. in an amount to be determined by a jury at trial,

plus, costs, interest, attorney fees, and all other relief the Court deems just and appropriate.

**FIFTH CAUSE OF ACTION**

(Against American Express, Federal Insurance and Sklover For Promissory Estoppel)

42. The Plaintiff re-alleges and incorporates herein by reference the factual allegations contained in paragraphs one through twenty-three above.

43. The Defendants knowingly misrepresented the Policy provisions as set forth above.

44. In reasonable reliance upon the Defendants' representations, the Plaintiff purchased the Policy and was led to believe she would be entitled to $1.5 Million under the Policy if she became disabled.

45. In reasonable reliance upon her belief that she had purchased insurance which would cover her if she were to become disabled, the Plaintiff did not purchase other disability insurance.

46. The Plaintiff became disabled on or about December 25, 2002.

47. Having induced the Plaintiff to purchase the Policy with their misrepresentations, the Defendants are estopped from denying that the Plaintiff was entitled

to $1.5 Million under the Policy when she became disabled.

WHEREFORE, the Plaintiff, Altagracia J. Peguero, demands judgment against the Defendants, American Express Company, Federal Insurance Company, and The Sklover Group, Inc. in an amount to be determined by a jury at trial, plus, costs, interest, attorney fees, and all other relief the Court deems just and appropriate.

**THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
THE PLAINTIFF,
By his Attorney,

Kevin Donius, Esquire
Corcoran, FitzGerald
& Hennessy
500 Granite Avenue
Milton, MA 02186
TEL (617) 696-5700
FAX (617) 696-6704
BBO#: 551298

Date: April 15, 2005

A

CORCORAN, FITZGERALD & HENNESSY, LLC
COUNSELORS AT LAW
500 GRANITE AVENUE
MILTON, MASSACHUSETTS 02186
(617) 696-5700
FAX: (617) 696-6704

TIMOTHY M. CORCORAN, P.C.
DAVID M. FITZGERALD
GARY CASHAVELLY
ROBERT M. HYNES
KEVIN DONIUS

BRIAN J. LENFEST
SETH J. ROBBINS
MARINA M. TRAMONTOZZI
PAUL F. DEGNAN

OF COUNSEL
DAVID C. CAMPBELL
PAUL A. KELLEY

June 8, 2004

**VIA CERTIFIED MAIL R/R/R**
**NO. 7003 1680 0006 6025 8462**

Kenneth I. Chenault, President
American Express Company
200 Vesey Street
New York, NY 10285

**VIA CERTIFIED MAIL R/R/R**
**NO. 7003 1680 0006 6025 8561**

Andrew Sklover, President
The Sklover Group, Inc.
400 Post Avenue, Suite 103
Westbury, NY 11590-2226

**VIA CERTIFIED MAIL R/R/R**
**NO. 7003 1680 0006 6025 8578**

John D. Finnegan, Chairman
Chubb Group of Insurance Companies
15 Mountain View Road
Warren, NJ 07059

**RE: Demand for Relief Pursuant to Massachusetts General Laws Chapter 93A §§ 2 and 9**

Dear Sirs:

Please be advised that this law firm represents Altagracia Pequero of 1 Shandon Road, Apartment 215, Dorchester, Massachusetts in connection with her claims against American Express Company ("American Express"), The Sklover Group, Inc. ("Sklover"), and Federal Insurance Co. ("Federal Insurance") (collectively, "the Defendants"), for damages for violation of Massachusetts General Laws Chapter 93A (the "Consumer Protection Act") arising out of the false, misleading, unfair and deceptive marketing and sales of the so-called "Accidental Disability Plan" arranged by Sklover, marketed by American Express, and underwritten by Federal Insurance. Please be advised that this letter constitutes a formal demand under the Consumer Protection Act on behalf of Ms. Pequero and a class of similarly situated and injured consumers for compensation for damages sustained as a

direct and proximate result of the Defendants' unfair and deceptive practices. Under Massachusetts law, the failure to respond to this demand for relief with a reasonable, written offer of settlement within 30 days may entitle Ms. Pequero to, among other forms of relief, treble damages. Please govern yourself accordingly.

I. Background

Ms. Pequero is 42 years old (D.O.B. 6/20/61) and the single mother of two teenagers. Born and raised in the Dominican Republic, Ms. Pequero was there trained and licensed in dentistry. In order to provide a better future for herself and her children and to seek greater financial security, Ms. Pequero and her children came to America. Despite her training and experience as a dentist in the Dominican Republic, Ms. Pequero was not licensed and could not practice as a dentist in the United States. She worked for several years cleaning office buildings before securing a position as a dental assistant. In 2002, by working six days a week and 228 hours of overtime, Ms. Pequero earned $35,275.54.

As a single mother, Ms. Pequero was concerned about the financial security of her family if she became disabled. She wanted to purchase disability insurance that would provide financial support for her family if she became unable to work. Accordingly, in response to a solicitation from American Express and in reliance upon representations regarding financial security and the promise of the payment of $1.5 million in the event she became permanently disabled, Ms. Pequero purchased the Defendants' Accidental Disability Policy. In reliance upon her belief that the disability policy she purchased would provide her and her family with financial security, Ms. Pequero did not purchase additional disability insurance.

On December 25, 2002, Ms. Pequero became permanently and totally disabled when her right arm was amputated in a motor vehicle rollover accident. Ms. Pequero, who was right hand dominant and whose primary language is Spanish, lost not only her arm and her career, but her ability to provide any economic support for her family. Due to the loss of her arm, Ms. Pequero can never return to work as a dentist or dental assistant. Given her limited ability to speak English, the only other types of jobs Ms. Pequero could reasonably be expected to obtain involve manual labor, such as office cleaning, from which the loss of her arm precludes her. In recognition of her inability to perform any substantial form of gainful employment, Ms. Pequero has been awarded Social Security Disability Benefits. A Vocational Assessment report of Ms. Pequero is attached as Exhibit A.

Devastated by the loss of her arm and the loss of her ability to work, Ms. Pequero was initially comforted by the fact that she had had the foresight to purchase disability insurance. Regrettably, to her disbelief, Ms. Pequero learned that Federal Insurance would agree to pay her only $500.00 for the loss of her arm and that it would not deem her permanently and totally disabled unless she had lost the use of one hand and one foot, both hands and both feet, sight in both eyes, hearing in both ears, or the ability to speak. This was the first time Ms. Pequero ever learned about the severe limitations on when claims would be paid and she knew that she had been duped. Had Ms. Pequero believed the insurance provided such limited, illusory coverage, she would not have purchased the insurance and she would have purchased other insurance which would in fact have provided some financial protection for her.

That Ms. Pequero was unaware of the extraordinarily limited circumstances in which she would be paid under the policy is not at all surprising. To the contrary, given the unfair and deceptive manner in which the policy was advertised, marketed and sold, as set forth below, it is clear that the Defendants intended to deceive Ms. Pequero and consumers like her regarding the protection afforded by the coverage. And, given the restricted definition of total disability, it is equally clear that any one informed of such definition would have no interest in purchasing the policy. Accordingly, it is evident that deception was the cornerstone of the Defendants' marketing strategy.

II. Violations of The Consumer Protection Act

Under the Consumer Protection Act a material misrepresentation or omission which is likely to mislead constitutes actionable deception. Moreover, pursuant to M.G.L. c.175, §110E, which sets forth the standards for disclosure of contents and for advertising of accident and sickness insurance . . .

(1) Words, phrases or illustrations shall not be used in a manner which misleads or has the capacity and tendency to deceive as to the extent of any policy benefit payable, loss covered or premium payable. An advertisement relating to any policy benefit payable, loss covered or premium payable shall be sufficiently complete and clear as to avoid deception or the capacity and tendency to deceive.

(2) When an advertisement refers to any dollar amount, period of time for which any benefit is payable, cost of policy, or specific policy benefit or the loss for which such benefit is payable, it shall also disclose those exceptions, reductions and limitations affecting the basic provisions of the policy without which the advertisement would have the capacity and tendency to mislead or deceive.

(3) All information required to be disclosed shall be set out conspicuously and in close conjunction with the statements to which such information relates or under appropriate captions of such prominence that it shall not be minimized, rendered obscure or presented in an ambiguous fashion or intermingled with the context of the advertisements so as to be confusing or misleading. . . .

