UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALTAGRACIA PEGUERO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-10995-WGY |
| ) | |
| AMERICAN EXPRESS COMPANY ) | |
| and HEALTHEXTRAS, INC., ) | |
| ) | |
| Defendants. ) | |

### DEFENDANT HEALTHEXTRAS, INC.'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**Introduction**

Defendant HealthExtras, Inc. ("HealthExtras") submits that it is entitled to summary judgment dismissing all remaining claims of the plaintiff, Altagracia Peguero ("Ms. Peguero"). In July, 2002, Ms. Peguero received in the mail a one-page, two-sided document promoting the "Accidental Disability Plan *from* American Express" (the "Plan"). The Plan consists of permanent total disability insurance and other benefits. The disability insurance component of the Plan, underwritten by former defendant Federal Insurance Company ("Federal"), provides a lump-sum benefit of either $1 million or $1.5 million (depending on the level of coverage selected) if an accident causes the enrollee to become permanently and totally disabled. Federal's definition of "permanent total disability" – which in relevant part requires the permanent loss of use of both arms, or both legs, or one arm and one leg – was set forth in the document Ms. Peguero received, under the bold heading "IMPORTANT DISCLOSURE." After reading parts of this document but not (she claims) this disclosure, Ms. Peguero enrolled in the Plan.

On December 25, 2002 at 2:30 a.m., Ms. Peguero and her boyfriend, Hector Amador, were returning to Ms. Peguero's home in Boston from a holiday party in New Bedford. Mr. Amador was driving Ms. Peguero's car and she was in the passenger seat, asleep. Mr. Amador, driving 60 to 65 m.p.h. on Route 128 in Braintree, Massachusetts, realized he was about to miss the exit into Boston and tried to quickly maneuver the car towards the exit. Mr. Amador lost control of the car and it left the pavement, rolling over at least once. As a result of this accident Ms. Peguero's right arm was severed above her elbow.

In early 2003, Ms. Peguero submitted to Federal a claim for the $1.5 million permanent total disability benefit. Because her injury did not meet the physical threshold requirement for a "permanent total disability," Federal denied Ms. Peguero's claim. In March, 2005, Ms. Peguero sued Federal, The Sklover Group, Inc. (an insurance broker), and the American Express Company ("American Express"), claiming that: (1) she is "permanently and totally disabled" within the meaning of Federal's policy and therefore is entitled to receive $1.5 million; (2) in the alternative, Federal's policy is "illusory," by which Ms. Peguero means that the coverage it provides is of no economic value; and (3) she was deceived by the initial promotional document she received in the mail. Ms. Peguero's complaint includes counts for "fraud/deceit," promissory estoppel, breach of contract, violation of M.G.L. c. 175, § 110E (which authorizes the Massachusetts Commissioner of Insurance to regulate insurance advertising), and violation of M.G.L. c. 93A.

In September, 2005, Ms. Peguero reached a settlement with Federal and voluntarily dismissed all of her claims against Federal with prejudice. In January, 2006, American Express filed a third-party complaint against HealthExtras, which had participated in the creation and initial marketing of the Plan. Shortly thereafter, Ms. Peguero filed a set of "direct claims"

against HealthExtras that are identical to her claims against the other defendants. In June, 2006, Ms. Peguero settled with Sklover and voluntarily dismissed her claims against Sklover with prejudice. This settlement left American Express and HealthExtras as the remaining defendants.

With fact discovery complete, it is apparent that, based on the undisputed material facts, HealthExtras is entitled to summary judgment on all of Ms. Peguero's remaining claims. As set forth below, Ms. Peguero's claims based on Federal's permanent total disability policy are barred by her settlement with Federal and her dismissal <u>with prejudice</u> of her claims against Federal. Even if not so barred, her claim that she is entitled to coverage under Federal's policy is belied by the unambiguous language of the policy, and her alternative claim that the policy is "illusory" is belied by the fact (among others) that, to date, Federal has paid out millions of dollars in claims under that policy. Ms. Peguero's claim that she was deceived by the initial promotional document she received is similarly barred by her settlement with Federal: as her own insurance expert acknowledges, in Massachusetts <u>insurers</u> are legally responsible for the form and content of all advertising and promotional materials concerning their policies. Even if not so barred, Ms. Peguero's claim that she was deceived by the initial promotional document fails for several independent reasons, including that: (1) the document contained no false statements of fact, (2) Ms. Peguero could not have reasonably relied on any factual statements in the document, and (3) Ms. Peguero cannot prove that she suffered any detriment as a result of her alleged reliance.