M.G.L. c.175, §110E further provides that in actions for violations of the applicable standards "[t]he measure of damages . . . shall be the amount the person damaged could reasonably have anticipated he would have recovered had the advertising or the policy provisions not been contrary to the regulations, plus reasonable costs and attorney's fees."

The Defendants have violated the Consumer Protection Act and M.G.L. c. 175, §110E by minimizing, obscuring, and rendering ambiguous the definition of disability, by falsely, deceptively, and unfairly advertising and marketing its policy and by intentionally and/or negligently misleading Ms. Pequero and other consumers to believe that the policy provided them with financial security in the amount of $1.5 million if they became disabled.

More specifically, by, among other things,

1) the use of a misleading policy name;

2) emphasizing in oversized, bold letters "Financial Security" and stating "You're covered with up to $1.5 MILLION if an accident leaves you permanently disabled" and disclosing the limitations on the back of the solicitation in small print;

3) failing to provide a conspicuous, unambiguous definition of disability;

4) failing to provide a Plan Summary and Policy to Ms. Pequero and, upon information and belief, other Massachusetts consumers;

5) stating in promotional materials, without qualification or further definition, that "This plan will pay you a $1.5 million lump sum benefit in the event that a catastrophic accident leaves you totally and permanently disabled, and unable to work";

6) use of other false and misleading statements in promotional materials; and

7) selling an insurance policy with illusory coverage,

the Defendants unfairly and deceptively induced Ms. Pequero and other consumers to purchase the policy and to continue to pay for it each month. Further, any benefit to Ms. Pequero and other consumers under the policy is so minimal as to render it unconscionable.

III. Demand For Relief

By virtue of the false, misleading, unfair and deceptive promotion of the Accidental Disability Policy, Ms. Pequero and the class of similarly situated consumers who have also purchased the policy, have been severely harmed. Such harm includes the loss of the amounts paid for premiums, the loss of benefits reasonably expected to be paid, and the loss of the opportunity to purchase disability insurance which would in fact provide coverage in the event of disability. Accordingly, on behalf of Ms. Pequero and the class of similarly situated and injured consumers, demand is herby made that:

(1) the Defendants make payment to Ms. Pequero in the amount of $1.5 million to fulfill her reasonable expectations of the coverage provided by the policy in question;

(2) the Defendants pay interest to Ms. Pequero at the legal rate of twelve (12%) percent per annum on the sum of $1.5 million, said interest commencing on December 25, 2003;

(3) the Defendants pay a sum to reasonably and fairly reimburse Massachusetts consumers for premiums collected under false pretenses and paid for illusory coverage; and

(4) The Defendants pay all reasonable costs and attorney's fees incurred as a result of its unfair and deceptive practices.

If no written response accompanied by a reasonable offer of settlement is received by me within thirty (30) days, Ms. Pequero and the claim of similarly situated individual consumers shall seek treble damages and all other relief as provided by applicable law.

Very truly yours,

Kevin Donius

KD/kc

**TODD & WELD LLP**
ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

J. OWEN TODD
Email: jotodd@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

August 4, 2004

**VIA TELECOPY AND**
**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Kevin Donius, Esq.
Corcoran, Fitzgerald & Hennessy, LLC
500 Granite Avenue
Milton, MA 02186

Re: Claim of Altagracia Pequero

Dear Mr. Donius:

This letter is the statutory response by Federal Insurance Company ("Federal") to your Chapter 93A §§ 2 and 9 demand letter on behalf of your client, Ms. Pequero.

Let me begin by thanking you for your courtesy in agreeing to extend the time within which our response is due until today.

As you indicate in your demand letter, Federal is the underwriting insurer of the Voluntary Accident Insurance Policy No. 6475-22-11 (the "Policy"), marketed by American Express in conjunction with HealthExtras and The Sklover Group. As the underwriter, Federal's responsibility is to insure that members of the program are paid the benefits to which they are entitled under the terms of the Policy. Federal believes that it has totally fulfilled its responsibility in the case of your client, Altagracia Pequero.

The allegations set out in your demand letter, particularly those concerning alleged violations of Chapter 93A, are so general that it is difficult for us to respond. We read your letter generally, however, to complain that Federal "fail[ed] to provide a Plan Summary and Policy to Ms. Pequero," and that to the extent Federal did provide written material, that material was misleading. To the extent your demand is premised on a belief that Ms. Pequero did not receive a Benefit Plan Description, we believe that allegation to be incorrect. Ms. Pequero was sent a Benefit Plan Description — which fully disclosed the precise benefits and terms of coverage under the Policy — by mail. The written materials which Ms. Pequero was sent set out clearly and in simple terms the

circumstances under which an insured is eligible to receive the $1.5 million benefit.[1] Ms. Pequero had the opportunity to carefully review the Policy's coverage terms, and if she was in any way unsatisfied with those terms, she could have notified Federal to cancel coverage. Ms. Pequero never notified Federal that the coverage she purchased was inadequate, however. Instead, she continued to pay the Policy premiums on a monthly basis.

To the extent your demand is premised on the language and disclosures found in other written materials received by Ms. Pequero, we are unable to respond without reviewing the written materials you describe as misleading. Suffice it to say, however, Federal believes the benefits are clearly and adequately described so that a member could make an informed decision whether to continue with or leave the Program.

Given the above, Federal must respectfully disagree with your assertion that Federal violated, in any manner, the provisions of the Massachusetts Consumer Protection Act and therefore denies your demand for relief on behalf of your client. Your client's injury did not, by the terms of the Benefit Plan Description, qualify for the $1.5 million benefit. Ms. Pequero has received the benefit for which she was eligible under the Accidental Dismemberment portion of the Policy.

---

1 The Benefit Plan Description clearly and plainly defines "Permanent Total Disability" as follows:

Permanent Total Disability means Accidental Bodily Injuries that solely and directly cause the Primary Insured Person's:

Loss of:

Use of One Hand and One Foot; or
Use of Both Hands or Both Feet; or
Sight of Both Eyes; or
Hearing of Both Ears; or
Speech,

which solely and directly:

1) prevent the Primary Insured Person from engaging in any gainful occupation for which the Primary Insured Person is qualified, by reason of education, training, experience, or skill; and

2) cause a condition which is medically determined by a Physician, approved by [Federal], to be of continuous and infinite duration; and

3) require the continuous care of a Physician, unless the Primary Insured Person has reached his/her maximum point of recovery.

(Emphasis omitted)

Federal is prepared to accommodate your client by engaging in an expeditious resolution of the dispute pursuant to the mandatory arbitration provision in the Benefit Plan Description and to consider any alternative dispute resolution approach you suggest prior to the hearing before the Arbitrator(s).

Cordially,

J. Owen Todd
Counsel to Federal Insurance Company

JOT:lmb
Cc: Linda F. Walker, Esq.
H. Christopher Boehning, Esq.
Timothy S. Martin, Esq.

CORCORAN FITZGERALD & HENNESSY, LLC
COUNSELORS AT LAW
500 GRANITE AVENUE
MILTON, MASSACHUSETTS 02186
(617) 696-5700
FAX: (617) 696-6704

TIMOTHY M. CORCORAN, P.C.
DAVID M. FITZGERALD
ROBERT M. HYNES
KEVIN DONIUS

BRIAN J. LENFEST
SETH J. ROBBINS
MARINA M. TRAMONTOZZI
PAUL F. DEGNAN

OF COUNSEL
DAVID C. CAMPBELL
PAUL A. KELLEY

November 10, 2004

VIA CERTIFIED MAIL R/R/R
NO. 7004 0750 0002 6877 8102

Kenneth I. Chenault, President
American Express Company
200 Vesey Street
New York, NY 10285-5005

RE: **Demand for Relief Pursuant to Massachusetts General Laws Chapter 93A §§ 2 and 9**

Dear Mr. Chenault:

Please be advised that this law firm represents Altagracia Pequero of 1 Shandon Road, Apartment 215, Dorchester, Massachusetts in connection with her claims against American Express Company ("American Express"), The Sklover Group, Inc. ("Sklover"), and Federal Insurance Co. ("Federal Insurance") (collectively, "the Defendants"), for damages for violation of Massachusetts General Laws Chapter 93A (the "Consumer Protection Act") arising out of the false, misleading, unfair and deceptive marketing and sales of the so-called "Accidental Disability Plan" arranged by Sklover, marketed by American Express, and underwritten by Federal Insurance. This same letter was sent to you on June 8, 2004. No response was received.