**Statement Of Undisputed Material Facts**[1]

1. Plaintiff Altagracia Peguero resides at One Shandon Road in Dorchester, Massachusetts, where she has lived since approximately 1998. Ex. B at 5. Before immigrating to the United States in 1993, Ms. Peguero was a practicing dentist in her native Dominican Republic. Id. at 11-12. She attended university for six years and received her degree in dentistry in 1987 or 1988. Id. at 10.

2. Defendant HealthExtras, Inc. is a Delaware corporation with its principal place of business at 800 King Farm Road in Rockville, Maryland. HealthExtras' Answer to Plaintiff's Direct Claims (Document # 59), ¶ 4. Among other lines of business, HealthExtras contracts with insurers and other benefit providers on the one hand, and financial services companies on the other hand, to develop and make available to consumers various programs of insured and non-insured benefits. Ficklin Aff., ¶ 1; Ex. C at 17-18.

3. One such program is the Accidental Disability Plan *from* American Express (the "Plan") that is at issue in this case. The Plan consists of (a) permanent total disability insurance in the amount of $1 million or $1.5 million, depending on the level of coverage selected, (b) a $1,000 Accidental Death and Dismemberment Benefit, (c) a $2,500 Emergency Accident & Sickness Medical Expense Benefit, and (d) a Medical Care Coordination Benefit. Ex. A; Ex. C at 71-72. In the late 1990's, HealthExtras contracted with Federal Insurance Company to

---

[1] The undisputed facts in this section are drawn from (1) the pleadings, (2) the promotional document at issue, (3) Ms. Peguero's recent deposition, (4) the Rule 30(b)(6) deposition of HealthExtras, and (5) the previously filed Affidavit of Joanna Ficklin of HealthExtras (Attachment #1 to Document #20, filed on July 26, 2005). An exemplar of the promotional document is attached to the accompanying Affidavit of Counsel as Exhibit A. Relevant excerpts from the depositions of Ms. Peguero and HealthExtras are attached to the Affidavit of Counsel as Exhibits B and C, respectively. These exhibits will be referred to by the abbreviation "Ex.__" followed, in the case of the deposition excerpts, by appropriate page citations. The Affidavit of Joanna Ficklin will be referred to as "Ficklin Aff."

underwrite the permanent total disability insurance component of the Plan, and with American Express Company to market the Plan to its cardholders. Id. at 8, 51-53, 117, & 145-146. Former defendant The Sklover Group, Inc. was Federal's insurance broker of record. Id. at 23-24. Once the Plan was developed and American Express mailed initial promotional documents to its cardholders, HealthExtras' role was to receive completed enrollment forms, send "Welcome Packets" (which included a detailed description of Federal's permanent total disability coverage and the other Plan benefits) to the new enrollees, and, thereafter, to provide ongoing customer service and support. Ex. C at 27-28 & 141-144; Ficklin Aff., ¶¶ 5 & 6.

   4. In July, 2002, Ms. Peguero received in the mail from American Express a one-page, two-sided document promoting the Plan. Ex. A. This document describes the Plan in general terms, and includes a "tear-off" form that the recipient can sign and return to enroll in the Plan. Id. Among other things, the front side of the document states:

> Acceptance is easy. To start your coverage, simply fill out the form below and send it in. Within 10 days, you will receive a Plan Summary and complete Benefit Plan Description. Review the Plan materials at your leisure. If you are not satisfied for any reason, you may cancel within the first 90 days and receive a full refund of Plan fees. There's absolutely no risk.

Id. Further down the page, below the signature of an American Express employee, is a line that reads, "P.S. Take a look at this valuable plan for 90 days – risk-free." Id. Just below this "P.S.," and just above the tear-off form, the document states, "For more plan details and additional benefits, please see reverse side." Id. On the back of the document, set off in the middle of the page under the bold heading "IMPORTANT DISCLOSURE," is a paragraph that recites several key terms of the Plan, including the applicable definition of "total permanent disability." Id.