Please be advised that this letter constitutes a second demand under the Consumer Protection Act on behalf of Ms. Pequero and a class of similarly situated and injured consumers for compensation for damages sustained as a direct and proximate result of the Defendants' unfair and deceptive practices. Under Massachusetts law, the failure to respond to this demand for relief with a reasonable, written offer of settlement within 30 days may entitle Ms. Pequero to, among other forms of relief, treble damages. Please govern yourself accordingly.

Case 1:05-cv-10995-WGY Document 8-2 Filed 05/31/2005 Page 30 of 48

## I. Background

Ms. Pequero is 42 years old (D.O.B. 6/20/61) and the single mother of two teenagers. Born and raised in the Dominican Republic, Ms. Pequero was there trained and licensed in dentistry. In order to provide a better future for herself and her children and to seek greater financial security, Ms. Pequero and her children came to America. Despite her training and experience as a dentist in the Dominican Republic, Ms. Pequero was not licensed and could not practice as a dentist in the United States. She worked for several years cleaning office buildings before securing a position as a dental assistant. In 2002, by working six days a week and 228 hours of overtime, Ms. Pequero earned $35,275.54.

As a single mother, Ms. Pequero was concerned about the financial security of her family if she became disabled. She wanted to purchase disability insurance that would provide financial support for her family if she became unable to work. Accordingly, in response to a solicitation from American Express and in reliance upon representations regarding financial security and the promise of the payment of $1.5 million in the event she became permanently disabled, Ms. Pequero purchased the Defendants' Accidental Disability Policy. In reliance upon her belief that the disability policy she purchased would provide her and her family with financial security, Ms. Pequero did not purchase additional disability insurance.

On December 25, 2002, Ms. Pequero became permanently and totally disabled when her right arm was amputated in a motor vehicle rollover accident. Ms. Pequero, who was right hand dominant and whose primary language is Spanish, lost not only her arm and her career, but her ability to provide any economic support for her family. Due to the loss of her arm, Ms. Pequero can never return to work as a dentist or dental assistant. Given her limited ability to speak English, the only other types of jobs Ms. Pequero could reasonably be expected to obtain involve manual labor, such as office cleaning, from which the loss of her arm precludes her. In recognition of her inability to perform any substantial form of gainful employment, Ms. Pequero has been awarded Social Security Disability Benefits. A Vocational Assessment report of Ms. Pequero is attached as Exhibit A.

Devastated by the loss of her arm and the loss of her ability to work, Ms. Pequero was initially comforted by the fact that she had had the foresight to purchase disability insurance. Regrettably, to her disbelief, Ms. Pequero learned that Federal Insurance would agree to pay her only $500.00 for the loss of her arm and that it would not deem her permanently and totally disabled unless she had lost the use of one hand and one foot, both hands and both feet, sight in both eyes, hearing in both

ears, or the ability to speak. This was the first time Ms. Pequero ever learned about the severe limitations on when claims would be paid and she knew that she had been duped. Had Ms. Pequero believed the insurance provided such limited, illusory coverage, she would not have purchased the insurance and she would have purchased other insurance which would in fact have provided some financial protection for her.

That Ms. Pequero was unaware of the extraordinarily limited circumstances in which she would be paid under the policy is not at all surprising. To the contrary, given the unfair and deceptive manner in which the policy was advertised, marketed and sold, as set forth below, it is clear that the Defendants intended to deceive Ms. Pequero and consumers like her regarding the protection afforded by the coverage. And, given the restricted definition of total disability, it is equally clear that any one informed of such definition would have no interest in purchasing the policy. Accordingly, it is evident that deception was the cornerstone of the Defendants' marketing strategy.

II. <u>Violations of The Consumer Protection Act</u>

Under the Consumer Protection Act a material misrepresentation or omission which is likely to mislead constitutes actionable deception. Moreover, pursuant to M.G.L. c.175, §110E, which sets forth the standards for disclosure of contents and for advertising of accident and sickness insurance . . .

(1) Words, phrases or illustrations shall not be used in a manner which misleads or has the capacity and tendency to deceive as to the extent of any policy benefit payable, loss covered or premium payable. An advertisement relating to any policy benefit payable, loss covered or premium payable shall be sufficiently complete and clear as to avoid deception or the capacity and tendency to deceive.

(2) When an advertisement refers to any dollar amount, period of time for which any benefit is payable, cost of policy, or specific policy benefit or the loss for which such benefit is payable, it shall also disclose those exceptions, reductions and limitations affecting the basic provisions of the policy without which the advertisement would have the capacity and tendency to mislead or deceive.

(3) All information required to be disclosed shall be set out conspicuously and in close conjunction with the statements to which such information relates or under appropriate captions of such prominence that it shall not

be minimized, rendered obscure or presented in an ambiguous fashion or intermingled with the context of the advertisements so as to be confusing or misleading. . . .

M.G.L. c.175, §110E further provides that in actions for violations of the applicable standards "[t]he measure of damages . . . shall be the amount the person damaged could reasonably have anticipated he would have recovered had the advertising or the policy provisions not been contrary to the regulations, plus reasonable costs and attorney's fees."

The Defendants have violated the Consumer Protection Act and M.G.L. c. 175, §110E by minimizing, obscuring, and rendering ambiguous the definition of disability, by falsely, deceptively, and unfairly advertising and marketing its policy and by intentionally and/or negligently misleading Ms. Pequero and other consumers to believe that the policy provided them with financial security in the amount of $1.5 million if they became disabled.

More specifically, by, among other things,

1) the use of a misleading policy name;

2) emphasizing in oversized, bold letters "Financial Security" and stating "You're covered with up to $1.5 MILLION if an accident leaves you permanently disabled" and disclosing the limitations on the back of the solicitation in small print;

3) failing to provide a conspicuous, unambiguous definition of disability;

4) failing to provide a Plan Summary and Policy to Ms. Pequero and, upon information and belief, other Massachusetts consumers;

5) stating in promotional materials, without qualification or further definition, that "This plan will pay you a $1.5 million lump sum benefit in the event that a catastrophic accident leaves you totally and permanently disabled, and unable to work";

6) use of other false and misleading statements in promotional materials; and

7) selling an insurance policy with illusory coverage,

the Defendants unfairly and deceptively induced Ms. Pequero and other consumers to purchase the policy and to continue to pay for it each month. Further, any benefit to Ms. Pequero and other consumers under the policy is so minimal as to render it

unconscionable.

III. Demand For Relief

By virtue of the false, misleading, unfair and deceptive promotion of the Accidental Disability Policy, Ms. Pequero and the class of similarly situated consumers who have also purchased the policy, have been severely harmed. Such harm includes the loss of the amounts paid for premiums, the loss of benefits reasonably expected to be paid, and the loss of the opportunity to purchase disability insurance which would in fact provide coverage in the event of disability. Accordingly, on behalf of Ms. Pequero and the class of similarly situated and injured consumers, demand is hereby made that:

(1) the Defendants make payment to Ms. Pequero in the amount of $1.5 million to fulfill her reasonable expectations of the coverage provided by the policy in question;

(2) the Defendants pay interest to Ms. Pequero at the legal rate of twelve (12%) percent per annum on the sum of $1.5 million, said interest commencing on December 25, 2003;

(3) the Defendants pay a sum to reasonably and fairly reimburse Massachusetts consumers for premiums collected under false pretenses and paid for illusory coverage; and

(4) The Defendants pay all reasonable costs and attorney's fees incurred as a result of its unfair and deceptive practices.

If no written response accompanied by a reasonable offer of settlement is received by me within thirty (30) days, Ms. Pequero and the claim of similarly situated individual consumers shall seek treble damages and all other relief as provided by applicable law. Unless this matter is resolved, a complaint will be filed on or about January 15, 2005.

Very truly yours,

Kevin Donius

KD/kc

**EXHIBIT 2**

**Accidental Disability Plan *from* American Express**
2273 Research Boulevard, 2nd Floor • Rockville, MD 20850
Customer Service 1-888-668-9035
Fax 1-800-963-4434

Cards PTD 1.5M/1AD&D-0102

# Accidental Disability Plan *from* American Express

Benefit Plan Description

NOTE: Read carefully and keep with your valuable documents.