5

5.      Federal reviewed and approved all written materials concerning the Plan, including the initial promotional document, before they were sent to any American Express cardholders.  Ex. C at 48-50, 88-89 & 126-127.  In particular, Federal dictated the form and content of the "IMPORTANT DISCLOSURE" on the initial promotional document Id. at 127-129.

6.      In July, 2002, Ms. Peguero received in the mail a document substantially identical to Exhibit A.  Ex. B at 58.  Ms. Peguero testified at her deposition that she read most of the front of the document, including the paragraph indicating that within 10 days she would receive a Plan Summary and a complete Benefit Plan Description for her review, after which she could, within 90 days, cancel her enrollment and receive a full refund.  Id. at 58-61.  She testified that she also read the words, "For more plan details and additional benefits, please see reverse side."  Id. at 61.  She testified that she turned the document over and read the first line at the top of the back page, but then abruptly stopped reading.  Id. at 62-63 & 69-71.  She decided to enroll in the Plan and, that same day, signed and returned the tear-off enrollment form.  Id. at 63.

7.      HealthExtras received Ms. Peguero's signed enrollment form and enrolled her in the Plan on July 15, 2007.  Ficklin Aff., ¶ 5.  On July 16, 2007, HealthExtras mailed a "Welcome Packet" – including a detailed description of Federal's permanent total disability insurance coverage – to Ms. Peguero at her One Shandon Road, Dorchester, address.  Id., ¶¶ 6 & 7.  HealthExtras makes an entry in its customer service database if the U.S. Postal Service returns any mailing as undeliverable.  Id., ¶ 7.  There is no record that Ms. Peguero's Welcome Packet was returned to HealthExtras as undeliverable.  Id.  Ms. Peguero claims that she did not receive this Welcome Packet.  Plaintiff's Direct Claims Against HealthExtras (Document #42), ¶ 12; Ex. B at 66 & 119-122.

6

8. Before enrolling in the Plan, Ms. Peguero had experience obtaining other types of insurance, including auto, health and credit protection insurance. Ex. B at 28-30 & 41-46. She understood that insurance is a contract between an insurance company and its insured, and that the parties' obligations are spelled out in a written agreement. Id. at 35-36. With regard to the Plan in particular, Ms. Peguero understood that the initial promotional document she received was not the entire agreement, and that, apart from that document, there was an insurance policy containing detailed provisions defining the circumstances in which she would receive $1.5 million and the circumstances in which she would not. Id. at 67-68 & 71.

9. Ms. Peguero keeps files at her home for insurance policies and other important papers. Ex. B at 31, 35 & 49. She keeps separate files for different types of insurance. Id. at 39. With regard to the Plan, although Ms. Peguero: (a) understood that the initial promotional document she received was not the entire agreement, and that the terms of the insurance she was buying would be spelled out in detail in a separate document; (b) read the part of the promotional document stating that, within 10 days of her enrollment, she would receive detailed written materials about the Plan, and would have 90 days to review those materials and decide whether to cancel and receive a full refund; and (c) did not (she claims) receive any further information about the Plan, Ms. Peguero never looked in her mail for any further information about the Plan, and never called American Express to request the information she had been promised or to ask any questions about the Plan. Id. at 66-69. She testified that she did not want to know how the insurance policy defined "permanent disability." Id. at 72-73. She does not recall whether she even saved the top portion of the original promotional document after sending in her signed enrollment form. Id. at 63-66.

7

10. Before receiving the initial promotional document at issue, Ms. Peguero did not know that disability insurance existed. Ex. B at 36-37. She had never thought about buying disability insurance and had never talked about it with her family or friends. Id. at 37.