Cards

Please read this and, if you enroll, please keep it in a safe place with your other insurance documents. This summary is not a contract of insurance but is simply an informative statement of the principal provisions of the insurance while in effect. Complete provisions pertaining to this plan of insurance are contained in the master policies on file with the policyholder. If this insurance plan does not conform to your state statutes, it will be amended to comply with such laws. If a statement in this booklet and any provision in the policy differ, the policy will govern.

**Plan arranged by**

*The Sklover Group, Inc.*

*400 Post Avenue, Suite 103*

*Westbury, NY 11590-2226*

**Accidental Disability and Accidental Loss of Life Insurance underwritten by**

Federal Insurance Company
A member insurer of the
**Chubb Group of Insurance Companies**
15 Mountain View Road, P.O. Box 1615
Warren, NJ 07061

**$2,500 Emergency Accident and Sickness Medical Expense Benefit underwritten by**

**Virginia Surety Company, Inc.**
Executive Offices
123 North Wacker Drive
Chicago, IL 60606

# Accidental Disability Plan *from* American Express
## Benefit Plan Description Overview

Under your plan, you are offered the following benefits:

- **$1.5 Million Accidental Disability Plan**
  (Permanent Total Disability Lump Sum Benefit)
- **Additional Benefits**
  - $1,000 Accidental Loss of Life (AD&D) Benefit
  - $2,500 Emergency Accident and Sickness Medical Expense Benefit
  - Medical Care Coordination Benefit

This overview was developed to help you understand your benefits (including the Certificate of Insurance Declarations, the Certificate of Insurance Contract and other sections that follow). Please read carefully.


| SECTION | PAGE |
| --- | --- |
| *Certificate of Insurance Declarations*<br>Defines Insured Person and lists benefit amounts for your Permanent Total Disability Lump Sum Benefit and your AD&D Benefit. | 1 |
| *Certificate of Insurance Contract*<br>Sections I – VII (pages 4-16) contain the major provisions of your Permanent Total Disability Lump Sum and AD&D Benefits. It describes the coverage, definitions, exclusions, limitations and payment should you suffer a loss under this plan. | 4 |
| *$2,500 Emergency Accident and Sickness Medical Expense Benefit*<br>Contains the major provisions of your $2,500 Emergency Accident and Sickness Medical Expense Benefit. It describes the coverage, definitions, exclusions, limitations and payment terms under this plan. | 17 |
| *Medical Care Coordination Benefit*<br>Includes a description of this service. | 22 |

# Certificate of Insurance
## Declarations

*Policyholder's Name and Mailing Address*
*Citizens Bank of Rhode Island, as Trustee for G.A.R.D. Trust*
*for the Account of HealthExtras/American Express*
*One Citizens Plaza*
*Providence, RI 02903-1339*

| | |
|---|---|
| *Policy Number* | *6475-26-11* |
| *Effective Date* | *August 1, 2000* |
| *Anniversary Date* | *August 1* |
| *Producer Number* | *63542* |
| *Producer* | *The Sklover Group, Inc.*<br>*400 Post Avenue, Suite 103*<br>*Westbury, NY 11590-2226* |

### Section I – Policy Period

From: August 1, 2000 To: until terminated
12:01 A.M. standard time at the **Policyholder's** address shown above.

### Section II – Insured Persons

The following are the **Insured Persons** under this policy:

| Class | Description |
|---|---|
| 1A | All eligible **Accountholders** of the **Policyholder** for whom the **Accountholder** elects Individual coverage and pays the required premium. |
| 1B | All eligible **Accountholders** of the **Policyholder** and their spouses for whom the **Accountholder** elects Individual plus Spouse coverage and pays the required premium. |

If a person has coverage for a specific **Loss** as both an **Insured Person** and a **Primary Insured Person**, only one **Benefit Amount** applicable to that **Loss** will be paid. If one **Benefit Amount** is larger, the larger **Benefit Amount** will be paid and premium for the lesser **Benefit Amount** will be refunded. If the **Benefit Amounts** are equal, one **Benefit Amount** will be paid and premium for the remaining **Benefit Amount** will be refunded.

### Section III – Hazard(s)

The following are the **Hazard(s)** for which coverage applies:

| *Hazard(s)* | *Form Number* |
|---|---|
| 24 Hour Business and Pleasure | 44-02-1062 (Ed. 6/96) |



### Section IV – Benefit Amounts

The following are **Losses** covered and subject to the Multiple Losses Maximum Payment provision.

A. *PERMANENT TOTAL DISABILITY LUMP SUM BENEFIT*

| **Benefit Amount** | **Elimination Period** |
|---|---|
| $1,500,000 | 365 days |

*PERMANENT BENEFIT AMOUNTS*

The following are **Permanent Total Disability Lump Sum Benefit Amounts**:

| **Permanent:** | **Percent of Loss of Use Benefit Amount** |
|---|---|
| Loss of Use of One Hand and One Foot | 100% |
| Loss of Use of Both Hands or Both Feet | 100% |
| Loss of Sight of Both Eyes | 100% |
| Loss of Hearing of Both Ears | 100% |
| Loss of Speech | 100% |

B. *ACCIDENTAL LOSS OF LIFE (AD&D) BENEFIT AMOUNT*

The **AD&D Benefit Amount** and **Class** are as follows:

| **Class** | **Benefit Amounts** |
|---|---|
| 1A | $1,000 |
| 1B | $1,000 |

*ACCIDENTAL BENEFIT AMOUNTS*

The following are **Accidental Loss Benefit Amounts**:

| **Accidental:** | **Percent of AD&D Benefit Amount** |
|---|---|
| Loss of Life | 100% |
| Loss of Speech and Loss of Hearing | 100% |
| Loss of Speech and Loss of One of: Hand, Foot or Sight of an Eye | 100% |
| Loss of Hearing and Loss of One of: Hand, Foot or Sight of an Eye | 100% |
| Loss of Both Hands, Loss of Both Feet, Loss of Sight of Both Eyes or a Combination of Any Two of a Loss of Hand, a Loss of Foot or Loss of Sight of an Eye | 100% |
| Loss of One Hand, Loss of One Foot or Loss of Sight of an Eye | 50% |
| Loss of Speech or Loss of Hearing | 50% |
| Loss of Thumb and Index Finger of the Same Hand | 25% |

### *DOMESTIC PARTNER*

Whenever the term "spouse" is used in the policy, the term includes **Domestic Partner**. The **Primary Insured Person** and the **Domestic Partner** agree to provide additional information and documentation as may be required to substantiate the relationship and eligibility for coverage under the policy.

**Domestic Partner** Coverage applies.

Coverage only applies for the **Class(es)**, **Hazard(s)**, **Benefit Amounts** and **Losses** that are specifically indicated as covered.

44-02-1087 (Ed. 6/96)



# *Certificate of Insurance*
## *Contract*

**READ YOUR CERTIFICATE CAREFULLY.**

This certificate contains the major provisions of the policy. It describes the coverage, definitions, exclusions, limitations and payment of loss. This certificate replaces all prior certificates issued to the **Insured Person** for the policy.

Words and phrases that appear in bold print have special meanings and are defined in the Definitions section(s) of this certificate. Defined terms include the plural.

Throughout this certificate the words "you" and "your" refer to the **Policyholder** shown in the Declarations of the policy. The words "we", "us" and "our" refer to the **Company** providing this insurance.

## *Section I – Coverage*

We will pay the applicable **Benefit Amount** if an **Accident** results in a **Loss** not otherwise excluded. The **Accident** must result from a covered **Hazard** and occur during the policy period. The **Loss** must occur within one (1) year of the **Accident**.

### *Effective Date of Individual Coverage*

Coverage for the **Insured Person** becomes effective on the latest of:
1) the effective date of the policy; or
2) the beginning of the period for which premium is paid for the **Insured Person**; or
3) the date on which a person meets the definition of **Insured Person**.

### *Termination of Individual Coverage*

Coverage for the **Insured Person** automatically terminates on the earliest of:
1) the termination date of the policy; or
2) the expiration of the period for which premium has been paid for the **Insured Person**; or
3) the date on which a person no longer meets the definition of **Insured Person**.

## *Section II – Extensions of Coverage*

Extensions of Coverage are subject to the provisions of Section I of the Contract, Coverage, and all other policy terms and conditions:

### *Permanent Total Disability Lump Sum*

If **Accidental Bodily Injury** causes the **Primary Insured Person** to have a **Permanent Total Disability** that is continuous during the period for which **Permanent Total Disability Benefit Amounts** are payable, after the **Elimination Period** we will pay the **Permanent Total Disability Lump Sum Benefit Amount** shown in the Declarations.