**Argument**

I. MS. PEGUERO'S DISMISSAL WITH PREJUDICE OF HER CLAIMS AGAINST FEDERAL BARS HER REMAINING CLAIMS TO THE EXTENT THEY ARE BASED ON FEDERAL'S INSURANCE POLICY

Ms. Peguero's claims – organized into five counts – have two principal bases: Federal's permanent total disability insurance policy, and the initial promotional document she received about the Plan. In the first category, Ms. Peguero's claim that she is "permanently and totally disabled" within the meaning of Federal's policy, and therefore is entitled to $1.5 million, is the sole basis for her breach of contract claim (Fourth Cause of Action). Her alternative claim – that the coverage afforded by Federal's policy is "so minimal as to be illusory and unconscionable" – appears to underlie all of her remaining counts: "fraud/deceit," violation of M.G.L. c. 175, § 110E, violation of M.G.L. c. 93A, and promissory estoppel. These claims, which seek enforcement of Federal's policy (as implausibly interpreted by Ms. Peguero), and in the alternative a determination that Federal's policy is invalid, are claims against Federal. Ms. Peguero in fact asserted these claims against Federal and then resolved them – for her own strategic reasons – by dismissing them with prejudice. It is settled law that a voluntary dismissal with prejudice operates as an adjudication on the merits of the dismissed claims "as fully and completely as if the order had been entered after trial." Tapalian v. Town of Seekonk, 188 F. Supp. 2d 136, 139 (D.Mass. 2002), quoting Bagley v. Moxley, 407 Mass. 633, 637 (1990).

The preclusive effect of such an adjudication depends on the circumstances. Here, where Ms. Peguero has sued Federal over the validity and enforceability of its permanent total

8

disability policy, and where those claims have been resolved against Ms. Peguero on the merits, she is precluded from maintaining those same claims against HealthExtras. Since HealthExtras had nothing to do with the drafting of Federal's policy, or Federal's handling (and denial) of her claim, Ms. Peguero's attempt to hold HealthExtras liable on claims based directly on Federal's policy must rely on a theory of vicarious liability.[2] This brings into play a principle codified in the Restatement (Second) of Judgments in relevant part as follows:

> If two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them . . . (1) a judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for the conduct unless:
>
>   (a)  The claim asserted in the second action is based upon grounds that could not have been asserted against the defendant in the first action; or
>
>   (b)  The judgment in the first action was based on a defense that was personal to the defendant in the first action.

Restatement (Second) of Judgments, § 51 (1982). This principle was applied in analogous circumstances in Gosselin v. Field, Hurley, Webb & Sullivan, 188 F. Supp. 2d 107 (D.Mass. 2002). In that case, this Court held that the plaintiff's settlement – and stipulation of dismissal with prejudice – of his malpractice claim against his former attorney barred him from further pursuing his claims against three other defendant attorneys, whom the plaintiff alleged were liable under a theory of "partnership by estoppel." 188 F. Supp. 2d at 109-110 and authorities cited. The same result should obtain here with regard to Ms. Peguero's claims based on Federal's policy.

---

[2] Ms. Peguero's complaint refers to the Plan as "a scheme devised by the Defendants," and includes many vague allegations of collective action by, and the collective liability of, "the defendants."

9

## II.  EVEN IF MS. PEGUERO'S POLICY-BASED CLAIMS ARE NOT SO PRECLUDED, THOSE CLAIMS FAIL ON THE UNDISPUTED FACTS

Even if not precluded by her settlement with Federal, Ms. Peguero's claims based on Federal's insurance policy should be dismissed as a matter of law, based on the undisputed facts.

### A.  Breach of Contract

Ms. Peguero's claim that she is "permanently and totally disabled" within the meaning of Federal's policy, and that Federal's denial of her insurance claim makes "the defendants" liable for breach of contract, is belied by the plain language of the initial promotional document she received.  Like many other disability insurance policies, several state workers' compensation statutes and the federal social security disability regulations,[3] Federal's policy defines "permanent total disability" by reference to a physical threshold requirement.  In addition to appearing in Federal's policy, this requirement is fully set forth in the initial promotional document Ms. Peguero received, under the bold heading "IMPORTANT DISCLOSURE."  Ms. Peguero's claim not to have read this disclosure is no defense to its enforcement as a matter of contract law.  See Miller v. Cotter, 448 Mass. 671, ___ (2007) and cases cited (absent fraud, party's failure to read or understand contract does not free him from its obligations).  Without for a moment diminishing the severity of Ms. Peguero's injury or the profound impacts it has wrought on her life, her resulting disability does not arguably meet the physical threshold requirement to be deemed a "permanent total disability."