Whenever the term "**Primary Insured Person**" is used in the **Permanent Total Disability Lump Sum Endorsement**, the term includes **Covered Person**.

*Disappearance*

If the **Insured Person** has not been found within one (1) year of the disappearance, stranding, sinking, wrecking or breakdown of any conveyance in which the **Insured Person** was covered as an occupant at the time of the **Accident**, it will be assumed, subject to all other terms of the policy, that the **Insured Person** has suffered **Loss of Life** covered under the policy.

*Exposure*

If an **Accident** resulting from a **Hazard** causes the **Insured Person** to be unavoidably exposed to the elements and as a result of such exposure the **Insured Person** has a **Loss**, such **Loss** will be covered under the policy.

## *Section III – Multiple Losses Maximum Payment*

For those **Losses** identified in the Declarations as subject to the Multiple Losses Maximum Payment provision, if an **Insured Person** has multiple **Losses** as the result of one **Accident**, we will pay only the single largest **Benefit Amount** applicable.

## *Section IV – Territory*

This insurance applies worldwide.

## *Section V – Exclusions*

**Permanent Total Disability** coverage does not apply to persons age seventy (70) or older on the date of the **Loss**.

*Aircraft Owned, Leased or Operated*

This insurance does not apply to **Loss** occurring while an **Insured Person** is in, entering, or exiting any aircraft owned, leased or operated by the **Policyholder** or on behalf of the **Policyholder**.

*Aircraft Pilot or Crew*

This insurance does not apply to **Loss** occurring while an **Insured Person** is in an aircraft while acting or training as a pilot or crew member.

This exclusion does not apply to passengers who temporarily perform pilot or crew functions in a life-threatening emergency.

*Criminal Activity*

This insurance does not apply to **Loss** occurring while the **Insured Person** is committing a criminal act, or attempting to commit a criminal act.



*Disease or Illness*

This insurance does not apply to **Loss** caused by or resulting from an **Insured Person's** emotional trauma, mental or physical illness, disease, pregnancy, childbirth or miscarriage, bacterial or viral infection, or bodily malfunctions.

This exclusion does not apply to **Loss** resulting from an **Insured Person's** bacterial infection caused by an **Accident** or from **Accidental** consumption of a substance contaminated by bacteria.

*Intoxication and Narcotic Influence*

This insurance does not apply to **Loss** caused by or resulting from the **Insured Person** being intoxicated, as defined by the laws of the jurisdiction where the **Loss** occurred, or under the influence of any narcotic unless taken on the advice of a **Physician** and used in accordance with the prescription.

*Military Service*

This insurance does not apply to **Loss** occurring while the **Insured Person** is participating in military service duties of any state, country, or international authority.

*Parachute Jumping*

This insurance does not apply to **Loss** caused by or resulting from the **Insured Person** participating in parachute jumping from an aircraft.

*Pre-Existing Condition*

This insurance does not apply to **Loss** caused by or resulting from a **Pre-Existing Condition**. A **Pre-Existing Condition** means illness, disease or **Accidental** injury of the **Insured Person** for which medical advice, diagnosis, care or treatment was recommended or received within the six (6) months prior to the effective date of **Insured Person's** coverage under this policy. A **Pre-Existing Condition** will not be excluded after twelve (12) months has elapsed from the effective date of the **Insured Person's** coverage.

*Professional Sporting Activity*

This insurance does not apply to a **Loss** caused by or resulting from the **Insured Person** participating in any professional sporting activity for which the **Insured Person** received a salary or prize money as a substantial part of their income.

*Suicide or Intentional Injury*

This insurance does not apply to suicide, attempted suicide or loss that is intentionally self-inflected.

*War*

This insurance does not apply to **Loss** caused by or resulting from a declared or undeclared **War**. Declared or undeclared **War** does not include acts of terrorism.

*Section VI – Definitions*

*Accident or Accidental*

**Accident** or **Accidental** means a sudden, unforeseen, and unexpected event which happens by chance, arises from a source external to the **Insured Person**, is independent of illness, disease or other bodily malfunction and is the direct cause of loss.

*Accidental Bodily Injury*

**Accidental Bodily Injury** means bodily injury, which is **Accidental** and the direct cause of a **Loss**.

*Accountholder(s)*

**Accountholder(s)** means a holder, authorized by the **Policyholder**, of a valid credit card account, bank account, or mortgage with the **Policyholder**.

*Benefit Amount*

**Benefit Amount** is the amount shown in Section IV of the Declarations applicable to the **Loss**:

1) at the time of the **Accident**; and
2) to the **Insured Person** who has the **Loss**.

*Class*

**Class** means the persons described in Section II of the Declarations, Insured Persons.

*Company*

**Company** means Federal Insurance Company.

*Dependent Child or Children*

**Dependent Child** or **Children** means those children, including adopted children and those children placed for adoption, who are primarily dependent upon the **Insured Person** for maintenance and support, and who are:

1) under the age of nineteen (19) and reside with the **Insured Person**; or
2) beyond the age of nineteen (19), permanently mentally or physically challenged, and incapable of self-support; or
3) under the age of twenty-five (25) and classified as full-time students at an institution of higher learning

*Domestic Partner*

**Domestic Partner** means a person designated in writing at enrollment by the **Primary Insured Person**, who is at least eighteen (18) years of age, and who throughout the past twelve (12) months:

1) has been in a committed relationship with the **Primary Insured Person**; and
2) has been the **Primary Insured Person's** sole spousal equivalent; and



3) has resided in the same household as the **Primary Insured Person**; and
4) has been jointly responsible with the **Primary Insured Person** for each other's financial obligations,

and who intends to continue the relationship described above indefinitely.

*Elimination Period*

**Elimination Period** means the number of consecutive days of the **Primary Insured Person's Permanent Total Disability** that must elapse before **Permanent Total Disability** benefits become payable. The **Elimination Period** is shown in the Declarations. **Permanent Total Disability** benefits are not payable, nor do they accrue, during an **Elimination Period**.

*Hazard*

**Hazard** means the covered circumstances for which this insurance is provided as stated in Section III of the Declarations and described in the Hazard form.

*Insured Person*

**Insured Person** means a person described as a Class member in Section II of the Declarations:

1) who elects coverage; or
2) for whom coverage is elected,

and on whose behalf premium is paid.

*Loss of Use*

**Loss of Use** means the permanent and total inability of the specified body part to function, as determined by a **Physician**.

**The following definitions of Loss of Use apply to Section IV.A of the Declarations, PERMANENT TOTAL DISABILITY LUMP SUM BENEFIT:**

*Loss of Use of Hand*

**Loss of Use of Hand** means the **Loss of Use** at or above the knuckle joints of at least four (4) fingers on the same hand or at least three (3) fingers and the thumb of the same hand.

*Loss of Use of Foot*

**Loss of Use of Foot** means the **Loss of Use** of the foot at or above the ankle joint.

*Loss of Sight of Both Eyes*

**Loss of Sight of Both Eyes** means the permanent loss of vision in both eyes. Remaining vision in both eyes must be no better than 20/200 using a corrective aid or device, as determined by a **Physician**.

*Loss of Hearing of Both Ears*

**Loss of Hearing of Both Ears** means the permanent, irrecoverable and total deafness of both ears to the extent that the deafness cannot be corrected by any aid or device, as determined by a **Physician**.

*Loss of Speech*

**Loss of Speech** means the permanent, irrecoverable and total loss of the capability of speech without the aid of mechanical devices, as determined by a **Physician**.

*Loss*

**Loss** means the types of **Accidental Bodily Injuries** listed in Section IV of the Declarations for which the policy provides coverage.

**The following definitions of Loss apply to Section IV.B of the Declarations, AD&D BENEFIT AMOUNTS:**

*Loss of Foot*

**Loss of Foot** means the complete severance through or above the ankle joint. We will consider it a **Loss of Foot** even if the foot is later reattached.

*Loss of Hand*

**Loss of Hand** means complete severance through or above the knuckle joints of at least 4 fingers on the same hand or at least 3 fingers and the thumb on the same hand. We will consider it a **Loss of Hand** even if the fingers and/or thumb are later reattached.