---

[3] See e.g., Knepp v. Apfel, 204 F.3d 78, 86-87 (3d. Cir. 2000) (referencing social security disability regulations); Fagan v. Bankers Multiple Line Ins. Co., 669 F.2d 293, 294 & n.1 (5th Cir. 1982) (employer's group disability policy); Cotton v. Provident Life & Casualty Ins. Co., 951 F. Supp. 395, 396-397 (E.D.N.Y. 1997) (individual disability policy); Texas Labor Code § 408.161 (2006) (workers' compensation statute).

B.  "Illusory Policy"

Ms. Peguero's claim that Federal's policy is "illusory" similarly founders on the undisputed facts. Like most kinds of insurance, Federal's policy covers an event that is exceedingly unlikely to happen to a particular insured. At the same time, when considering a large population of insureds, such covered events are inevitable. It is easy to imagine many types of accidents that would result in a "permanent total disability" as defined in Federal's policy. Ms. Peguero's own accident – had it happened in a slightly different way – could very well have left her with such a disability. Imagination and speculation aside, Federal has in fact paid out millions of dollars in claims under its policy, which it underwrote for about four and a half years.[4] Just as the unlikelihood that one's house will burn down does not render fire insurance "illusory," the unlikelihood that an individual will be involved in a catastrophic accident that leaves him or her "permanently and totally disabled" as defined in Federal's policy does not render that policy "illusory."

III.  MS. PEGUERO'S SETTLEMENT WITH FEDERAL SHOULD BE DEEMED TO ALSO PRECLUDE HER CLAIMS BASED ON THE INITIAL PROMOTIONAL DOCUMENT SHE RECEIVED, LEGAL RESPONSIBILITY FOR WHICH RESTS SOLELY WITH FEDERAL

Ms. Peguero's dismissal with prejudice of her claims against Federal should be deemed to preclude her claims based on the initial promotional document she received. Massachusetts law – including M.G.L. c. 175, § 110E ("Section 110E"), on which Ms. Peguero's Second Cause of Action is based – makes insurers solely responsible for the form and content of written materials advertising or otherwise promoting their policies. By its express terms, Section 110E

---

[4] HealthExtras has separately moved for leave to file under seal an affidavit from an officer of Federal disclosing the number of permanent total disability claims Federal has received under the Plan, the number of those claims it has paid, and the total dollar amount of the claims it has paid. In the event this motion is denied and HealthExtras is unable to file the affidavit, HealthExtras will seek leave of court to file a new, substituted memorandum of law omitting this point.

applies to "insurers," a term defined in M.G.L. c. 175, § 1 as meaning the same as "company," which in turn is defined in relevant part as "all corporations, associations, partnerships and individuals <u>engaged as principals in the business of insurance</u> . . ."[5] (emphasis added). It is undisputed that neither of the remaining defendants is an insurer, within the meaning of Section 110E or otherwise. Moreover, Section 110E is principally an enabling act that directs the commissioner of insurance to make regulations governing insurance advertising, and authorizes the commissioner to enforce those regulations. It does not create a private right of action – even against insurers – with one narrow exception: in its final paragraph, it creates a private right of action against "[a]n insurer not authorized to do business in the commonwealth . . ."

One of Ms. Peguero's own proposed insurance experts, Tim Ryles, recognizes the responsibility of insurers (as opposed to non-insurers such as the remaining defendants) for all advertisements and other "descriptive literature" concerning their policies when he observes (referring to state versions of a model insurance advertising regulation), "Irrespective of the source of an advertisement, regulators hold insurers liable for compliance with the regulation." A copy of a relevant expert from Mr. Ryles' report dated October 4, 2006 is attached to the Accompanying Affidavit of Counsel as Exhibit D.

Consistent with its legal responsibility for the form and content of written materials promoting its policy, Federal <u>in</u> <u>fact</u> reviewed and approved all materials concerning the Plan, including the initial promotional document received by Ms. Peguero. Federal not only reviewed and approved that document, but <u>itself</u> prepared and supplied the "IMPORTANT DISCLOSURE" that, among other things, sets out Federal's definition of "permanent total

---

[5]The regulations promulgated under Section 110E, which appear at 211 CMR 40.00, <u>et</u> <u>seq.</u>, also use the term "insurer," as well as the term "carrier," which is defined in relevant part as "an insurer licensed or otherwise authorized to transact accident and health insurance under M.G.L. c. 175 . . . ."