*Loss of Hearing*

**Loss of Hearing** means the permanent, irrecoverable and total deafness of both ears to the extent that the deafness cannot be corrected by any aid or device, as determined by a **Physician**.

*Loss of Life*

**Loss of Life** means death, including clinical death, determined by the local governing medical authorities.

*Loss of Sight of an Eye*

**Loss of Sight of an Eye** means the permanent loss of vision in one eye. Remaining vision in that eye must be no better than 20/200 using a corrective aid or device, as determined by a **Physician**.



*Loss of Speech*

**Loss of Speech** means the permanent, irrecoverable and total loss of the capability of speech without the aid of mechanical devices, as determined by a **Physician**.

*Loss of Thumb and Index Finger*

**Loss of Thumb and Index Finger** means complete severance through or above the knuckle joints of the thumb and index finger of the same hand. We will consider it a **Loss of Thumb and Index Finger** even if one or both are later reattached.

*Permanent Total Disability*

**Permanent Total Disability** means **Accidental Bodily Injuries** that solely and directly cause the **Primary Insured Person's**:

Loss of:

Use of One **Hand** and One **Foot**; or
Use of Both **Hands** or Both **Feet**; or
**Sight of Both Eyes**; or
**Hearing of Both Ears**; or
**Speech**,

which solely and directly:

1) prevent the **Primary Insured Person** from engaging in any gainful occupation for which the **Primary Insured Person** is qualified, or could be qualified, by reason of education, training, experience, or skill; and
2) cause a condition which is medically determined by a **Physician**, approved by the **Company**, to be of continuous and indefinite duration; and
3) require the continuous care of a **Physician**, unless the **Primary Insured Person** has reached his/her maximum point of recovery.

*Physician*

**Physician** means a person who is licensed as a medical doctor or a doctor of osteopathy under the laws of the jurisdiction in which treatment is given and who is qualified to provide the medical treatment. **Physician** does not include a family member of the **Insured Person**, a social worker or a physical therapist.

*Policyholder*

**Policyholder** means the entity identified in the Insuring Agreement who is responsible for the collection and remittance of premium.

***Primary Insured Person***

**Primary Insured Person** means an **Insured Person** who:
1) is offered coverage by the **Policyholder** and elects coverage under the policy; and
2) pays the premium for the coverage selected.

***War***

**War** means:
1) hostilities following a declaration of **War** by a government authority;
2) if there is no declaration of **War**, then armed, open and continuous hostilities between two countries; or
3) armed, open and continuous hostilities between two factions, each in control of territory, or claiming jurisdiction over the site of the area of hostility.

## *Section VII – Common Policy Conditions*

***Absolute Assignment***

The **Insured Person's** rights under the policy may be irrevocably assigned. However, we will only recognize an assignment if the **Insured Person** has given us prior written notice and has our written acknowledgement of this assignment.

***Arbitration***

In the event of a dispute under the policy, either we, the **Insured Person**, or in the event of **Loss of Life**, the **Insured Person's** beneficiary may make a written demand for arbitration. In that case, we and the **Insured Person**, or in the event of **Loss of Life**, the **Insured Person's** beneficiary, will each select an arbitrator. The two arbitrators will select a third. If they cannot agree within fifteen (15) days, either we or the **Insured Person**, or in the event of **Loss of Life**, the **Insured Person's** beneficiary, may request that the choice of arbitrator be submitted to the American Arbitration Association. The arbitration will be held in the state of the **Insured Person's** principal residence.

***Beneficiary***

The **Loss of Life** benefit will be paid to the beneficiary designated by the **Insured Person**. This choice must be in writing and filed with the **Policyholder**.

If the **Insured Person** has not chosen a beneficiary or if there is no beneficiary alive when the **Insured Person** dies, we will pay the **Benefit Amount** to the first surviving party in the following order:

1) the **Insured Person's** spouse;
2) in equal shares to the **Insured Person's** surviving children;
3) in equal shares to the **Insured Person's** surviving parents;
4) in equal shares to the **Insured Person's** surviving brothers and sisters;
5) to the **Insured Person's** estate.



All other **Benefit Amounts** are paid to the **Insured Person**, unless otherwise directed by the **Insured Person** or the **Insured Person's** designee.

***Beneficiary Changes***

The **Insured Person**, and no one else, has the right to change the beneficiary. The **Insured Person** does not need the consent of anyone to do so. Changes must be in writing and filed with the **Policyholder**. We do not assume any responsibility for the validity of the changes.

***Cancellation, Nonrenewal and Grace Period***

The **Policyholder** may cancel the policy or any of its individual coverages by sending us written notice stating when cancellation is to take effect. The effective date of cancellation may not be earlier than the date notice is mailed or transmitted.

We may cancel the policy or any of its individual coverages if the **Policyholder** fails to pay the premium within the grace period of thirty-one (31) days after the premium due date, except for the first premium due during the policy term. We will send written notice stating the effective date of cancellation, which will be no earlier than thirty-one (31) days from the premium due date.

The **Policyholder** is entitled to a grace period of thirty-one (31) days for the payment of premium due. The policy will continue in force during the grace period. The grace period does not apply to the first premium payable during the policy term. Failure to pay the first premium on or before the due date will immediately terminate the policy as of inception. We are not required to provide notification of such termination.

We may cancel or nonrenew the policy for reasons other than non-payment of premium by sending written notice at least forty-five (45) days before the Anniversary Date shown in the Insuring Agreement.

We will send notice of cancellation or nonrenewal to the **Policyholder** at its last known address. If the notice is mailed, proof of mailing will be considered proof of cancellation or nonrenewal. The **Policyholder** is required to provide notice of cancellation to all **Insured Persons**.

The **Primary Insured Person** may cancel the insurance described in this policy by returning to us or our authorized representative the Benefit Plan Description with a written request for cancellation within ninety days of receipt. The premium will be fully refunded.

***Claim Forms***

When we receive notice of a claim we will send the **Insured Person** or the **Insured Person's** designee, within fifteen (15) days, forms for giving us Proof of Loss. If the **Insured Person** or the **Insured Person's** designee does not receive the forms, the **Insured Person** or the **Insured Person's** designee should send us a written description of the **Loss**. This written description should include information detailing the occurrence, type and extent of the **Loss** for which claim is made.

***Claim Notice***

Written Claim Notice must be given to us or any of our appointed agents or brokers within twenty (20) days after the occurrence or commencement of any **Loss** covered by the policy or as soon as

reasonably possible. Notice must include enough information to identify the **Insured Person** and **Policyholder**. Failure to give Claim Notice within twenty (20) days will not invalidate or reduce any claim if notice is given as soon as reasonably possible.

*Claim Payment*

For benefits payable involving disability, we will pay the **Insured Person** or beneficiary the applicable **Benefit Amount** no less frequently than monthly during the continuance of the period for which we are liable. All payments by us are subject to receipt of written Proof of Loss.
For all benefits payable under the policy except those for disability, we will pay the **Insured Person** or beneficiary the applicable **Benefit Amount** within sixty (60) days after we receive a complete Proof of Loss if the **Insured Person** and **Policyholder** have complied with all the terms of the policy.

*Claim Proof of Loss*

For claims involving disability, written Proof of Loss must be given to us within thirty (30) days after commencement of the period for which we are liable. Subsequent written proof of the continuance of such disability must be given to us at such intervals as we may reasonably require.

Failure to give written Proof of Loss within these timeframes will not invalidate or reduce any claim if notice is given as soon as reasonably possible, and in no event, except in cases where the claimant lacks legal capacity, later than one (1) year after the deadline to submit written Proof of Loss.

For all claims except those involving disability, written Proof of Loss must be given to us within ninety (90) days after the date of **Loss**, or as soon as reasonably possible.

*Claim and Suit Cooperation*

In the event of a claim under the policy, the **Policyholder**, the **Insured Person** and the beneficiary, if applicable, must fully cooperate with us in handling of the claim, including, but not limited to, the timely submission of all medical and other reports, and full cooperation with all physical examinations and autopsies that we may require.

If the **Policyholder** is sued in connection with a claim under the policy, the **Policyholder** will immediately give us copies of every demand, notice and summons which the **Policyholder** receives relating to the suit. The **Policyholder** must fully cooperate with us in the handling of the suit. At our request, the **Policyholder** will assist in the settlement or conduct of the suit. The **Policyholder** or its designee will attend all hearings and trials and assist in giving evidence and securing the attendance of witnesses. The **Policyholder** must not, except at its own expense, voluntarily make any payment or assume any obligation in connection with the suit without our prior written consent.