12

disability." As non-insurers, the remaining defendants relied – reasonably – on Federal's knowledge of the laws and regulations governing insurance advertising, and, more specifically, on Federal's approval of the form and content of the promotional document in question. Because Ms. Peguero has dismissed with prejudice her claims against the party that, under Massachusetts law, is solely responsible for the form and content of the initial promotional document she received, she should be precluded from pursuing those same claims against the remaining defendants.

IV. **EVEN IF NOT SO PRECLUDED, MS. PEGUERO'S CLAIMS BASED ON THE INITIAL PROMOTIONAL DOCUMENT FAIL AS A MATTER OF LAW**

   A. Fraud/Deceit

Claims of fraud must be pleaded with particularity and proved by clear and convincing evidence. Compagnie De Reassurance D'Ile De France v. New England Reinsurance Corp., 825 F. Supp. 370, 379-380 (D.Mass. 1993) and cases cited. To prove her fraud claim here, Ms. Peguero must prove by clear and convincing evidence that (1) the remaining defendants made a false representation of a material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing her to act thereon, and that (4) she reasonably relied on the false representation as true, and (5) acted on the representation to her detriment. Pearce v. The Duchesneau Group, Inc., 392 F. Supp. 2d 63, 72-73 (D.Mass. 2005) and cases cited. HealthExtras submits that Ms. Peguero cannot satisfy any of these elements with any evidence, much less clear and convincing evidence.

Ms. Peguero cannot demonstrate that any factual statement in the initial promotional document is false and was made with knowledge of its falsity. To the extent Ms. Peguero claims that the headline at the top of the promotional document, or any of the descriptive language in

13

the body of the document, constitutes a false statement of fact, HealthExtras submits that any claimed reliance by Ms. Peguero – or any person – on such statements as expressing all material terms of an insurance policy is unreasonable as a matter of law.  This is particularly so given that these statements include (1) a reference to the fact that enrollees will receive, within 10 days, "a Plan Summary and complete Benefit Plan Description" to review, after which, if not satisfied for any reason, the enrollee can cancel and receive a full refund,[6] and (2) a direction, prominently located just above the tear-off form, that reads "For more plan details and additional benefits, please see reverse side" (where one would see, set off by itself in the middle of the page, under a large, bold caption, Federal's "IMPORTANT DISCLOSURE").

Moreover, putting aside the hypothetical "reasonable person," it is an undisputed fact that Ms. Peguero read these statements and <u>knew</u> that this initial promotional document was not the entire agreement, and that, apart from this document, there was an insurance policy with detailed provisions defining the circumstances in which she would receive $1.5 million and the circumstances in which she would not.  Ms. Peguero candidly testified that she did not want to know how the policy defined "permanent disability."  In light of her deposition testimony, Ms. Peguero cannot credibly claim to have ever believed that her own understanding of "permanent total disability" would control her entitlement to benefits under the Plan.

Even if Ms. Peguero could prove that some factual statement in the initial promotional document was both false and known by the remaining defendants to be false, and that she reasonably relied on that statement as true, Ms. Peguero cannot prove by clear and convincing

---

[6]For purposes of summary judgment, HealthExtras accepts Ms. Peguero's testimony that she did not receive these additional, detailed materials.  However, should the case stand for trial, HealthExtras expects to show that it mailed the complete "Welcome Packet" to Ms. Peguero's correct address, and that, under settled law concerning the "presumption of regularity" in mail delivery, Ms. Peguero will be deemed to have received those materials.  <u>United States v. Stewart</u>, 472 F.2d 1114, 1118 (1st Cir. 1973).

evidence that she acted on any such statement to her detriment, such that she is entitled to damages in the amount of $1.5 million. To do so, she would have to show that, had she known "the truth," she could have, and would have, obtained some alternative insurance that would have covered her eventual injury and paid her a comparable benefit.[7] While it would be easy for Ms. Peguero to now say that she "would have" done just that, HealthExtras submits that such a claim would be incredible in light of her deposition testimony that, before she received the initial promotional document at issue, she was not even aware that disability insurance existed. However, whether or not she claims that she "would have" done so, Ms. Peguero will be unable to show that she <u>could have</u> purchased any remotely comparable, low-cost disability insurance that would have covered her injury and paid her anything approaching $1.5 million.