*Compliance by Policyholder and Insured Person*

We have no duty to provide coverage under the policy unless the **Policyholder** and the **Insured Person** have fully complied with all the terms and conditions of the policy.



*Conformance With Statutes*

Any terms of the policy which are in conflict with the applicable statutes, laws or regulations of the state or territory in which the policy is issued are amended to conform to such statutes, laws or regulations.

*Conversion Privilege*

In the event the **Insured Person's** coverage under the policy ceases for any reason other than termination of the policy, the **Insured Person** is eligible for an individual accident policy.

To convert to an individual accident policy, the **Insured Person** must submit to us or our authorized representative:

1) a complete, written application; and
2) the required premium

for the individual accident policy within thirty-one (31) days after the **Insured Person's** coverage ended.

The individual accident policy will:

1) be issued without evidence of insurability;
2) provide insurance only for **AD&D** that is most similar to, but not greater than, the terminated coverage;
3) not pay for the same **Loss** for which benefits have already been paid under the policy;
4) provide a **Benefit Amount** for the **Insured Person** which will be the lesser of the following:
   a) the **Insured Person's Benefit Amount** under the policy; or
   b) $100,000; and
5) be subject to current rates for age and **Class** at the time of conversion.

*Examination Under Oath*

We have a right to examine under oath, as often as we may reasonably require, the **Insured Person**, the **Policyholder** or the beneficiary. We may also require the **Insured Person**, the **Policyholder** or the beneficiary to provide a signed description of the circumstances surrounding the Loss and their interest in the **Loss**. The **Insured Person**, the **Policyholder** and the beneficiary will also produce all records and documents requested by us, and will permit us to make copies of such records or documents.

*Inadvertent Error*

The insurance provided under the policy will not be prejudiced by the failure on the part of the **Policyholder** to transmit reports, collect and remit premium or comply with any of the terms and conditions of the policy when such failure is due to inadvertent error or clerical mistake.

*Legal Action Against Us*

No legal action may be brought to recover on the policy until sixty (60) days after we have been given complete, written Proof of Loss. No such action may be brought after three (3) years from the

time complete, written Proof of Loss is required to be given. No such action may be brought unless there has been full compliance with all of the terms of the policy.

In no case will we be liable for benefits that are not payable under the terms of the policy or that exceed the applicable **Benefit Amounts**.

***Liberalization***

If we adopt any changes:

1) within forty-five (45) days prior to the effective date shown in the Insuring Agreement; or
2) during the policy period,

which could broaden this insurance without an additional premium charge, the **Insured Person** will automatically receive the benefit of the broadened coverage.

***Physical Examination and Autopsy***

We have the right to have the **Insured Person** examined by a **Physician** approved by us, as often as reasonably necessary while a claim is pending. We may also have an autopsy done by a **Physician**, unless prohibited by law. Any examinations or autopsies that we require will be done at our expense.

***Premium Payment***

The **Policyholder** will collect and remit to us all premiums due under the policy, subject to the grace period specified in the Cancellation, Nonrenewal and Grace Period condition.

Premium is auditable. We will calculate the earned premium for each audit Reporting Period based on the applicable rates and exposures shown in the Premium Summary. The **Policyholder** must keep records of the information we need to calculate the premium and send us copies of these records for each Reporting Period.

The earned premium will be computed on a pro-rata basis. Any unearned premium will be remitted to the **Policyholder** for return to the **Primary Insured Person** as soon as practicable.

***Premium Rate Changes***

We may change the premium rates for the policy on the Anniversary Date. We will give the **Policyholder** at least forty-five (45) days prior written notice.

***Statement by Policyholder or Insured Person and Incontestability***

We will not use any statements, except fraudulent misstatements, made by the **Policyholder** or an **Insured Person** to void the insurance or reduce benefits payable under the policy, or to otherwise contest the validity of the policy, unless such statements are contained in a written document signed by the **Policyholder** or the **Insured Person**. If we rely on such statements for this purpose, we will provide a copy of the written document to the **Policyholder**, the **Insured Person**, or the **Insured Person's** designee or beneficiary, as appropriate.



We will consider all statements made by the **Policyholder** and the **Insured Person** to be representations and not warranties.

Except for nonpayment of premium, we will not use statements made by the **Policyholder** or an **Insured Person** regarding insurability to contest the validity of the policy when the statements are made more than two (2) years after the policy has been in force during the **Insured Person's** lifetime.

Nothing in this section will preclude us from asserting at any time defenses based upon a claimant's ineligibility for coverage under the policy, or upon any other policy provision or condition.

***Titles of Paragraph***

The titles of the various paragraphs of this certificate and any endorsements attached are inserted solely for the convenience of reference and do not limit or affect in any way the provisions to which they relate.

***Workers' Compensation***

The benefits payable under the policy are not in lieu of and do not affect any requirement for Workers' Compensation Insurance.

44-10-0443 (Ed. 6/96)

## HAZARD

***24 Hour Business and Pleasure***

**24 Hour Business and Pleasure Hazard** means all circumstances, subject to the terms and conditions of the policy, to which the **Insured Person** may be exposed anywhere in the world.

44-02-1062 (Ed. 6/96)

# $2,500 Emergency Accident and Sickness Medical Expense Benefit

### *ISSUED BY*

Virginia Surety Company, Inc. under the Travel Protection Policy Number HTP00137

### *DESCRIPTION OF COVERAGE*

| Schedule of Coverages | Maximum Annual Benefits Per Policy |
|---|---|
| Emergency Accident and Sickness Medical Expense | |
| Benefit payable with other Insurance | $500; maximum annual benefit per family - $2,500 |
| Benefit payable without other Insurance | Up to $100/day; maximum of $500 |

***Emergency Accident and Sickness Medical Expense***

The Company will pay benefits, up to the maximum shown on the Schedule of Coverages, if as the result of an Accidental Injury or Sickness while on Your Trip, You incur necessary covered medical expenses for Emergency Treatment. Covered medical expenses are necessary services and supplies, which are recommended by the attending Physician. They include the services of a legally qualified Physician; charges for Hospital confinement and use of operating rooms; charges for anesthetics (including administration), x-ray examinations or treatments, and laboratory tests; ambulance service, drugs, medicines, prosthetics and therapeutic services and supplies. The Company will not pay benefits in excess of the reasonable and customary charges commonly used by providers of medical care in the locality in which the care is furnished.

### *LIMITATIONS AND EXCLUSIONS*

The following exclusions apply to Emergency Accident and Sickness Medical Expense coverage. This plan does not cover any loss caused by or resulting from:

1) Pre-Existing Conditions, as defined below;
2) Suicide or attempted suicide;
3) Intentionally self-inflicted injuries;
4) War, invasion, acts of foreign enemies, hostilities between nations (whether declared or not), civil war;
5) Any loss starting while You are in the service of the armed forces of any country. Orders to active military service for training purposes of two months or less will not constitute service in the armed forces;
6) Piloting or learning to pilot or acting as a member of the crew of any aircraft;
7) Mental or emotional disorders, unless hospitalized;
8) Participation as a professional in athletics or underwater activities;
9) Being under the influence of drugs or intoxicants unless prescribed by a Physician;
10) Commission or the attempt to commit a criminal act;



11) Participating in bodily contact sports; skydiving; hang gliding; parachuting; mountaineering; any race; bungee cord jumping; or speed contest;
12) Dental treatment except as a result of an Accidental Injury to sound, natural teeth within twelve (12) months of the Accidental Injury;
13) Any non-emergency treatment or surgery, routine physical examinations, hearing aids, eye glasses or contact lenses;
14) Pregnancy and childbirth (except for complications of pregnancy);
15) Confinement or treatment in a government Hospital; however, the U.S. government may recover or collect benefits under certain conditions;
16) Care or treatment which is not medically necessary;
17) Care or treatment for which compensation is payable under Workers' Compensation law, any Occupational Disease law, the 4800 Time Benefit plan or similar legislation;
18) Care or treatment that is payable under any Insurance policy that does not require deductible and/or coinsurance payments by the Eligible Person;
19) Injury or Sickness when traveling against the advice of a Physician; and
20) Cosmetic surgery except for: reconstructive surgery incidental to or following surgery for trauma, or infection or other covered disease of the part of the body reconstructed, or to treat a congenital malformation of a child.