Ms. Peguero's own recent expert disclosure (which was the subject of HealthExtras' motion to strike the disclosure as untimely) sheds light on this point. Ms. Peguero's purported expert, an insurance agent named Glendon Nickerson, presents two hypothetical "proposals" for what he calls "traditional disability income insurance" that Ms. Peguero could have purchased in 2002 – one with a monthly premium of $93.97, a figure seven times higher than Ms. Peguero's total monthly fee of $12.95 for <u>all</u> benefits under the Plan, and the other with a monthly premium of $226.52, over <u>17 times</u> higher than the monthly fee under the Plan. <u>See</u> Attachment #1 to HealthExtras' Motion to Strike Plaintiff's Late Disclosure of a New Expert, Document #89. According to these proposals, the maximum benefit Ms. Peguero could have hoped to receive – after up to 24 years of monthly payments – would have been about $600,000, or less than half of the lump sum payment she would have received had she qualified for the maximum benefit under the Plan. <u>Id.</u>

---

[7] In the absence of such a showing, Ms. Peguero's only arguable detriment as of the time of her accident was her payment of approximately $78.00 in monthly Plan fees.

15

For all of these reasons, HealthExtras submits that Ms. Peguero's "fraud/deceit" claim fails as a matter of law.

### B. Promissory Estoppel

To prove her claim for promissory estoppel, Ms. Peguero must show that (1) the remaining defendants made an unambiguous promise or representation to her, (2) she acted, or omitted to act, in reasonable reliance on that promise or representation, and (3) she has suffered harm as a result of her act or omission. Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F. Supp. 404, 419-420 (D.Mass. 1995). Given the similarities between the elements of fraud and promissory estoppel, HealthExtras submits that, for the reasons argued above, Ms. Peguero cannot prove that the initial promotional document at issue contained any unambiguous promise or representation that she could have – or did – reasonably rely on, and that, in any event, she cannot prove that she suffered any harm as a result of any such reliance. For these reasons, HealthExtras submits that Ms. Peguero's promissory estoppel claim fails as a matter of law.

### C. M.G.L. c. 175, § 110E

As set forth in Argument section III. above, with one exception not relevant here, there is no private right of action under M.G.L. c. 175, § 110E. Accordingly, Ms. Peguero's claim under Section 110E fails as a matter of law.

### D. Breach of Contract

As set forth in Argument section II.A. above, Ms. Peguero's injury does not arguably meet Federal's definition of "permanent total disability," which was fully set forth in Federal's "IMPORTANT DISCLOSURE" that Ms. Peguero chose not to read. Thus, even assuming arguendo that the initial promotional document was a contract between the remaining defendants

and Ms. Peguero, Federal's denial of her claim, based on the clear language of its policy, could not have been a breach of that contract, and her breach of contract claim fails as a matter of law.

### E. M.G.L. c. 93A

Ms. Peguero's claim under M.G.L. c. 93A is entirely derivative of her other claims, all of which, as set forth above, are baseless. Because Ms. Peguero presents no "unique arguments" in support of her Chapter 93A claim, that claim, too, fails as a matter of law. <u>Egan v. Athol Memorial Hosp.</u>, 971 F. Supp. 37, 47 (D.Mass. 1997).

### Conclusion

For the foregoing reasons, HealthExtras submits that it is entitled to summary judgment dismissing all of Ms. Peguero's remaining claims with prejudice.

HEALTHEXTRAS, INC.,

By its attorney,

  /s/  Donald R. Pinto, Jr.
Donald R. Pinto, Jr., BBO No. 548421
RACKEMANN, SAWYER & BREWSTER
One Financial Center
Boston, Massachusetts  02111
(617) 542-2300

Dated:  April 14, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

                                                    /s/ Donald R. Pinto, Jr.
                                                    Donald R. Pinto, Jr.

Dated: April 14, 2007