### *DEFINITIONS*

**"Accident"** means a sudden, unexpected, unusual, specific event which occurs at an identifiable time and place, but shall also include exposure resulting from a mishap to a conveyance in which You are traveling.

**"Accidental Injury"** means Injury caused by an Accident (of external origin) occurring during a Covered Trip being the direct and independent cause in the loss.

**"Eligible Person"** means You, Your spouse, and Your unmarried dependent child(ren) who are under 19 years of age (24, if a full-time student). Dependent children include stepchildren, legally adopted or children who have been placed in Your home for adoption, and foster children. If a mental or physical handicap prevents an unmarried dependent child from self-support when he/she reaches the termination age, he/she may remain as an Eligible Person under this policy. Proof of such incapacity and dependency must be furnished to the Company within 31 days of the child's attainment of the termination age and not more frequently than annually thereafter. Coverage will continue as long as coverage remains in force and the dependent child is incapable of self-support.

**"Emergency Treatment"** means necessary medical treatment, including services and supplies, which must be performed during Your Trip due to the serious and acute nature of the Accidental Injury.

**"Hospital"** means a facility that:

a) holds a valid license if it is required by the law;
b) operates primarily for the care and treatment of sick or injured persons as in-patients;
c) has a staff of one or more Physicians available at all times;
d) provides 24-hour nursing service and has at least one registered professional nurse on duty or call;
e) has organized diagnostic and surgical facilities, either on the premises or in facilities available to the hospital on a pre-arranged basis; and

f) is not, except incidentally, a clinic, nursing home, rest home, or convalescent home for the aged, or similar institution.

**"Individual Coverage Term"** means the period of time beginning when the Eligible Person has been enrolled for coverage under the policy and for whom the required premium has been paid.

**"Injury"** means bodily injury caused by an Accident occurring while this policy is in force, and resulting directly and independently of all other causes in loss covered by the policy. The Injury must be verified by a Physician.

**"Insurance"** means any one of the following types of policies or plans which provide benefits for Hospital confinement for You on Your effective date of coverage, and such policy or plan requires You to pay a deductible and/or portion of coinsurance: individual, group or blanket insurance plans; group Blue Cross, Blue Shield, or other group prepayment coverage plans; coverage under labor management trustee plans, union welfare plans, employer organization plans, employee benefit organizational plans, or other arrangements of benefits for persons of a group. Insurance does not include Medicare or Medicaid.

**"Physician"** means a licensed practitioner of medical, surgical or dental services acting within the scope of his/her license. The treating Physician may not be You, a Traveling Companion* or a Family Member**.

* Traveling Companion means a person who is sharing travel arrangements with You (to a maximum or four (4) persons including You).

** Family Member means the Eligible Person's or Traveling Companion's legal or common law spouse, parent, legal guardian, step-parent, grandparent, grandchild, in law, natural or adopted child, step-child, brother, sister, step-brother, step-sister, aunt, uncle, niece or nephew, who reside in the United States or Canada.

**"Pre-Existing Condition"** means any Injury or Sickness which has been diagnosed by a legally qualified Physician, with consultation, advice or treatment occurring within twelve (12) months immediately prior to an Eligible Person's Individual Coverage Term. Pre-Existing Condition also means symptoms of a condition that would have led an ordinarily prudent person to seek diagnosis, care or treatment. Such an Injury or Sickness will continue to be a Pre-Existing condition until the earlier of:

(a) the expiration of twelve (12) consecutive months beginning with the Individual Coverage Term, for which the Eligible Person has not received any medical care, consultation, diagnosis or treatment, or has not taken any prescribed drug or medicine on account of such condition; or

(b) the expiration of twenty-four (24) consecutive months, beginning with the Individual Coverage Term.

**"Sickness"** means an illness or disease which is diagnosed or treated by a Physician after the effective date of this plan and while You are covered under this policy.

**"The Company"** means Virginia Surety Company, Inc.

**"Trip"** means any trip taken by an Eligible Person, to age 70 only, for which the required premium has been paid and which is 100 or more miles away from the Eligible Person's primary residence (if a student, the primary residence will be the parents' residence). Travel must be solely for business or for pleasure, not for the procurement of medical treatment or advice.



**"You and Your"** means an Eligible Person.

## *GENERAL PROVISIONS*

**Legal Actions.** No legal action for a claim can be brought against us until sixty (60) days after we receive proof of loss. No legal action for a claim can be brought against us more than two (2) years after the time required for giving proof of loss.

**Controlling Law.** Any part of this Policy that conflicts with the state law where the Policy is issued is changed to meet the minimum requirements of that law.

**Misrepresentation and Fraud.** Coverage as to an Eligible Person shall be void if, whether before or after a loss, the Eligible Person has concealed or misrepresented any material fact or circumstance concerning this Policy or the subject thereof, or the interest of the Eligible Person therein, or if the Eligible Person commits fraud or false swearing in connection with any of the foregoing.

**Subrogation.** To the extent the Company pays for a loss suffered by an Eligible Person, the Company will take over the rights and remedies the Eligible Person had relating to the loss. This is known as subrogation. The Eligible Person must help the Company to preserve its rights against those responsible for the loss. This may involve signing any papers and taking any other steps the Company may reasonably require. If the Company takes over an Eligible Person's rights, the Eligible Person must sign an appropriate subrogation form supplied by the Company.

**Assignment.** This Policy is not assignable but benefits may be assigned.

**When an Eligible Person's coverage begins.** All coverage will take effect on the first day of the following month in which the required premium has been paid.

**When an Eligible Person's coverage ends.** An Eligible Person's coverage will end on the date which is the earliest of the following:

a) the date the Policy is terminated;
b) the date on which You no longer meet the definition of "Eligible Person";
c) the date coverage is ended by You; or
d) the due date of a premium when due, subject to the Grace Period. The Company will allow a period of 31 days after the premium due date for payment of each premium after the first premium payment. The Policy is in force during this period. Termination of insurance of any Eligible Person will be without prejudice to any claim that begins before the date of termination.

**Notice of Claim.** Written notice of claim must be given to the Company or its designated representative within twenty (20) days after a covered loss first begins or as soon as reasonably possible. Notice should include the Eligible Person's name and Policy number. To obtain claim forms call 1-888-668-9035.

**Proof of Loss.** The Claimant must send the Company, or its designated representative, proof of loss within ninety (90) days after a covered loss occurs or as soon as reasonably possible.

**Payment of Claims.** The Company, or its designated representative, will pay the claim after receipt of acceptable proof of loss. All claims will be paid to the Eligible Person or the Eligible Person's estate. In the event the Eligible Person is a minor, incompetent or otherwise unable to give a valid release, the Company may make arrangements to pay claims to the Eligible Person's legal guardian, committee or other qualified representative.

**Physical Examination and Autopsy.** The Company, or its designated representative, at their own expense, have the right to have the Eligible Person examined as often as reasonably necessary while a claim is pending. The Company, or its designated representative, also has the right to have an autopsy made unless prohibited by law.

**NOTE:** Problems of distance, information and communication make it impossible for Virginia Surety Company, Inc., HealthExtras, or The Sklover Group, Inc. to assume any responsibility for the availability, quality, use or result of any emergency service. In all cases, You are still responsible for obtaining, using and paying for Your own required services of all types.

This insurance, under Policy HTP00137, is underwritten by: Virginia Surety Company, Inc, Executive Offices: 123 North Wacker Drive, Chicago, Illinois 60606

Policy terms and conditions are briefly outlined in this Plan Description. Complete provisions pertaining to this insurance are contained in the Master Policy on file with the trustee, Marine Bank, Springfield and HealthExtras. In the event of any conflict between this Plan Description and the Master Policy, the Policy will govern.



# Medical Care Coordination Benefit

Should You become permanently disabled, a medical care coordinator will be available to help evaluate care options and provide guidance and assistance in obtaining appropriate medical treatment.

*Please note that the Benefit Plan Description is not the master policy. Actual coverage is subject to the language of the master policies issued.*

For Customer Service or to cancel your enrollment in the Plan, please call **1-888-668-9035.**

*Offer subject to change. This plan may be modified, suspended, cancelled or otherwise terminated with notice.*