UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALTAGRACIA PEGUERO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-10995-WGY |
| ) | |
| AMERICAN EXPRESS COMPANY ) | |
| and HEALTHEXTRAS, INC., ) | |
| ) | |
| Defendants. ) | |

AFFIDAVIT OF COUNSEL

Donald R. Pinto, Jr. says the following of his personal knowledge:

1.      I am a member in good standing of the bars of the Commonwealth of

Massachusetts and of this court.  I represent the defendant HealthExtras, Inc. ("HealthExtras") in

the above-captioned case.

2.      Attached as Exhibit A is an exemplar of the initial promotional document that the

plaintiff, Altagracia Peguero ("Ms. Peguero"), received in July, 2002.

3.      Attached as Exhibit B are relevant excerpts from the deposition of Altagracia

Peguero taken on March 15, 2007.

4.      Attached as Exhibit C are relevant excerpts from the Rule 30(b)(6) deposition of

HealthExtras taken on February 2, 2007.

5.     Attached as Exhibit D is a relevant excerpt from the October 4, 2006 report of one of Ms. Peguero's proposed insurance experts, Tim Ryles.

Signed under the penalties of perjury this 14th day of April, 2007.

_____/s/ Donald R. Pinto, Jr._____
Donald R. Pinto, Jr.

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

_____/s/ Donald R. Pinto, Jr._____
Donald R. Pinto, Jr.

Dated:  April 14, 2007



**Cards**

B021:0001

Sample A. Sample
1044 Pulinski Road
Ivyland, PA  18974-1552

# Financial
# Security

You're covered with
## up to $1.5 Million

if an accident leaves you
permanently disabled.

Dear Sample A. Sample:

You've worked hard to achieve the lifestyle you enjoy today.  At American Express, we understand that our Cardmembers' need for financial security and peace-of-mind is a step above the ordinary.

That's why we are pleased to offer you one of the most affordable catastrophic accidental disability plans available today.  The Accidental Disability Plan *from* American Express provides you with **$1 million** in one lump sum if you are permanently disabled due to an accident and can't return to work.  For just $9.95 a month, you can help guarantee your financial security now and in the future. <u>And, as a special offer, you can increase your coverage to **$1.5 million for only $3 more per month**</u>.

Acceptance is easy.  To start your coverage, simply fill out the form below and send it in.  Within 10 days, you will receive a Plan Summary and a complete Benefit Plan Description.  Review the Plan materials at your leisure.  If you are not satisfied for any reason, you may cancel within the first 90 days and receive a full refund of Plan fees.  There's absolutely no risk.

With the Accidental Disability Plan *from* American Express you can prevent a personal tragedy from becoming a financial tragedy.  Enroll now, and for as little as $9.95 a month, you can rest assured that you are protected.

Sincerely,

*Anne Schepp*

Anne Schepp
Insurance Officer

P.S. Take a look at this valuable plan for 90 days – risk-free.

P6719                    For more plan details and additional benefits, please see reverse side.                    L-MCT-AD-0302

---



*"Most people don't think about disability coverage until it's too late. Please don't put this off."*

— Christopher Reeve

**✓Yes!** Please sign me up for the Accidental Disability Plan *from* American Express that includes other valuable benefits. Please bill my American Express® Card.  I understand that I can cancel my coverage for any reason and receive a full refund within the first **90 days.**

**Please select coverage and payment option:**

☐ **$1 Million** for **$9.95** per month (or **$99** per year) or

☐ **$1.5 Million** for **$12.95** per month (or **$135** per year)

☐ I choose to pay on an annual basis *and save $20!*

(____) _____   Date of Birth* __/__/__
Home Phone

☐ **Please enroll my spouse** for the same coverage I selected above for an additional $5.95 per month or $70 per year (for $1 Million) or $7.95 per month or $80 per year (for $1.5 Million). *(Spouse will be enrolled in same coverage as Cardmember.)*

_____   Date of Birth* __/__/__
Name of Spouse
MCTA-99-0000001

J06

Sample A. Sample
1044 Pulinski Road
Ivyland, PA  18974-1552
9999 999999 99999

X _____
Please sign here

I understand that if I do not select a benefit option, I will be enrolled in the $1 million benefit and billed monthly. If I choose the annual payment option, my Card will automatically be billed annually unless I notify American Express to cancel my coverage.

A-MCT-AD-0302

**THESE ADDITIONAL VALUABLE BENEFITS ARE INCLUDED WITH YOUR PLAN:**

**$2,500 Emergency Accident & Sickness Medical Expense Benefit** (per family) — If you, your spouse, or your dependent children are 100 miles or more from your home and suddenly require medical attention as a result of an accident or an illness, we will reimburse you up to $2,500 ($500 maximum per family member) per year for co-insurance and/or deductible expenses. If you do not have health insurance, up to $100 per day of medical care will be paid directly to you instead to a maximum of $500 per family member per year. Should you use this benefit even once, it could amount to hundreds of dollars in savings.

**Medical Care Coordination Benefit** — In the event you become permanently disabled, a medical care coordinator will be available to help you evaluate care options and provide guidance and assistance in obtaining appropriate medical treatment.

**IMPORTANT DISCLOSURE:**

Please read carefully. The accidental disability policy provides you with a $1 million or $1.5 million benefit (based on your selection) for catastrophic accident disability situations only and includes a $1,000 Accidental Death and Dismemberment benefit. **Accidental Permanent Total Disability:** All benefits subject to the terms, conditions, definitions, limitations and exclusions, including pre-existing condition provisions, as set forth in master policy no. 6475 26 11 issued by Federal Insurance Company (Rated "A++" (Superior) by A.M. Best) to Citizens Bank of Rhode Island, as Trustees for G.A.R.D. Trust for the account of HealthExtras/American Express, and as summarized in the American Express Accidental Disability Plan Benefit Plan Description. Written proof of a total permanent disability resulting from an accidental injury which (1) commences within 365 days of the date of the accidental injury, (2) continues without interruption for at least a year from the date the total permanent disability commences, (3) results in the entire and irrecoverable loss of use of both hands or both feet, or one hand and one foot, or the sight of both eyes, or the hearing of both ears, or the ability to speak, and (4) prevents the insured from returning to work must be provided. **\*Must be over age 18 and less than 70 to be eligible.** There is no insurance coverage at age 70 or over. Exclusions: This insurance does not cover loss resulting from: an Insured's emotional trauma, mental or physical illness, disease, pregnancy, childbirth or miscarriage, bacterial or viral infection (except bacterial infection caused by an accident or from accidental consumption of a substance contaminated by bacteria), or bodily malfunctions; suicide, attempted suicide or intentionally self-inflicted injuries; declared or undeclared war. This insurance also does not apply to an accident occurring while: an Insured is in, entering or exiting any aircraft while acting or training as a pilot or crew member; participating in military service; committing or attempting to commit a criminal act; being intoxicated or under the influence of any narcotic unless taken on the advice of a physician; participating in any professional sport; or participating in parachute jumping from an aircraft. Pre-existing Condition: This insurance does not apply to Loss caused by or resulting from an illness, disease or accidental injury of the insured person for which medical advice, diagnosis, care or treatment was recommended or received within 6 months prior to the effective date of coverage. A pre-existing condition will not be excluded after 12 months has elapsed from the effective date of the insured's coverage. **Additional Program Benefits:** A $2,500 Emergency Accident and Sickness Medical Expense Benefit and a Medical Care Coordination Benefit will be provided in your benefit package. **Other Disclosures:** The $2,500 Emergency Accident and Sickness Medical Expense Benefit is underwritten by Virginia Surety Company, Inc. (Rated "A+" (Superior) by A.M. Best) under Travel Protection Policy HTP00137. Insurance offered through The Sklover Group, Inc., 400 Post Avenue, Westbury, NY 11590. **Not a Medicare Supplement.** Program may not be available in all states. Coverage is effective on the first day of the month following receipt of payment from you. Program available through HealthExtras, 2273 Research Boulevard, Rockville, MD 20850. **Annuity Option:** At the time of benefit payment, you may elect an annuity option arranged by HealthExtras: For $1 million benefit - a $500,000 cash payment plus $5,000 a month for 20 years for a total of $1.7 million; or for $1.5 million benefit - a $500,000 cash payment plus $7,500 a month for 20 years, totaling $2.3 million. Payments made for endorsement. This literature is descriptive only. Actual coverage is subject to the language of the master policy as issued.

Program subject to change. This program may be modified, suspended, cancelled or otherwise terminated with notice.

CT.0302



**Cards**

**Page 1**

```
 1                                    Volume:    1
                                      Pages:    1-125
 2                                    Exhibits: 1-11

 3            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
 4
                      C.A. NO. 05-10995-RCL
 5
     *****************************************x
 6   ALTAGRACIA J. PEGUERO,
                    Plaintiff
 7
            vs.
 8
     AMERICAN EXPRESS COMPANY, AND
 9   HEALTHEXTRAS, INC.,
                    Defendants
10   *****************************************x

11              DEPOSITION OF ALTAGRACIA J. PEGUERO,

12   a witness called on behalf of the Defendant, pursuant

13   to the applicable provisions of the Massachusetts Rules

14   of Civil Procedure, before Camille Macomber, Registered

15   Professional Reporter and Notary Public within and for

16   the Commonwealth of Massachusetts, at the Law offices

17   of Rackemann, Sawyer & Brewster, One Financial Center,

18   Boston, Massachusetts, on Thursday, March 15, 2007,

19   commencing at 10:00 a.m.

20

21              SHEA COURT REPORTING SERVICES
22              ONE UNION STREET, SECOND FLOOR
                BOSTON, MASSACHUSETTS 02108
23                    (617)227-3097

24
```

**Page 2**

```
 1   APPEARANCES:

 2      LAW OFFICES OF KEVIN DONIUS, P.C.
 3      By Kevin Donius, Esquire
        424 Adams Street
 4      Suite 100
        Milton, Massachusetts 02186
 5           On behalf of the Plaintiff

 6

 7

 8      RACKEMANN, SAWYER & BREWSTER
 9      By Donald R. Pinto, Jr., Esquire
        One Financial Center
10      Boston, Massachusetts 02111
             On behalf of the Defendant

11

12

13

14      MULTILINGUAL GROUP
15      By Erica Noymer, Interpreter
        @ Fanueil Hall marketplace
16      Third Floor
        Boston, Massachusetts 02109

17

18

19

20

21

22

23

24
```

**Page 3**

```
 1                      I N D E X

 2   WITNESS            DIRECT    CROSS    REDIRECT

 3   Altagracia J. Peguero
 4     By Mr. Pinto...........4................120
       By Mr. Donius....................119

 5

 6              E X H I B I T S

 7   NO.   DESCRIPTION                          PAGE

 8   1     Copy of American Express Bill from
           July 2002....................................41
 9
     2     Copy of American Express Bill with
10         closing date of November 25, 2002............51

11   3     Copy of American Express bill from
           March 2003...................................53
12
     4     Copy of American Express bill from
13         August 2003..................................55

14   5     Letter From American Express Cards...........58

15   6     Copy of bottom of form, signed by
           Altagracia Peguero...........................75
16
     7     Letter to Altagracia Peguero from
17         American Express.............................76

18   8     Copy of Accidental Disability Plan from
           American Express Plan Summary................78
19
     9     Copy of Accidental Disability Plan from
20         American Express.............................80

21   10    Letter to Altagracia Peguero, dated
           October 27, 2004.............................84
22
     11    Copy of Accident Protection Plan from
23         American Express Program Summary.............85

24         (Exhibits retained by Attorney Pinto)
```

**Page 4**

```
 1              P R O C E E D I N G S
```

 2      ERICA D. NOYMER, the interpreter, was
 3   duly sworn by the Notary Public to interpret the
 4   proceedings to the best of her ability.

 5

 6      ALTAGRACIA J. PEGUERO,
 7      upon production of her driver's
 8   license, being duly sworn by the Notary Public,
 9   was examined and testified as follows:

10

11      MR. PINTO:  The parties have agreed
12   and stipulated that we will reserve objections,
13   except as to the form of the question, reserve
14   motions to strike.  The witness will read and
15   sign the transcript within 30 days under the
16   penalties of perjury.

17      DIRECT EXAMINATION
18   BY MR. PINTO:
19   Q  Ms. Peguero, we're going to have an audio tape
20      as well as a written transcript of today's
21      deposition.  The reason for that is so we will
22      have a record of any Spanish that's spoken by
23      the interpreter to you or by you to the
24      interpreter, because Camille is only going to be

EXHIBIT B

Page 5

1     taking down the English. But as I've discussed
2     with Kevin, I would like to try to conduct the
3     deposition in English to the extent we can. So
4     I would ask that if you don't understand my
5     question, please tell me, and I will either try
6     to rephrase it in English or ask the interpreter
7     to interpret it for you. Then if you're able to
8     answer in English, please do so. If you don't
9     feel you're able to, you can answer in Spanish,
10    and Erica will interpret the answer back.
11  A  Okay.
12  Q  Could you tell me your full name, please?
13  A  Altagracia Jacqueline Peguero.
14  Q  Where do you live now, Ms. Peguero?
15  A  One Shandon Road, Apartment 215 in Dorchester,
16     Massachusetts 02124.
17  Q  How long have you lived at that address? How
18     many years?
19  A  Almost nine.
20  Q  Where were you born?
21  A  Dominican Republic.
22  Q  What city or town?
23  A  Bani, B-a-n-i.
24  Q  What year did you come to the United States?

Page 6

1  A  1993.
2  Q  '93?
3  A  Yes.
4  Q  Where did you first live when you moved to the
5     U.S.?
6  A  My first address?
7  Q  Yes.
8  A  It's 158 Boylston Street, Jamaica Plain.
9  Q  How many years did you live at that address?
10  A  Until '97, I think so.
11  Q  In '97, did you move to Shandon Street?
12  A  No, I moved with my friend at 94 Montebello
13     Street, Jamaica Plain, too.
14  Q  Would you spell the name of that street.
15  A  Montebello.
16  Q  Are you a U.S. citizen?
17  A  Yes, I am.
18  Q  When did you become a U.S. citizen?
19  A  July 2002.
20  Q  Do you have two children?
21  A  Yes.
22  Q  What are their names?
23  A  Jonathan Pena and Jeffrey Pena.
24  Q  How old are they?

Page 7

1  A  Jonathan is 18, and Jeffrey is 12.
2  Q  Does Jonathan live with you still?
3  A  Yes, just for a while because he's living at the
4     college now.
5  Q  What college does he attend?
6  A  Worcester State College.
7  Q  Jeffrey lives in your household?
8  A  Yes, all the time.
9  Q  Is there anyone else who lives in your household
10    with you?
11  A  Yes, now Hector is living with me, Hector
12     Amador.
13  Q  His last name is Amador with an R at the end?
14  A  Yes.
15  Q  Are you married?
16  A  No.
17  Q  Have you ever been married?
18  A  No.
19  Q  Who is the father of your boys?
20  A  Luis Adolfo Pena.
21  Q  Does he live in the U.S.?
22  A  No, never.
23  Q  Does he live in the Dominican Republic?
24  A  Yes.

Page 8

1  Q  Does Hector have any children of his own?
2  A  Not with me.
3  Q  Do you know if he has any children?
4  A  Yes, he has one.
5  Q  One child?
6  A  Yes, one child.
7  Q  Are you taking any medications this morning?
8  A  Yes.
9  Q  What medications have you taken this morning?
10  A  Neurontin and Baclofen and Ritalin.
11  Q  Do any of those three affect your ability to
12     remember, affect your memory?
13  A  I think so.
14  Q  Any one of them or all of them?
15  A  I think the Ritalin -- no, not Ritalin, sorry.
16     The Neurontin does something to me.
17  Q  Have you noticed when you've taken it in the
18     past that it affects your memory?
19  A  I taken more in the last like five, three, four
20     or three months because I was -- my pain was
21     increasing, and they needed to increase the
22     doses.
23  Q  That's the Neurontin?
24  A  Neurontin, yes.

Multi-Page

**Page 9**

1 Q Do you know what the dosage is of Neurontin that
2    you've taken today?
3 A 800 milligram.
4 Q Have you ever been convicted of a crime?
5 A Me?
6 Q Do you understand?
7 A Yeah. No, never.
8 Q Do you understand convicted of a crime, what
9    that means?
10 A Yes.
11 Q Okay.
12 A No.
13 Q Could you tell me about your education in
14    Dominican Republic beginning with high school?
15 A Sure. Yes, I assisted to the Francisco Colegio,
16    which is high school.
17 Q You graduated from that high school?
18 A Yes.
19 Q What year was that?
20 A I think it was '81.
21 Q Did you take any English courses in high school?
22 A No.
23 Q After high school, where did you attend?
24 A I attended Universidad Autonoma de Santo

**Page 10**

1    Domingo.
2 Q How long did you attend there?
3 A It was six years.
4 Q What did you study?
5 A Community dentistry, odontology is the name.
6 Q Odontology?
7 A Odontology school.
8 Q Is that a school for odontology or is it a
9    general school with different courses of study?
10 A Yes, it's a general school.
11 Q But you pursued dentistry for six years?
12 A Yes.
13 Q Did you take English courses at college or at
14    university?
15 A No.
16 Q Did you receive a degree of completion?
17 A Yes.
18 Q When was that?
19 A It was '87, something like that. '87, '88, I
20    don't remember exactly.
21 Q Was your degree, your certificate in dentistry?
22 A Yes.
23 Q Did you have any other schooling in Dominican
24    Republic after that six years at the university?

**Page 11**

1 A I've taken many courses after the one that I
2    received -- what do you say - diploma.
3 Q Diploma?
4 A Diploma, yes.
5 Q That was after your university education?
6 A Yes.
7 Q Were those further courses in the field of
8    dentistry also?
9 A Yes, everything in dentistry.
10 Q When did you first begin working in dentistry in
11    the Dominican Republic?
12 A I started to work, I think it was before I
13    graduated, because in my country it is no
14    problem, you can start to work without
15    finishing.
16 Q So before 1987 --
17 A Yes.
18 Q -- you began working?
19 A Um-hmm.
20 Q Were you working in the office of a dentist?
21 A No, my own office.
22 Q How many years were you doing that before you
23    came to the U.S.?
24 A It's like since '86. Yes, it was around the end

**Page 12**

1    of '86.
2 Q So between 1986 and 1993, you were practicing
3    dentistry in Dominican Republic?
4 A Yes.
5 Q Why did you decide to come to the U.S. in 1993?
6 A Because my family moved here.
7 Q Your family had already moved here?
8 A Yes.
9 Q Which members of your family did you have in
10    mind?
11 A My parents, my brothers and sisters. And this
12    time I separate from the father of my sons, of
13    my children.
14 Q Do your parents live in the Boston area?
15 A Yes, they are living at Salem, Massachusetts.
16 Q Salem?
17 A Yes.
18 Q How many brothers and sisters do you have?
19 A Five.
20 Q Are all of them in the United States?
21 A Yes -- no, one is living in the Dominican
22    Republic. My other sister is living there.
23 Q Are they in the Boston area also, your brothers
24    and sisters who are you in the U.S.?

Case 1:05-cv-10995-WGY     Document 93-3     Filed 04/14/2007     Page 4 of 17

Page 25

1  Q  Did you do any work on patients, dental work
2     yourself?
3  A  No.
4  Q  Did you do teeth cleaning?
5  A  No.
6  Q  Were there dental hygienists who also worked in
7     the office?
8  A  Dental hygienists are different, you know, yes.
9  Q  There were dental hygienists who worked for
10    Dr. Carr also?
11 A  Yes, they are dental hygienists, but they are
12    different person.
13 Q  What do you call your job at the office?
14    Assistant?
15 A  Yes, dental assistant.
16 Q  When you came to the U.S., did you investigate,
17    look into whether you could practice as a
18    dentist in the U.S.?
19 A  Oh yes.
20 Q  What did you find out?
21 A  After I arrive to Dr. Carr, I have a lot of
22    information.  There are some girl, co-worker who
23    was trying to get her dental license too,
24    because she was working with me.  And she

Page 26

1     conveyed me to the information, and I started to
2     study to apply for my first national board.
3  Q  That was a test that you would have to take?
4  A  Yes, before I go to the university.
5  Q  So you would have to take a test in order to go
6     to the university?
7  A  Yes.
8  Q  Then how much schooling did you have to do?
9  A  Two years, and another board, and another
10    national board.
11 Q  After the school?
12 A  Yes, while or after.
13 Q  Did you take any action, any steps to enroll in
14    any course to study?
15 A  The first time I was preparing myself, because
16    after you apply, they have to send everything to
17    you the day before the test, you know, then you
18    are supposed to be ready for that, and I was
19    trying to be ready.  I'm sorry.
20       MR. PINTO:  That's okay, do you want
21    to take a few minutes?
22       (Off the Record.)
23 Q  So you had gotten materials to study?
24 A  Oh yes.

Page 27

1  Q  Had you gone to any classroom to study?
2  A  No, I was doing it by myself.  After I enrolled,
3     I can go for less than six months, but it's too
4     much material.  You need to be ready.
5  Q  So you had study materials that you studied on
6     your own?
7  A  Yes.
8  Q  Then you were going to take a board test?
9  A  Yes.
10 Q  And that would tell whether you could go to
11    dental school?
12 A  Yes.
13 Q  Was that test for a particular school?
14 A  No, it was for general.  I can study at any
15    university here after I take this test.
16 Q  Did you take the test?
17 A  No.
18 Q  You didn't end up taking the test?
19 A  I didn't apply because I have my accident.  That
20    changed my life.
21 Q  Do you remember when the test was going to be?
22 A  It was supposed to be in July, I think so, June
23    or July of 2003.
24 Q  2003?

Page 28

1  A  Yes.
2  Q  So you were studying for a long time in advance?
3  A  Yes.
4  Q  In July of 2002, you were studying?
5  A  Yes, I started to study in 2002.
6  Q  Do you remember when in 2002 you got the
7     materials and began studying?
8  A  I think it was -- I don't remember exactly.  I
9     don't remember exactly.
10 Q  When you lived in the Dominican Republic, did
11    you have any kind of insurance?
12 A  In my country?
13 Q  Yes.
14 A  No, just healthcare, insurance for health.
15 Q  In the Dominican Republic, is health insurance
16    something that you buy privately?
17 A  Yes.
18 Q  You had that kind of insurance?
19 A  Yes.
20 Q  Any other kind of insurance?
21 A  No.
22 Q  Life insurance?
23 A  No.
24 Q  Disability insurance?

Page 29

1   A  No.
2   Q  Did you have auto insurance in Dominican
3       Republic?
4   A  What?
5   Q  Car, auto insurance.
6   A  Sure.
7   Q  Did you have written material about your health
8       insurance in Dominican Republic that explained
9       what the insurance covered?
10  A  Yes, I remember I have it there, but I leave it
11      there.
12  Q  Similarly, with auto insurance, did you get an
13      auto insurance policy?
14  A  No, there it is different. There it is
15      different.
16  Q  What's different about it?
17  A  They are different from there. Everything is
18      different there from here.
19  Q  Do you get paper that explains --
20  A  Sure, I have paper, yes.
21  Q  -- what the insurance covers?
22  A  Yes.
23  Q  You didn't have any insurance other than health
24      insurance and auto insurance --

Page 30

1   A  No.
2   Q  -- in the Dominican Republic?
3   A  No.
4   Q  When you came to the U.S., did you have health
5       insurance when you got here?
6   A  Yeah, I have Mass. Health.
7   Q  How soon after you got to the U.S. did you
8       enroll in Mass. Health?
9   A  After Mass. Health, I just have my disability
10      insurance.
11  Q  My question was, after you arrived in the U.S.,
12      how many months before you got Mass. Health?
13      Did you get it right away?
14  A  No, I don't have any insurance.
15  Q  For a while you had no insurance?
16  A  Yes.
17  Q  How many months or years?
18  A  No, it was not too much, it was just like two
19      month -- no, it was more. I don't remember
20      exactly. I can't remember.
21  Q  But it was a few months, and then you got Mass.
22      Health?
23         MR. DONIUS: Objection to the form,
24      but go ahead, you can answer. Don't guess or

Page 31

1       speculate, but if you know...
2   A  No, I don't remember exactly.
3   Q  Then you enrolled in Mass. Health?
4   A  Yes.
5   Q  Do you remember getting materials from Mass.
6       Health that described what the health coverage
7       was?
8   A  Yes.
9   Q  Did you read those materials?
10  A  Sure.
11  Q  Do you keep those materials at your home?
12  A  Yes, I think so. Yes, I have it.
13  Q  Do you have a file or a drawer that you keep --
14  A  Yes, I have a file.
15  Q  Is that for insurance papers?
16  A  Yes.
17         MR. DONIUS: Altagracia, I'm just
18      going to ask that you wait until he completely
19      finishes his question before you go onto your
20      answer.
21         THE WITNESS: Okay.
22  Q  Did you keep Mass. Health continuously from the
23      time you started up to the present time?
24  A  No, because I don't have a confirming before.

Page 32

1   Q  I'm sorry?
2   A  I don't have my own apartment, I couldn't have a
3       good record of all of my things because I was
4       living with another person in a room.
5   Q  So you couldn't have Mass. Health?
6   A  Yes, sometimes they throw away my papers, you
7       know, because it was not really my home.
8   Q  Let me see if I understand that. After you got
9       to the U.S., you enrolled in Mass. Health?
10  A  Yes.
11  Q  But then you lost the Mass. Health coverage?
12  A  Oh, yes, I lost for a long time.
13  Q  It was because you were not living on your own?
14  A  No, it was not for that. I went to the
15      Dominican Republic for a while, and then when I
16      come back, they have send to me the paper for
17      renewing, and I couldn't send it in time, and it
18      was late.
19  Q  I understand. So you went back to Dominican
20      Republic after you got to the U.S.? You went
21      back to the Dominican Republic --
22  A  It was just for a few times. I was going to
23      Dominican Republic many times.
24  Q  For a visit?

Page 33

1   A   Yes, for visit. Sometime my grandpa, my father
2       was sick, and my grandma and my grandpa, you
3       know. For many reasons.
4   Q   So many times?
5   A   Yes.
6   Q   How long of a trip did you take?
7   A   It's hard for me to say how long.
8   Q   Was it sometimes that you were gone for one
9       month?
10  A   No.
11  Q   Not that long?
12  A   No. I don't remember.
13  Q   Were there times when you were gone for --
14  A   Let me see. Yes, one time I just spend the time
15      there. Yes, one time I need to go because I
16      didn't have a place where I can live here, and I
17      need to go back. But I come back a few times,
18      you know. Then I found a place where I was
19      going to live.
20  Q   So when you first got to the U.S., you stayed
21      for a while, and then went back to Dominican
22      Republic for a while?
23  A   Yes, I was coming and going, you know.
24  Q   During what years were you coming and going?

Page 34

1   A   It was not too much because I have to work for
2       my son, I need to have the money for my son. It
3       was many times. I have been there many times.
4   Q   But in 1994, were you back and forth between
5       Dominican Republic and the U.S.?
6   A   In '94, yes, I drive my younger son to his
7       father because they didn't know him, you know.
8       After Jeffrey born, I went there for a while. I
9       don't remember exactly for the time, but I know
10      I remember this time.
11  Q   Was that time a few weeks or a few months that
12      you went back?
13  A   No, I don't remember exactly.
14  Q   In 1995 and 1996, did you continue going back
15      and forth?
16  A   Yes.
17  Q   Did you have in those years a residence in the
18      Boston area that you kept?
19          MR. PINTO: Maybe I could use a
20      translation on this.
21  Q   In 1995 and 1996, did you keep a residence in
22      the Boston area that you would return to when
23      you came back from Dominican Republic?
24  A   Yes, the same place. 158 Boylston Street. Yes,

Page 35

1       I keep this address.
2   Q   How soon after you got to the U.S. did you get a
3       car here?
4   A   After I came here to live.
5   Q   Yes. Did you get an automobile right away?
6   A   No. I have a car, I think it was in 1997 I have
7       my first car here.
8   Q   Did you buy auto insurance for your car?
9   A   Sure.
10  Q   Did you get a copy of a auto policy, insurance
11      policy?
12  A   I don't remember. I need to check my file.
13  Q   Do you have a file that you keep insurance
14      policies? Is it a separate file for insurance
15      at your house?
16  A   Yes.
17  Q   You understand that insurance is an agreement
18      between you and a company?
19  A   Yes.
20  Q   There's a written contract?
21  A   Yes.
22  Q   And that contract spells out or tells you what
23      the company's obligations are to you?
24  A   Yes.

Page 36

1   Q   And you have obligations to the company? Do you
2       understand that?
3   A   Yes.
4   Q   Apart from your Mass. Health insurance and your
5       auto insurance, have you had any other insurance
6       since you've been in the U.S., putting aside
7       this American Express plan?
8   A   No.
9   Q   Did you have any life insurance ever?
10  A   No.
11  Q   Never had life insurance?
12  A   Never have it.
13  Q   Have you ever had any other type of disability
14      insurance other than the American Express
15      disability plan?
16  A   Before or after?
17  Q   Before, while you lived in Dominican Republic?
18  A   No.
19  Q   How about since you have been in the U.S.?
20  A   No.
21  Q   No other kind of disability insurance?
22  A   No other kind.
23  Q   Before you enrolled in the American Express plan
24      that this case is about, had you shopped for

Page 37

1  disability insurance?
2  A  No, I didn't look because I don't know about
3     this kind of insurance before, you know.  But I
4     was thinking about it when I saw American
5     Express offer.
6  Q  But before you saw that offer, you weren't
7     thinking about it?
8  A  No.
9  Q  Does disability insurance exist in the Dominican
10    Republic, do you know?
11 A  I don't know.
12 Q  Before you enrolled in the American Express plan
13    that this case is about, were you aware of life
14    insurance?
15 A  No.
16 Q  You didn't have any knowledge of what that was?
17 A  No.
18 Q  Did you ever talk to anyone, family or friends
19    about disability insurance before you enrolled
20    in the American Express plan?
21 A  Before, no.
22 Q  How about life insurance, did you ever discuss
23    that with anyone?
24 A  My older brother sometime told me about that,

Page 38

1     but I don't pay attention to that.
2  Q  You said what?
3  A  My older brother told me about life insurance
4     one time, but I don't pay attention to that
5     because I have no interest in that.
6  Q  Why did you have no interest in that?
7  A  I don't know, because I see many bad things here
8     about the son or the boyfriend or something like
9     that will get the money from this insurance.
10 Q  I don't think I understood that.
11       THE INTERPRETER:  Express it again,
12    yourself.
13 A  I don't take this kind of insurance because I
14    see in the United States many cases where sons
15    killing the father or the mother or their
16    boyfriend or their husband or wife is killing,
17    you know, another one, just for trying to get
18    this money.
19 Q  To get the insurance money?
20 A  Yes.  And then I say this is dangerous
21    insurance.  I don't believe in it.
22 Q  Besides Mass. Health, have you had any other
23    health insurance from any other company?
24 A  No.

Page 39

1  Q  Do you have Mass. Health now still?
2  A  Yes.
3  Q  Do you today have a file or a place at home that
4     you keep information from Mass. Health?
5  A  Yes.
6  Q  Is it the same place that you keep information
7     about your auto insurance?
8  A  No, my car insurance is a different place.
9  Q  You had a place for your auto insurance also?
10 A  Yes.
11 Q  Those are the only two kinds of insurance you
12    had, other than the American Express plan that
13    we're talking about?
14 A  Can you repeat, please?
15 Q  Did you have no other kind of insurance other
16    than Mass. Health, auto insurance, and then
17    later the American Express disability plan?
18 A  Yes, disability plan.  I'm sorry, I need to say
19    something to you.  At the time when I have my
20    accident, I don't have any health insurance
21    because I was working for Dr. Carr.  He doesn't
22    offer to us any health insurance, and I was
23    earning a lot of money to get the Mass. Health
24    insurance.

Page 40

1  Q  You were earning too much for Mass. Health?
2  A  Yes, it was too much for Mass. Health, and at
3     this time I don't have Mass. Health.
4  Q  Did you have Mass. Health up until the time you
5     started working for Dr. Carr?
6  A  Yes, they stopped giving to me then.
7  Q  After you started working for Dr. Carr?
8  A  Yes.
9  Q  And making more money?
10 A  Um-hmm.
11 Q  Did Dr. Carr offer any benefits, insurance
12    benefits?
13 A  No.
14 Q  Janitronic's, did that offer any benefits,
15    insurance?
16 A  No.
17 Q  Do you remember if you had the opportunity to
18    purchase insurance through Janitronic's?
19 A  I don't know about that.
20 Q  Did you ever talk to Dr. Carr about whether he
21    would give you insurance benefits through his
22    office?
23 A  I asked him one time about it, he say he don't
24    offer it for the employees.

Page 41

1   Q   I'm going to show you a few documents which are
2      from American Express, and just ask you to look
3      at them, and I will ask you a few questions
4      about them.
5         MR. PINTO: Why don't we mark that as
6      Exhibit 1.
7         (The document was marked as Exhibit
8      No. 1.)
9   Q   Ms. Peguero, I would like you to look at this
10      document and take as much time as you need, and
11      tell me if you recognize it.
12   A   (Witness reviews document.) Yes.
13   Q   Is this a copy of one of your American Express
14      bills from the American Express Company from
15      July 2002?
16   A   Yes.
17   Q   On the first page, if you look on the left at
18      the dates of the transaction, there's a
19      transaction dated July 26, 2002. Do you see
20      that one?
21   A   Yes.
22   Q   What is Amex Credit Protection Plan that you
23      were charged $3.96 for?
24   A   Amex, they asking me by phone -- they say I can

Page 42

1      try for a time, and when I want, I can cancel.
2      Then later, I don't have a -- let me say --
3      enough information for cancel. Then I pay for,
4      like -- I don't remember, for a while, but after
5      I canceled because I say I don't receive any
6      protection, I don't need it.
7   Q   What did you understand it did? What did it
8      protect from?
9   A   For healthcare.
10   Q   This Amex Credit Protection?
11   A   Yes, yes, it is for credit protection.
12   Q   How does it protect your credit?
13   A   Maybe some person is taking my identity, and
14      that is protection to me on my credit.
15   Q   So your understanding is if someone stole your
16      identity and charged things in your name, this
17      would protect you?
18   A   Yes.
19   Q   This is something that you were told about over
20      the telephone?
21   A   Yes.
22   Q   You got a telephone call from Amex?
23   A   Yes, just a telephone call.
24   Q   Did they say they would send any paperwork, any

Page 43

1      information?
2   A   No, just by phone.
3   Q   They didn't promise to send any information in
4      the mail after the phone call?
5   A   No.
6   Q   Did you ever receive any information?
7   A   I don't remember. I don't remember that.
8   Q   Do you remember how long you had that protection
9      before you canceled it?
10   A   No, I don't remember it.
11   Q   Also, on the first page, the entry dated July --
12      Did you have something to add to your last
13      answer?
14   A   No.
15   Q   The entry dated July 3, 2002 says, "Credit
16      Secure Services," with a charge of 9.99, what
17      was that, Credit Secure Services?
18   A   I need to take this like insurance, like I buy
19      some insurance about that, because I have
20      something from another credit card, like credit
21      protection. I didn't know I need to take care
22      about that like some important insurance like
23      car or like health or like disability plans. I
24      didn't know, I'm sorry.

Page 44

1   Q   That's okay, I'm just asking you a few questions
2      about this Credit Secure Services.
3   A   Okay.
4   Q   Do you know what that did, what service or
5      protection that gave you?
6   A   Yes.
7   Q   What did that do?
8   A   But I canceled. I remember I canceled because
9      my statement was coming with a lot of amount,
10      and I say I don't receive any important
11      protection for me.
12   Q   What did you understand Credit Secure, what was
13      the purpose of that? I understand that you
14      canceled, but --
15   A   Get my credit protection. I understand what
16      that meant.
17   Q   If you know, what was the difference between the
18      Amex credit protection and Credit Secure
19      Services?
20   A   Because this is a protection plan, the first
21      one. Amex is a different company than security,
22      Secure Service.
23   Q   So did the Amex Credit Protection Plan only
24      protect your Amex card?

|  | Page 45 |
|---|---|
| 1 | A  I suppose, except for American Express card, my |
| 2 |     credit. |
| 3 | Q  Did Credit Secure Services protect something |
| 4 |     else? |
| 5 | A  It was protecting my security, my whole credit, |
| 6 |     I think so. |
| 7 | Q  How did you hear about Credit Secure Services? |
| 8 |     Was that a telephone call or something in the |
| 9 |     mail? |
| 10 | A  Yes, yes. |
| 11 | Q  You received a phone call from that company? |
| 12 | A  Yes. |
| 13 | Q  Credit Secure Services? |
| 14 | A  Yes. |
| 15 | Q  And based on that phone call, you told them that |
| 16 |     you wanted to try that? |
| 17 | A  I say yes, yes. |
| 18 | Q  Did they send you any written information -- |
| 19 | A  Yes. |
| 20 | Q  -- after the phone call? |
| 21 | A  Yes, that one, yes, I remember them. |
| 22 | Q  Did you keep whatever they sent you? |
| 23 | A  No, after I canceled, I throw away because I |
| 24 |     have a lot of paper at home. |

|  | Page 46 |
|---|---|
| 1 | Q  Before you canceled, you held onto whatever |
| 2 |     information they sent you? |
| 3 | A  Yes. |
| 4 | Q  Did you read it when it came? |
| 5 | A  Yes. |
| 6 | Q  At that time, you understood what credit secure |
| 7 |     services was doing for you? |
| 8 | A  Yes. |
| 9 | Q  As you sit here today, what you can remember is |
| 10 |     that it was to protect your credit? |
| 11 | A  Yes. |
| 12 | Q  But it was broader than the American Express |
| 13 |     credit protection? |
| 14 |     THE WITNESS:  I don't understand. |
| 15 |     What is he saying? |
| 16 |     (Question translated by the |
| 17 |         interpreter.) |
| 18 | A  Yes. |
| 19 | Q  The Credit Secure Services protection. |
| 20 | A  Yes. |
| 21 | Q  Do you remember how long you had that |
| 22 |     protection -- |
| 23 | A  No. |
| 24 | Q  -- before you canceled? |

|  | Page 47 |
|---|---|
| 1 | A  No, I don't remember. |
| 2 | Q  The next entry, July 5, 2002, for $99. |
| 3 | A  Yes. |
| 4 | Q  It says, "Association Health CA," and then has a |
| 5 |     long number, "Membership Club."  What was that? |
| 6 | A  That one I canceled, almost immediately I |
| 7 |     canceled this because when I saw this amount, I |
| 8 |     say, "Oh my god, it's too much." |
| 9 | Q  What was it?  What was the product or the |
| 10 |     service? |
| 11 | A  Uh? |
| 12 | Q  What is Association Health CA?  Why did they |
| 13 |     charge you $99? |
| 14 | A  That was one on health insurance.  They sold to |
| 15 |     me through my phone, yes.  They called to me to |
| 16 |     offer that. |
| 17 | Q  It was health insurance? |
| 18 | A  Yes. |
| 19 | Q  At this time, you didn't have other health |
| 20 |     insurance? |
| 21 | A  It was too much money for me at this time. |
| 22 | Q  Do you remember if it was around July of 2002 |
| 23 |     that you first signed up for Association Health? |
| 24 | A  No, I don't remember exactly. |

|  | Page 48 |
|---|---|
| 1 | Q  Was the first thing you ever heard about this a |
| 2 |     telephone call? |
| 3 | A  Yes. |
| 4 | Q  Or something in the mail? |
| 5 | A  No. |
| 6 | Q  Phone call? |
| 7 | A  Phone call. |
| 8 | Q  Based on the phone call, you said you would sign |
| 9 |     up? |
| 10 | A  Yes. |
| 11 | Q  Did they say they would send you forms or |
| 12 |     paperwork? |
| 13 | A  Yes. |
| 14 | Q  After the phone call, did you receive some |
| 15 |     paperwork from this company? |
| 16 | A  Yes. |
| 17 | Q  Did you keep that in a file? |
| 18 | A  No, no.  After I canceled, I throw away. |
| 19 | Q  But before you canceled, you kept that |
| 20 |     paperwork? |
| 21 | A  Yes, I keep it. |
| 22 | Q  Was that in an insurance file or where did you |
| 23 |     keep it, those papers at your house? |
| 24 | A  I keep it in the same -- when I use them, you |

## Page 49

1    know.  When I have some insurance, I can hold
2    all the papers.
3  Q  Do you have a drawer or a file cabinet?  Where
4    do you keep important papers at home?
5  A  I have it two places.  I have one cooler, I
6    didn't use this cooler, and I put like folders,
7    in folders.  And I have a place who have many
8    places like this, with some pieces like this
9    (indicating), but it's more bigger because it
10    has a cover and it closes, yes.
11  Q  That's what you use to keep important papers?
12  A  Yes, that's the right place where I have it.
13  Q  What other kinds of things do you keep in that
14    place besides insurance papers?
15  A  Social security papers, SSI papers, Humana
16    papers, that's my insurance for Medicare.
17    Medicare, too.
18  Q  Humana is the company you get the Medicare from?
19  A  Yes.
20  Q  If you look back at the American Express bill
21    marked as Exhibit 1 on July 15th, there's
22    another charge of 8.95 that says MWI Essentials.
23  A  Where is it, please?  July what?
24  Q  July 15.

## Page 50

1    MR. DONIUS:  First page.
2  A  Yes.
3  Q  What was that MWI Essentials membership?
4  A  They sent to me, they want to -- no, they didn't
5    send to me, they called me.  All this thing I
6    buy was by phone.
7  Q  So the first you ever heard from MWI Essentials
8    was a telephone call?
9  A  Yes, um-hmm.
10  Q  What was their service or product?
11  A  I don't remember exactly.  I canceled.
12  Q  But you don't remember what it was that they
13    did.
14  A  No, I don't remember exactly.  I can't tell you
15    what that's about.
16  Q  Do you remember getting a phone call from them,
17    though?
18  A  Yes.
19  Q  At the end of the phone call you told them yes,
20    you would sign up?
21  A  Yes.
22  Q  On the next page, I will just confirm that the
23    first entry dated July 17th is your Amex
24    Disability Plan charge of 12.95 per month?

## Page 51

1  A  Yes.
2  Q  You saw that every month on your American
3    Express bills?
4  A  Yes.
5    MR. PINTO:  We can mark this
6    Exhibit 2.
7    (The document was marked as Exhibit
8    No. 2.)
9  Q  I will ask you, again, to look at this next
10    bill, which has a closing date of November 25,
11    2002.
12  A  Yes.  (Witness reviews document.)  Do you have
13    another duplicate copy before July, please?
14  Q  I'm sorry?
15    MR. DONIUS:  Why don't you wait for
16    the next question, Altagracia.
17    THE WITNESS:  Okay.
18  Q  The answer to that question is I don't have any
19    before July.  But this one from November, do you
20    recognize this as your American Express bill
21    from November 2002?
22  A  Yes.
23  Q  The Amex Credit Protection Plan charge here is
24    $7.26, whereas in July it was $3.96.  Do you

## Page 52

1    know why the amount changed from time to time?
2  A  Yes, I already said.
3  Q  Do you know how they determined how much to
4    charge you each month?
5  A  No.
6  Q  Do you remember that it was a different amount?
7  A  Yes.
8  Q  All the time?
9  A  Yes.
10  Q  Credit Secure Services as of November, you had
11    not canceled yet?
12  A  Yes, not yet.
13  Q  On the second page, MWI Essentials, you're
14    charged 9.95.  That one you had not canceled
15    yet?
16  A  Yes.
17  Q  What is that next charge dated November 13th for
18    Passport Info Service Direct Marketer?  Do you
19    remember what that was for?
20  A  Yes, because I needed to take my passport as
21    soon as possible.  My father was sick in the
22    Dominican Republic, and I need to call the
23    passport office to get my passport as soon as
24    possible, and I need to give some credit card,

Page 57

1     because I already paid.
2 Q  On the first page you're talking now?
3 A  Yes, this credit was for that, this one here.
4 Q  The $49 credit?
5 A  $49, yes.
6 Q  Yes, my question just now was on the $14.95 just
7     below that for MWI Essentials.
8 A  Oh yes.
9 Q  My question was whether you know why the amount
10     increased from 9.95 to 14.95 from the prior
11     bills?
12 A  I know the amount from credit protection is
13     going up when I was paying more money. If I had
14     paid more money, the credit protection plan is
15     going up and another plan, too.
16 Q  On this MWI Essentials, do you know why that one
17     went up as of this bill?
18 A  I don't know.
19 Q  Do you remember when -- I think I may have
20     already asked you this. Do you remember when
21     you canceled the MWI Essentials?
22 A  No, I don't remember.
23        MR. PINTO: I propose we take a short
24     break of 7 to 10 minutes.

Page 58

1        (Recessed at 11:30 a.m.,
2        resumed at 11:46 a.m.)
3        (The document was marked as Exhibit
4        No. 5.)
5 Q  If you could look at what's marked as Exhibit 5,
6     and let me know when you're done looking it
7     over.
8 A  (Witness reviews document.) I'm ready.
9 Q  Understanding that this letter is addressed to
10     Sample A. Sample, putting that aside, do you
11     recognize this document?
12 A  Sure.
13 Q  Do you recognize having received this document
14     or a very similar document in the mail?
15 A  Yes, similar document.
16 Q  This is something that arrived in your mail?
17 A  Yes.
18 Q  Do you remember when it was that you received
19     this?
20 A  Not exactly. I know it was 2002, but I don't
21     remember exactly.
22 Q  You don't remember what month?
23 A  No, I don't remember the month.
24 Q  Did you read the document when you opened it?

Page 59

1 A  Yes, I opened it and I read in the front.
2 Q  By the way, turning to the second page, do you
3     recognize the second page as the envelope that
4     this document came in?
5 A  Yes.
6 Q  Do you remember seeing that envelope or an
7     envelope with those words and the picture on it?
8 A  Yes, and the 1.5 million disability plan.
9 Q  Did you recognize that actor whose picture was
10     there?
11 A  Yes.
12 Q  You knew who that was?
13 A  Sure, Superman.
14 Q  Did you know his man, the actor's name?
15 A  Sure, Christopher Reeve.
16 Q  And you knew that at the time when you got this
17     in the mail?
18 A  Yes.
19 Q  Did you read this entire document when you
20     opened it, that is the front and back?
21 A  No, just in the front.
22 Q  I take it you read the large headline at the top
23     right side?
24 A  Sure, I see the highlight advertisement, yes.

Page 60

1 Q  I take it, when you read that, you read the
2     words "up to" that are next to 1.5 million?
3 A  Sure.
4 Q  You know what that means in English?
5 A  Yes.
6 Q  Up to?
7 A  Yes.
8 Q  Did you understand that that meant that
9     $1.5 million was the maximum that you could
10     recover under this product?
11 A  Yes.
12 Q  And that there would be circumstances where you
13     might be entitled to less than the maximum
14     amount?
15 A  Yes.
16 Q  In other words, the words "up to" you understood
17     that expression?
18 A  Yes.
19 Q  Do you remember reading the text of the letter
20     between Dear Sample A. Sample, and the signature
21     at the bottom?
22 A  Sure.
23 Q  So at the time you opened it, you read it?
24 A  Yes.

Page 61

1  Q  Looking at the third paragraph of the text of
2     the letter, the third sentence begins, "Within
3     ten days, you will receive a Plan Summary and a
4     complete Benefit Plan Description."  Do you
5     remember reading that at the time?
6  A  Yes.
7  Q  The next sentence says, "Review the Plan
8     materials at your leisure.  If you are not
9     satisfied for any reason, you may cancel within
10    the first 90 days and receive a full refund of
11    Plan fees."  You read that part, as well?
12 A  Sure.
13 Q  A few lines below the signature, it says, "For
14    more plan details and additional benefits,
15    please see reverse side."  Do you remember
16    reading that?
17 A  Yes.
18 Q  Did you ever see the reverse side and turn the
19    paper over?
20 A  No, I don't remember that.
21 Q  Did you read --
22 A  Yes.
23        MR. DONIUS:  Wait for the question,
24    please.

Page 62

1  Q  My question is, did you read the text of the
2     bottom portion of this front page to the right
3     of the picture?
4  A  Yes.
5  Q  At some point you signed the bottom of the sheet
6     that you received and returned it to American
7     Express?
8  A  Yes.
9  Q  If you could turn the paper over, please.  Is it
10    your testimony that at the time you received
11    this and read it, and as of the time you signed
12    and returned the form at the bottom, you had not
13    turned the page over and read any of the words
14    on the back page?
15 A  I just read the first line, "These additional
16    valuable benefits are included with your plan."
17    Then I stopped reading.
18 Q  After that first line, you didn't go on to read
19    the words right under that heading --
20 A  No.
21 Q  -- to see what the additional benefits were?
22 A  No.
23 Q  Did you read the words "Important Disclosure?
24 A  I just read the letters at the top and no more.

Page 63

1  Q  So you didn't read "Important Disclosure" in the
2     middle of the page?
3  A  No.
4  Q  And you didn't read any of the words after
5     important disclosure?
6  A  No.
7  Q  How long after you opened and read the front
8     page and the first line of the second page did
9     you sign the form and return it?  In other
10    words, was it the same day or --
11 A  Yes, same day, immediately.
12 Q  Do you remember how long it was from the time
13    you sent in the form to the time you first saw
14    that you were being charged on your American
15    Express bill?
16 A  No, I don't remember.
17 Q  What did you do -- I assume you cut off or tore
18    off the bottom portion?
19 A  Yes.
20 Q  Did you save the top portion in a file in your
21    house?
22 A  I don't remember exactly.  I remember I signed
23    it and I sent it back.
24 Q  But you have no memory of whether you kept the

Page 64

1     top part and put it in with your important
2     papers?
3  A  I don't remember.
4  Q  Did you ever see the letter again until we were
5     sitting here today?
6  A  Before?  Yes, because you sent to me another
7     one, one day, but it was a different plan, you
8     know...
9  Q  A letter that looks very much like this?
10 A  Very similar of this one.
11 Q  But my question is, after you tore off the
12    bottom, signed it and sent it to American
13    Express, you don't remember whether you put the
14    rest of the letter away somewhere or not?
15 A  Right now, I don't remember.
16 Q  Do you remember whether you ever found it in
17    your house anytime after you signed the bottom
18    and sent it back to American Express?
19 A  I have everything in my files.
20 Q  Did you look back in your files and look for
21    this, this particular letter?
22 A  I don't remember, because I was just going
23    through my files and looking for something
24    important.  When I found, I just take.

Page 65

1  Q  After signing and returning the bottom, you're
2     not sure whether you ever saw this, the one that
3     you received again?
4  A  I don't remember exactly.
5  Q  After your accident, did you look for paperwork
6     having to do with this accidental disability
7     plan in your files?
8  A  Not exactly, maybe -- no, I looking for that,
9     yeah, but was after, not immediately.  Because I
10    didn't remember I have this.  When I remembered
11    oh, I have insurance from American Express, and
12    I need to let them know I have an accident and
13    I'm disabled.
14 Q  Sometime after your accident but not right away,
15    you remembered that you had the American Express
16    insurance?
17 A  Yes.
18 Q  Did you then look in your important papers?
19 A  Yes.
20 Q  Did you find the top part of this document
21    that's marked as Exhibit 5?
22 A  I don't remember this part, because after my
23    accident, I was, you know, really confused.  My
24    life changed, and I can't remember exactly.

Page 66

1  Q  So when you say you can't remember exactly, that
2     means you don't remember if you found this
3     letter or not?
4  A  Yes, I don't remember exactly.
5  Q  Do you have it today?  In other words, not a
6     photocopy but the one that you received, do you
7     still have that?
8  A  I don't know.  I don't know.
9  Q  Did you receive anything from American Express
10    within ten days, as they say, on this letter?
11 A  I don't remember receiving that.
12 Q  A plan summary, you don't remember?
13 A  I don't remember receiving that.
14 Q  Or a benefit plan description?
15 A  Yes.
16 Q  This letter asks you to review those materials
17    and decide if you want to cancel the insurance.
18    Do you remember looking for those in the mail?
19    In other words, expecting them to come?
20 A  No, I don't remember receiving them.
21 Q  My question now is do you remember looking for
22    them, waiting for them to come, expecting them?
23 A  I don't remember that because I have too many
24    things to think about.

Page 67

1  Q  So I take it you didn't call American Express
2     when you didn't see any more information coming
3     to ask where it was or to ask them to send it?
4  A  No, I'm sure no call.
5  Q  So you did read the words that said they were
6     going to send something more within ten days
7     when you opened it?
8  A  Yes, I read all the front.  I just be interested
9     in the 1.5 million if an accident leaves you
10    permanently disabled.  And I just think about
11    that, and I read the first part too, the last
12    one too, and then sign here, and I read here.
13 Q  You understood that this was an insurance
14    policy?
15 A  Yes.  I see what Christopher Reeve say here, and
16    I think about, that was my decision.
17 Q  Did you understand at the time that the
18    insurance coverage would be described in a
19    policy?  In other words, something other than
20    this letter?
21 A  Yes, you know what, I buy this insurance because
22    I believe in American Express.  I saw American
23    Express sign, and I believe in that, and I know
24    this guy.  You think about being disabled one

Page 68

1     day, and I think about my son because I read
2     this part.  "Most people don't think about
3     disability coverage until it's too late.  Please
4     don't put this off."
5  Q  My question was whether you understood after you
6     read this letter that there would be an
7     insurance policy that would have more details
8     about what was covered?
9  A  No, I just think about American Express is a
10    good corporation, and I believe in this guy.  I
11    think about this.  And I was feeling sure about
12    what American Express offers to me, you know.
13 Q  Did you think that this letter was the entire
14    insurance policy?
15 A  I know that this isn't not entire.  I know.
16 Q  You knew it was not?
17 A  Yes.
18 Q  When you didn't receive the entire insurance
19    policy, you didn't remember to look for that?
20 A  No, I didn't take care about this thing because
21    I have too much thing about thinking in my
22    house, about my son, my job, my house,
23    everything.
24 Q  So at no point you called American Express --

Page 69

1 A No.
2 Q At no point prior to your accident you contacted
3   American Express about this plan to ask them any
4   questions or ask for the rest of the information
5   or the policy?
6 A No, you see I have already --
7       MR. DONIUS: You answered. He just
8   asked you whether you did it or not, and you
9   said no.
10 A No. Okay. No.
11 Q Did you ever call American Express for any
12   reason, customer service, any reason having to
13   do with this insurance, this plan before your
14   accident?
15 A No.
16 Q Just before we leave this. To be clear, on the
17   backside of the page, the only thing that you
18   read was the first line at the very top of the
19   page that says, "These additional valuable
20   benefits are included with your plan."
21 A Yes.
22 Q You didn't read the words immediately under that
23   or any of the other words on the page?
24 A No.

Page 70

1 Q Besides the $1.5 million disability coverage,
2   did you understand what other benefits were part
3   of this plan when you signed up?
4 A Yes, because I see I have more value benefits,
5   you know, emergency accident. I just read the
6   highlight things in here. I say, oh, it's a
7   good opportunity for me.
8 Q Did you read the bold print below the top line?
9 A No.
10 Q You read the top line?
11 A Yes.
12 Q You didn't read the next bolded line right below
13   it that says, "$2,500 Emergency Accident and
14   Sickness Medical Expense Benefit"?
15 A I just look at this line, not completely, no.
16   No, I didn't read that one.
17 Q Right now I'm talking about the back page, and
18   my question was about that particular line right
19   below the top line? And your testimony is you
20   did not --
21 A I just read the top line. I just read the top
22   line.
23 Q Why didn't you read on, the rest of what was on
24   the back page?

Page 71

1 A Excuse me?
2 Q Why did you not continue reading after you read
3   the top line?
4 A What I was trying to explain to you. I see
5   American Express -- what is this?
6 Q Logo.
7 A Logo, okay. I saw American Express logo. I
8   believe in American Express. And I think about
9   what Christopher Reeve say. I say I'm pretty
10   sure with this American Express Company, you
11   know, and I believe in that. And I see if you
12   are going to be permanent disability, you are
13   going to get 1.5 million.
14 Q But you understood that there was a policy that
15   would have more details about when you would get
16   the 1.5 million and when you might not? Did you
17   understand that?
18 A Yes, I understand.
19 Q But you never got the policy?
20       (Question translated by the
21       interpreter.)
22 A (By the Interpreter) But I want to know, when
23   does he want me to read it, before or after?
24 Q My question was whether she understood at the

Page 72

1   time -- whether you understood at the time you
2   signed up that there was more paperwork with
3   details about when you would be entitled to
4   1.5 million and when you might be entitled to
5   less or when you might be entitled to nothing
6   depending on the type of accident?
7       MR. PINTO: So the question is
8   directed to the time she enrolled and signed the
9   form.
10       (Question translated by the
11       interpreter.)
12 A Yes, I know that the policy about that. But I
13   know what mean permanent disability, you know.
14   That's what I think. I understand here
15   permanent disability. And then I don't know if
16   they have another meaning about disabled person.
17       THE INTERPRETER: Another definition.
18 A The definition, I don't know the definition for
19   this policy about permanent disability because I
20   could be permanent disability. That's what I
21   read here very highlight.
22 Q Were you interested to know the definition or
23   did you not care what the definition was?
24 A I don't want to know what was your policy

Page 73

1  because I just see what you are selling to me.
2  You sell to me the policy for 1.5 million if an
3  accident leaves me permanently disability.
4  That's what I understand about that.
5  Q  What did you understand permanent disability to
6  mean?  What did that mean to you when you read
7  those words?
8  A  The person who can't come back to their work
9  after the accident.  You know, this is for
10  accident, you know, and then I can't come back
11  to my job again.
12  Q  So permanent disability meant to you that you
13  couldn't go back to your job that you had
14  before?
15  A  Yes.
16  Q  Did you understand permanently disabled to mean
17  if you were able to go to a different job, you
18  would be permanently disabled, even though you
19  could do a different job?
20  A  I hope I can get another job, but you know what,
21  it's really hard for me.  I'm really older.
22  Q  My question is really just about the words on
23  this piece of paper.
24  A  I'm sorry.

Page 74

1  Q  I had asked you what permanently disabled meant
2  to you, and you said, "If I couldn't go back to
3  my job."  The question I'm trying to ask is
4  whether your understanding of permanently
5  disabled included a disability where you
6  couldn't go back to any job other than your own
7  job?  In other words, if you had an accident,
8  you became disabled, but you could do a
9  different job, did you understand that to be
10  permanent disability?
11  A  Yes.
12  Q  You did understand that there was a policy that
13  would have a definition of what the company
14  thought or what the company defined as
15  permanently disabled?
16      THE WITNESS:  What is he saying to me?
17      (Question translated by the
18      interpreter.)
19  A  No.
20      THE INTERPRETER:  I told her, "Were
21  you not interested to know what the company
22  defined permanently disabled?"
23      MR. PINTO:  And the answer was no.
24  Q  Tell me again what it is about the American

Page 75

1  Express company that influenced your decision to
2  buy the insurance?
3  A  Yes.
4      (Question translated by the
5      interpreter.)
6  A  Because I have a family here who was customer
7  from American Express from a long time ago, and
8  my aunt told me about this company.  She
9  believed in that.  I start to apply for this
10  card, and I believe in this company, you know.
11  Q  Because of family members' --
12  A  Yes.
13  Q  -- experience?
14  A  Yes, because of family members' experience.
15  While I use it, I know it is a good company,
16  because you see I buy many things from there.  I
17  didn't buy anything from another company.
18      (The document was marked as Exhibit
19      No. 6.)
20  Q  Would you look at this next exhibit, please?
21  A  (Witness views document.)
22  Q  Does that appear to be a copy of the actual
23  bottom of the form that you received and signed?
24  A  Yes.

Page 76

1  Q  That is your signature or a copy of your
2  signature?
3  A  Yes.
4      (The document was marked as Exhibit
5      No. 7.)
6  A  (Witness reviews document.)
7  Q  Have you finished?
8  A  Yes.
9  Q  Did you ever receive this document in the mail
10  from American Express?
11  A  Yes.
12  Q  Do you remember when in relation to the first
13  document you received this?
14  A  No.
15  Q  You don't know if it was weeks or months later?
16  A  No, I don't remember.
17  Q  Did you read this document when it arrived?
18  A  Yes.
19  Q  Did you sign and tear off the bottom of this
20  form and return it to American Express?
21  A  I don't remember that.
22  Q  Did you turn this document over and read --
23  A  No.
24  Q  You didn't read anything on the back?

Page 117

```
 1   A   No, I don't remember exactly why.
 2   Q   You never found out why?
 3   A   No, because he have the picture back, and I say,
 4       "Just hold it until I can go to Florida."
 5   Q   Where is your mailbox for the house?  Is it on
 6       the house?
 7   A   It's the office of the Boston Public Housing,
 8       they have it.
 9   Q   So you go to the office?
10   A   The room.
11   Q   Is it a little box that you have a key for?
12   A   Yes.
13           MR. PINTO:  I don't think I have any
14       other questions, but just give me about a
15       minute.
16           MR. DONIUS:  While you do that, I'm
17       just going to talk to Altagracia because I may
18       or may not have a question or two.
19           (Recessed at 1:12 p.m.,
20               resumed at 1:17 p.m.)
21   BY MR. PINTO:
22   Q   Do you remember seeing a doctor named Frances
23       Defrin, Dr. Defrin?
24   A   She is a counselor, yes.
```

Page 118

```
 1   Q   Where was she a counselor at?
 2   A   She was working at Cambridge, I think so, yes.
 3   Q   Why did you go to see her?
 4   A   She was my counselor first time, but she had a
 5       stroke and she was unable to treat me.
 6   Q   How did you first meet up with her?  Was she
 7       recommended by a doctor?
 8   A   Yes, by somebody from Mass. General, I think it
 9       was Guy, Leslie Guy or Guy Leslie, somebody like
10       this.  She saw me one time at the Mass. General,
11       because I was really bad, and she talked with
12       me.  I don't remember if I have been at the
13       psychiatric department or outside, because I
14       think like one or two times I was at the
15       psychiatric department, but just the emergency,
16       nobody send me to another psychiatric.
17   Q   Dr. Defrin, how many times did you see her?
18   A   I see her many times.
19   Q   Until she had a stroke, and then she couldn't
20       carry on?
21   A   Yes.
22           MR. PINTO:  I don't have anything
23       else.
24           MR. DONIUS:  I just have a couple of
```

Page 119

```
 1       questions.
 2               CROSS EXAMINATION
 3   BY MR. DONIUS:
 4   Q   Altagracia, if you could pull out Exhibit 5 and
 5       Exhibit 7.  On both Exhibit 5 and Exhibit 7, at
 6       the bottom there's an enrollment form with
 7       Christopher Reeve on it.  Do you see that?
 8   A   Yes.
 9   Q   Do you recall receiving two documents or just
10       one document that had Christopher Reeve's photo
11       on it?
12   A   Just one.  Just this.
13   Q   The Exhibit 5 is the one that you received?
14   A   Yes.
15   Q   You were asked some questions about Exhibit 7,
16       do you have any memory of receiving Exhibit 7 in
17       the mail?
18   A   Not that one because I didn't sign it.  If I
19       received it, I already signed it.  I don't
20       remember.  Yes, I was confused, because this is
21       looking almost similar, you know, from the
22       picture.
23   Q   So you say you were confused when you were
24       answering the questions regarding Exhibit 7?
```

Page 120

```
 1   A   Yes.
 2   Q   You were confused about having thought that you
 3       had received it; is that right?
 4   A   Yes.
 5   Q   Is it your best memory now that you received
 6       Exhibit 5, but not Exhibit 7?
 7   A   Yes, because now I understand the difference.  I
 8       was thinking I was reading that one.
 9   Q   You thought you were reading about Exhibit 5?
10   A   Yes.  I was confused.
11           MR. DONIUS:  That's it.  I have no
12       further questions.
13           MR. PINTO:  Can I see the two exhibits
14       as marked.
15           (Document tendered.)
16               REDIRECT EXAMINATION
17   BY MR. PINTO:
18   Q   Ms. Peguero, when I was asking you about
19       Exhibit 7, you recall that we had recently
20       looked at Exhibit 5, and I had asked you some
21       questions about Exhibit 5.
22           THE WITNESS:  What is the question?
23           (Question translated by the
24               interpreter.)
```

## Page 121

1  A  Yes, but I have been confused. I was thinking I

2      was talking about that one. My memory is not

3      good, you know. I have been confused.

4  Q  So even though we had just looked at the two of

5      them next to each other in close time, you were

6      confused?

7           (Question translated by the

8           interpreter.)

9  A  Yes. When I was answering the question, I was

10     thinking I was reading that one.

11  Q  It was after we took a break and you consulted

12     with your counsel that your confusion was

13     cleared up?

14  A  Yes. I just received that one.

15  Q  Pointing to Number 5?

16  A  Number 5, yes. I told you, I just see the

17     1.5 million for payment and disability. I just

18     followed the financial security.

19  Q  Although Number 7 doesn't have that on the top

20     at the time I asked you about it, you believed

21     you had received it?

22  A  If I received that one, I signed it, but I

23     didn't sign it. I don't receive that one or I

24     don't remember. That's why I was confused,

## Page 122

1     because with the same envelope, you say to me,

2     and then I was thinking about the envelope was

3     that one, not this.

4        MR. PINTO: Just have the record

5     reflect when she was talking about this in her

6     last part of her answer, she was pointing to

7     Number 7. So when we are reading the transcript

8     later, we know what this is and what that is.

9  A  Because it is not the same one. You marking

10     that one the first time.

11       MR. PINTO: I don't think I have

12     anything else.

13       MR. DONIUS: Okay, that's it.

14       (Off the record.)

15       MR. PINTO: I want to put on the

16     record that because of the issues concerning the

17     confidentiality of the two settlements I asked

18     for, I'm going to suspend rather than terminate

19     the deposition while I further consider whether

20     those confidentiality issues are something that

21     I'm going to pursue. And if I decide to pursue

22     it, then either by agreement of counsel or by

23     order of the Court, I may need to resume the

24     deposition on those subjects.

## Page 123

1        MR. DONIUS: Just a brief response.

2     We consider the deposition concluded, but we

3     will listen to any further requests that counsel

4     may have.

5       COURT REPORTER: Mr. Donius, are you

6     ordering a transcript?

7       MR. DONIUS: Yes.

8

9        (Whereupon at 1:25 p.m., the

10        deposition was adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## Page 124

1           SIGNATURE PAGE/ERRATA SHEET

2  Re: Altagracia J. Peguero vs. American Express Company

      and Healthextras, Inc.

3

    March 15, 2007

4  Deposition of Altagracia J. Peguero

5

       I, ALTAGRACIA J. PEGUERO, do hereby

6  certify that I have read the foregoing transcript of

    my testimony and further certify that it is a true

7  and accurate record of my testimony (with the

    exception of the following changes listed below):

8    Page    Line      Correction

9  _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20     Signed under the pains and penalties

21  of perjury this _____ day of _____ 200__.

22

23

24      _____

        ALTAGRACIA J. PEGUERO

Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3    -------------------------------X

     ALTAGRACIA J. PEGUERO,                :

4                                          :

              Plaintiff                    :    Case No:

5                                          :    05-10995-RCL

              -vs-                         :

6                                          :    Pages 1 - 185

     AMERICAN EXPRESS COMPANY and          :

7    HEALTHEXTRAS, INC.,                    :

                                           :

8             Defendants.                  :

     -------------------------------X

9

10

11            Deposition of Joanna Ficklin

12               Rockville, Maryland

13            Friday, February 2, 2007

14

15

16

17

18

19

20   Reported by:  Kathleen M. Vaglica, RMR

21   Job No:  179006

22

Joanna Ficklin

Page 6

1           P R O C E E D I N G S
2    Thereupon,
3           Joanna Ficklin,
4    a witness, called for examination by counsel for the
5    Plaintiff and, after having been sworn by the
6    notary, was examined and testified as follows:
7        MR. DONIUS:  The parties have agreed to
8    the usual stipulations by which is meant all
9    objections except to the form of the question are
10   reserved until the time of trial.  Motions to strike
11   are likewise reserved until the time of trial.  I
12   assume, of course, Don, you're going to have the
13   witness read and sign and under the pains of penalty
14   of perjury within 30 days?
15       MR. PINTO:  I will.
16       MR. DONIUS:  Okay.  Would you swear the
17   witness, please.
18   Thereupon,
19          JOANNA FICKLIN,
20   a witness, called for examination by counsel for the
21   Plaintiff and, after having been sworn by the
22   notary, was examined and testified as follows:

Page 7

1        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
2    BY MR. DONIUS:
3        Q.  Would you state your name, please?
4        A.  Joanna Ficklin.
5        Q.  And what's your date of birth?
6        A.  January 17, 1972.
7        Q.  And what's your work address?
8        A.  800 King Farm Boulevard, Rockville,
9    Maryland, 20850.
10       Q.  And your employer is who?
11       A.  HealthExtras, Inc.
12       Q.  How long have you worked as HealthExtras,
13   Inc.?
14       A.  Since July 1, 1999.
15       Q.  When you were first hired by HealthExtras,
16   what was your job title?
17       A.  I was an account manager.
18       Q.  What type of accounts?
19       A.  What do you mean?
20       Q.  Well, you were an account manager.  What
21   type of accounts were you managing?
22       A.  Financial institutions primarily.

Page 8

1        Q.  And what sort of product were you working
2    with?
3        A.  A catastrophic permanent total disability
4    benefit program.
5        Q.  And can you briefly summarize your job
6    duties back in July of 1999 when you first became an
7    account manager?
8        A.  I was the account manager for American
9    Express in particular, and we worked together to
10   coordinate making this program available to their
11   card members.
12       Q.  During that time frame when you first
13   started, July 1, 1999, were you working exclusively
14   on the American Express account?
15       A.  No.
16       Q.  What other accounts were you working on?
17       A.  I don't remember all the names, but there
18   were other financial institutions, and I just helped
19   out wherever it was needed.
20       Q.  Were those other accounts also involved
21   with disability policies?
22       A.  What do you mean by involved with

Page 9

1    disability policies?
2        Q.  Well, were they -- did they have a
3    disability policy that you were working on?
4        A.  They offered programs that may have
5    included a disability policy.
6        Q.  Prior to you starting up at HealthExtras,
7    do you know if HealthExtras was already in the
8    business of promoting disability programs at that
9    point before you got here?
10       A.  I believe to, I believe on a limited
11   basis.
12       Q.  Is it your understanding that around this
13   time, July 1 of 1999, when you came aboard they were
14   starting to get, HealthExtras was starting to get
15   more involved in the supplemental benefit programs?
16       A.  They were involved in supplemental benefit
17   programs.
18       Q.  Was the level of involvement increasing at
19   the time you got, came aboard?
20       A.  I don't know because I wasn't here before
21   that time.
22       Q.  At some point did your job title change

3 (Pages 6 to 9)

**Page 14**

1    A. Not that I can recall.

2    Q. With respect to the permanent total

3  disability policies that American Express was

4  offering, HealthExtras was involved with when you

5  became Director of Supplemental Benefits, did all of

6  those policies have substantially the same terms and

7  exclusions, as far as you know?

8    A. Yes.

9    Q. And of the 60 to 70 percent of the

10  programs that you were involved with that had

11  disability, a disability component of it, how many

12  of those or approximately had a permanent total

13  disability component?

14      MR. PINTO: Object to the form.

15      THE WITNESS: I would have to guess.

16  BY MR. DONIUS:

17    Q. I don't want you to guess, but, if you

18  have a memory, were there more than one program when

19  you became Director of Supplemental Benefits? Was

20  there more than one program that offered the

21  permanent total disability policy?

22    A. Yes.

**Page 15**

1    Q. And one was the American Express

2  disability plan; true?

3    A. Yes.

4    Q. What were the others, do you recall?

5    A. The others that --

6    Q. Offered permanent total disability.

7    A. I'm having a hard time answering that

8  question because it's not clear the way that it's

9  worded to me, you know, what other programs offered

10  a permanent total disability.

11    Q. I'm confused as to what part is confusing

12  you. What's --

13    A. I'm not sure what you're asking me when

14  you said what other programs offer --

15    Q. I'm just trying to use HealthExtras'

16  terminology to make life easy for everybody. When

17  you talk about the American Express accidental plan,

18  Accidental Disability Plan, do you call that a

19  program? What do you call that?

20    A. Theirs was an American Express plan.

21    Q. Was there a Citibank plan or an any other

22  plans that also had as a component of it a permanent

**Page 16**

1  total disability?

2    A. Okay. There was another program that

3  other financial institutions marketed.

4    Q. And what financial institutions?

5      MR. PINTO: I'm just going to make an

6  objection and an observation on the record, which is

7  that I haven't objected so far about other plans

8  because I understand this to be by way of getting

9  the witness's background and experience, but I will

10  object if we start heading down the road of any of

11  the other plans consistent with the Court's ruling

12  on the motion for protective order in which the

13  Court struck from the topics for examination the

14  references to substantially similar plans leaving

15  only the American Express disability plan as an

16  appropriate topic for today's deposition.

17      MR. DONIUS: I'm just trying to get a

18  sense as to what your job background was and what

19  you, type of programs you'd worked on previously.

20  BY MR. DONIUS:

21    Q. Can you think of any program or plan that

22  was marketed by any financial institution that had

**Page 17**

1  an accidental disability permanent total disability

2  insurance component to it?

3    A. Yes.

4    Q. What can you think of?

5    A. I think I just stated that there was

6  another program that had permanent total

7  disability policy that was offered by other

8  financial institutions.

9    Q. What was the name of that program or

10  programs?

11    A. I think it was called Accidental

12  Disability Program.

13    Q. All right. And for those programs there

14  would be an underwriter; someone other than

15  HealthExtras as an underwriter?

16    A. Correct.

17      MR. PINTO: Objection.

18      THE WITNESS: HealthExtras is not an

19  underwriter.

20  BY MR. DONIUS

21    Q. And there would be a marketing partner to

22  help market the program?

5 (Pages 14 to 17)

**Page 18**

1    A.   Correct.
2    Q.   And the marketing partner would be
3  typically some financial institution?
4    A.   Correct.
5    Q.   Did your job title change from Director of
6  Supplemental Benefits at any point?
7    A.   Yes.
8    Q.   What was the next title that you held?
9    A.   Vice President, Sales Administration.
10    Q.   And when did you get that title?
11    A.   I believe September 2005.
12    Q.   Is that your current title?
13    A.   Yes.
14    Q.   Did your job duties change when you took
15  that position?
16    A.   Yes.
17    Q.   How so?
18    A.   I now work for a Pharmacy Benefits
19  Management Division of the company.
20    Q.   Can you tell me just briefly about your
21  work history before you came to HealthExtras?
22    A.   I worked in pharmacy -- I mean, sorry.  I

**Page 19**

1  worked in provider contracting with physicians and
2  hospitals.
3    Q.   What is provider contracting?
4    A.   We were developing a network of physician
5  hospital organizations, so health care providers.
6    Q.   And what other experience, if any, had you
7  had in working prior to coming to HealthExtras?
8    A.   Can you be more specific than experiences?
9  It's rather broad.
10    Q.   When did you get out of college?
11    A.   In 1994.
12    Q.   Where did you go to college?
13    A.   Towson State University.
14    Q.   What did you get your degree in?
15    A.   Business administration.
16    Q.   What was the first job you had after
17  graduating?
18    A.   A receptionist.
19    Q.   Where did you work?  It's all right.  I'll
20  move on to the next question.  How long
21  approximately did you work as a receptionist?
22    A.   For a year.

**Page 20**

1    Q.   And then what was your next job?
2    A.   Contracting with health care providers.
3    Q.   And then after working, contracting with
4  health care providers, is that when you came to
5  HealthExtras?
6    A.   Correct.
7    Q.   I guess I'll just -- I forgot to mark this
8  at the beginning of the deposition, but this is the
9  deposition notice, if we can mark it as the first
10  exhibit, please.  Exhibit 1.
11       (Ficklin Exhibit No. 1, Deposition Notice,
12  was marked for identification and retained by
13  counsel.)
14  BY MR. DONIUS:
15    Q.   I'm going to show you a document and ask
16  you to take a moment to look at that and answer if
17  you've seen that before.
18    A.   Yes.
19    Q.   Okay.
20       MR. DONIUS:  And I guess this is really
21  just for you, Don, on the record that the only
22  documents produced in connection with this

**Page 21**

1  deposition notice were the ones that you produced
2  with the Bates stamps on them plus what you gave me
3  this morning.
4       MR. PINTO:  Plus the several this morning,
5  right.
6       MR. DONIUS:  And that's all that you have
7  that you are producing in connection with this
8  deposition?
9       MR. PINTO:  Yes, although I have to say, I
10  had -- I guess this can be on the record.  I had
11  reference when we produced documents not to what's
12  attached to the deposition notice, but to your, what
13  I believe was a separate Rule 34 request.  I never
14  went to compare the two to see if the one that's
15  attached here is identical to the other, but we
16  responded to the separate Rule 34 request.
17       MR. DONIUS:  Okay.
18       MR. PINTO:  And produced documents
19  consistent with our response, our written response
20  to that Rule 34 request.
21       MR. DONIUS:  Okay.
22  BY MR. DONIUS:

6 (Pages 18 to 21)

Joanna Ficklin

Page 22

1      Q.  I'm going to show you a document that's
2   entitled "Initial Disclosures of Third-Party
3   Defendant, HealthExtras, Inc." and ask you to take a
4   moment to see if you've seen that before.
5          MR. PINTO:  Is that going to be Exhibit 2?
6          MR. DONIUS:  Yes.
7          (Ficklin Exhibit No. 2, Initial
8   Disclosures of Third-Party Defendant, HealthExtras,
9   Inc., was marked for identification and retained by
10   counsel.)
11          THE WITNESS:  I don't recall seeing this.
12          MR. DONIUS:  Can we have this marked
13   Exhibit 2, the Initial Disclosures of Third Party
14   Defendant, HealthExtras, Inc.
15   BY MR. DONIUS:
16      Q.  I'm going to refer you to Exhibit 2 and,
17   excuse me, on the bottom of the first page it
18   indicates that you, as Vice President of Sales
19   Administration, has information concerning
20   HealthExtras' contractual relationships with
21   American Express, Federal Insurance Company and the
22   Sklover Group and HealthExtras' role in providing

Page 23

1   customer service, administration and fulfillment
2   services with respect to the accidental disability
3   plan brokered by Sklover, underwritten by Federal,
4   marketed by American Express and purchased by
5   Altagracia Peguero."  Do you see that?
6      A.  Yes.
7      Q.  Is that a true statement?
8      A.  Yes.
9      Q.  Now, it also lists several people here, I
10   guess 13 different individuals, and I'm just going
11   to ask you some questions about their role in the
12   American Express's Accidental Disability Plan, as
13   far as you know it.
14      A.  Okay.
15      Q.  Okay.  And with respect to Andrew Sklover,
16   based on your own knowledge, what was his role in
17   the American Express disability plan?
18      A.  He was the President of the Sklover Group
19   who was the broker of record for Federal Insurance
20   Company.
21      Q.  And his, what -- as the broker of record,
22   what do you know of his role in bringing this

Page 24

1   Accidental Disability Plan to the public as a
2   product?
3      A.  His role or the broker of record in
4   general?
5      Q.  Well, first the broker of record in
6   general and then Mr. Sklover specifically.
7      A.  The broker of record satisfied the
8   insurance agency and licensure requirements for any
9   insured benefits.
10      Q.  And what about Mr. Sklover's involvement
11   in the American Express Accidental Disability Plan?
12   What else did he do, if anything?
13      A.  It's a broad question.  Can you just be
14   more specific?
15      Q.  Was he involved in claims administration
16   in any way?
17      A.  I don't know.
18      Q.  Did he draft any of the promotional
19   materials?
20      A.  I don't know with certainty.
21      Q.  Is there anything that you do recall about
22   him doing in connection with the, this plan other

Page 25

1   than serving as broker of record?
2      A.  Yes.  I'm going to speak generally because
3   I, Andrew does not work for me, so I can't say
4   everything that he did, but generally he was the
5   person responsible for submitting all the marketing
6   materials and fulfillment materials to Federal for
7   compliance approval.
8      Q.  And --
9          MR. PINTO:  I don't think she was done.
10          MR. DONIUS:  Okay.  I'm sorry.
11          THE WITNESS:  He, he was also responsible
12   for forwarding premiums due to the carriers and just
13   generally served as a liaison between insurance
14   carriers and HealthExtras.
15   BY MR. DONIUS:
16      Q.  With respect to the submitting of
17   marketing materials and fulfillment materials to
18   Federal, was he essentially just passing them along
19   from HealthExtras to Federal Insurance, as far as
20   you know?
21          MR. PINTO:  Objection to the form.  Go
22   ahead.

7 (Pages 22 to 25)

Joanna Ficklin

Page 26

1      THE WITNESS: I don't know.
2   BY MR. DONIUS:
3      Q.   Did you have any expectations in that
4   regard?
5      A.   Yes.
6      Q.   What were your expectations?
7      A.   That he would be passing, that he would be
8   perhaps doing, looking through the materials
9   himself, but ultimately passing them through to the
10  insurance carriers.
11     Q.   All right.  Skipping down here to number,
12  well, I guess just go right to Number 3, Kirk, is it
13  Voisin?
14     A.   Mm-hmm.
15     Q.   Did you have any dealings with him
16  yourself?
17     A.   Yes.
18     Q.   What role did Mr. Voisin play in the
19  Accidental Disability Plan?
20     A.   I believe he was one of the individuals
21  responsible for managing Federal's relationship with
22  HealthExtras.

Page 27

1      Q.   And earlier you had talked about marketing
2   materials.  That's a term that you used in
3   connection with the American Express disability
4   plan.  What did you mean by "marketing materials"?
5      A.   A direct mail piece, for example.
6      Q.   And that would be something that would be
7   sent directly to American Express customers?
8      A.   Correct.
9      Q.   And would that typically, when you use the
10  term "direct mail", is that a, something that would
11  be sent separately from the American Express bill?
12     A.   Correct.
13     Q.   And, if you use the term "insert", is that
14  referencing things that were sent with a bill that
15  was going to go anyways?
16     A.   Correct.
17     Q.   And, when you say "fulfillment materials",
18  what do you mean?
19     A.   Fulfillment refers to post-enrollment
20  communications to an enrollee that would include a
21  welcome letter, the benefit plan description and any
22  materials that would be sent to a customer after

Page 28

1   enrollment during the due course of business,
2   billing reminders, member requests, you know,
3   responses to member inquiries, things of that
4   nature.
5      Q.   Plan summary?
6      A.   A plan summary, correct.
7      Q.   You said billing reminders.  Why -- were
8   the payments automatically deducted by American
9   Express for the, for the plan?
10     A.   Correct.
11     Q.   What would be a billing reminder?
12     A.   If, for example, a billing, for example, a
13  billing did not successfully bill, the member would
14  customarily be notified that the billing was not
15  successful.
16     Q.   What would be, what would cause an
17  unsuccessful billing?
18     A.   Something on the member's credit card that
19  would have caused the billing to not successfully
20  post.
21     Q.   Going back to the list here on the
22  disclosures, how about J. Whitney Stevens?  What was

Page 29

1   his role in all of this?
2      A.   Her role was, I believe she was the vice
3   president responsible for direct marketing programs
4   for American Express.
5      Q.   Do you know what she did?  That was her
6   title, but do you know what she actually did in
7   terms of this plan?
8      A.   Not specifically.  She signed an
9   agreement, but I don't know what, what other role
10  she had.
11     Q.   Which agreement did she sign?
12     A.   An agreement between HealthExtras and
13  American Express.
14     Q.   The marketing agreement?
15     A.   Correct.
16     Q.   How about Abby Mink?  Do you know what
17  role she played in the plan?
18     A.   Yes.  She was an account manager, I
19  believe.
20     Q.   And as account manager what, based on what
21  you know, would she do in connection with this plan?
22     A.   She was generally responsible for

8 (Pages 26 to 29)

Joanna Ficklin

Page 46

1  A.  Correct.
2      MR. DONIUS:  Can we have this marked as
3  the next exhibit, please?
4      (Ficklin Exhibit No. 3, Benefit Plan
5  Description, was marked for identification and
6  retained by counsel.)
7      MR. PINTO:  Three?
8      THE REPORTER:  Three.
9  BY MR. DONIUS:
10  Q.  Okay.  With respect to this American
11  Express Accidental Disability Plan, which we've
12  already discussed to some extent, was this a plan
13  that was developed by HealthExtras?
14  A.  What do you mean by developed by?
15  Q.  Well, developed by, I just took that term
16  from some documents that HealthExtras produced
17  describing its own role in these programs, and it
18  describes that HealthExtras was in the business of
19  developing supplemental benefit programs.
20  A.  Okay.  HealthExtras contracted with
21  insurance carriers, benefit providers, a broker of
22  record, Christopher Reeve and financial institutions

Page 47

1  to make the product available.
2  Q.  And with respect to Christopher Reeve,
3  does he get paid or did he get paid for his
4  endorsement of this product?
5  A.  Yes.
6  Q.  How did he get paid?
7      MR. PINTO:  I'm going to object.  I think
8  that's outside the scope.  I'll let her answer that
9  question, but Reeve doesn't, to my memory, show up
10  in any topic of discussion for today.  But you can
11  answer how he got paid, if you know.
12      THE WITNESS:  I don't recall exactly.
13  BY MR. DONIUS:
14  Q.  Do you know if the amount he got paid was
15  based upon the number of enrollees?
16      MR. PINTO:  Objection.
17      THE WITNESS:  I don't recall.
18  BY MR. DONIUS:
19  Q.  Do you have an understanding of whether or
20  not it is necessary to disclose the ultimate
21  consumer that Mr. Reeve was being paid for his
22  endorsement?

Page 48

1      MR. PINTO:  Objection.
2      THE WITNESS:  According to the insurance
3  carrier, that is something that should be disclosed.
4  BY MR. DONIUS:
5  Q.  And, to your knowledge, was it always
6  disclosed in connection with the marketing of this
7  Accidental Disability Plan whenever Mr. Reeve
8  provided an endorsement?
9  A.  Yes.
10  Q.  And was it important to you that the fact
11  that he was being paid for his endorsements be
12  disclosed in a manner that would effectively
13  communicate the disclosure to the end user?
14      MR. PINTO:  Object to the form.
15      THE WITNESS:  Federal Insurance Company
16  controlled all the disclosures.  I didn't personally
17  get involved.
18  BY MR. DONIUS
19  Q.  Well, you say you didn't get personally
20  involved in the disclosure.  Were you involved in,
21  for instance, this document, the financial, headed
22  up "Financial Security"?  There's a disclosure on

Page 49

1  the back of that; is that right?
2  A.  Right.
3      MR. PINTO:  The question is is that right?
4      MR. DONIUS:  Right, there's a disclosure
5  on the back.
6      THE WITNESS:  There is a disclosure on the
7  back.
8  BY MR. DONIUS
9  Q.  Were you involved in the creation of this
10  document?
11      MR. PINTO:  Object to the form.
12      THE WITNESS:  I had some involvement.
13  BY MR. DONIUS:
14  Q.  And what was your involvement?
15  A.  I collaborated with all the different
16  parties involved to make available this particular
17  direct mail piece that you are showing me.  That
18  included a variety of things, working with a
19  marketing agency that was developing the piece in
20  part, working with American Express, the Sklover
21  Group, Federal Insurance Company, obtaining
22  approvals from both of the parties, American Express

13 (Pages 46 to 49)

Joanna Ficklin

Page 50

1  and then Federal Insurance Company, and the Sklover
2  Group in making this piece available to the
3  consumers.
4      Q.  Did you consider a part of your duties to
5  make sure that this document was in compliance with
6  any regulatory or legal regulations?
7      A.  Absolutely.  We were required to submit
8  everything to Federal Insurance Company for their
9  approval for anything pertaining to laws,
10  regulations, compliance matters, and I always sent
11  all marketing pieces to Federal Insurance Company to
12  obtain their approval, and, if they ever requested
13  changes, it was our duty to make sure that we
14  incorporated their changes into the piece.
15      Q.  I'm getting a little bit out of order, but
16  we can have this marked as the next exhibit, please,
17  the document saying "Financial Security" at the top,
18  right.
19      (Ficklin Exhibit No. 4, Financial Security
20  document, was marked for identification and retained
21  by counsel.)
22  BY MR. DONIUS:

Page 51

1      Q.  I had, getting back to the Accidental
2  Disability Plan that we've talked about, we've, I
3  think, discussed that HealthExtras contracts with
4  insurers to underwrite the insurance components;
5  true?
6      A.  Correct.
7      Q.  And you, in this case HealthExtras
8  contracted with American Express to market and sell
9  the plan; is that fair?
10      A.  Correct.
11      Q.  And, as part of the marketing and selling
12  of this plan, HealthExtras had the rights to the
13  Christopher Reeve endorsement; true?
14      MR. PINTO:  Objection.
15      THE WITNESS:  Christopher Reeve agreed to
16  endorse the product.
17  BY MR. DONIUS:
18      Q.  Right, but that was something that
19  HealthExtras had legal agreements regarding?
20      A.  Correct.
21      Q.  Do you consider -- well, strike that.
22  Let's move on to the next document which is a

Page 52

1  marketing agreement.  If you could take a look at
2  that, please.
3      MR. PINTO:  If you're going to have a
4  series of questions about this, I might propose a
5  short break for a couple minutes; is that all right?
6      MR. DONIUS:  Sure.
7      (Whereupon, a short recess was taken.)
8  BY MR. DONIUS:
9      Q.  Okay.  With respect to the marketing
10  agreement, I don't know if you've had a chance to
11  look at that or not.
12      MR. PINTO:  Is that marked now?
13      MR. DONIUS:  Hasn't been marked yet.
14      THE WITNESS:  Okay.
15  BY MR. DONIUS:
16      Q.  Do you recognize that document?
17      A.  I do, except for the last page.
18      Q.  Okay.  Can I just see it for one second?
19  The whole thing, yeah.  Thank you.  And let's give
20  it back to you.  What do you recognize that document
21  to be?
22      A.  With the exception of the last page?

Page 53

1      Q.  With the exception of the last page.
2      A.  It is our marketing agreement with
3  American Express.
4      Q.  And that's dated September 17 of 1999?
5      A.  Correct.
6      Q.  And, as far as you know, was this the
7  controlling document between, regarding the
8  relationship between HealthExtras and American
9  Express relating to the Accidental Disability Plan?
10      MR. PINTO:  Objection.
11      THE WITNESS:  Yes.
12  BY MR. DONIUS:
13      Q.  In the second paragraph on the first page
14  there's a whereas clause.  It says, "Whereas
15  HealthExtras, together with its wholly owned
16  affiliates, subsidiaries and service contract
17  entities, are engaged in, among other things, the
18  business of promoting, selling and providing to
19  consumers programs associated with disability and
20  travel, medical care insurance and nonunderwritten
21  program benefits."  Do you see that?
22      A.  I see it.

14 (Pages 50 to 53)

Joanna Ficklin

Page 70

1    to have acquired an enrollee.
2        Q.   And to determine that would you look at
3    all the costs incurred and essentially just divide
4    it by the number of enrollees?
5        A.   Typically, yes.
6        Q.   And this says that, if the acquisition
7    cost was less than $40 per new enrollee,
8    HealthExtras and American Express would share the
9    difference between the actual acquisition cost and
10   $40.  Do you see that?
11       A.   Yes.
12       Q.   Did that happen in practice, do you know?
13       A.   No.
14       Q.   It didn't happen?
15       A.   No.
16       Q.   Is that because the acquisition cost was
17   not less than $40 per new enrollee?
18       A.   Correct.
19       Q.   Number 10 talks about the disability
20   insurance fee.  Do you see that?  What is a
21   disability insurance fee?
22       A.   American Express wrote this agreement.  I

Page 71

1    believe that they are referring to the fee that was
2    payable to the insurance carrier for disability
3    insurance.
4        Q.   So that would be the premiums?  Is that
5    the same as the premium?
6        A.   Correct.
7        Q.   And then this indicates that, if the
8    premium ended up being less than $27 per enrollee,
9    per -- I'm sorry -- per enrollee -- let me start
10   again.  If the disability insurance fee per enrollee
11   is less than $27 per million dollars of coverage,
12   than HealthExtras and American Express will split
13   the difference 50 percent to American Express and
14   50 percent to HealthExtras.  Did that happen in
15   practice?
16       A.   No.
17       Q.   And was that again because the target of
18   $27 per million dollars of coverage per enrollee was
19   never, it was never less than that?
20       A.   Correct.
21       Q.   Now, this plan that we talked about and is
22   described in the benefit description plan, had the

Page 72

1    $1.5 million Accidental Disability Plan, it had the
2    loss of life and dismemberment component, and it had
3    a $2,500 emergency accident and sickness medical
4    expense benefit?
5        A.   Correct.
6        Q.   And there was a medical care coordination
7    benefit?
8        A.   Correct.
9        Q.   Is there any other benefits that were part
10   of this that you know of?
11       A.   Not that I can recall.
12       Q.   So with respect to the $1.5 million
13   Accidental Disability Plan, a certain premium was
14   charged per enrollee by the underwriter?
15       A.   Correct.
16       Q.   Do you recall what that premium was?
17       A.   It varied over time.
18       Q.   Do you know what the range was?
19       A.   How much coverage?
20       Q.   For the 1.5 million coverage.
21       A.   I believe it may have been somewhere close
22   to $4.

Page 73

1        Q.   $4 per month?
2        A.   Correct.
3        Q.   How about the loss of life and
4    dismemberment premium?  Do you recall what that was?
5        A.   I don't.
6        Q.   It would have been less than $4?
7            MR. PINTO:  Objection.
8    BY MR. DONIUS:
9        Q.   Is that true?
10       A.   I don't remember.
11       Q.   And what about the $2,500 emergency
12   accident and sickness medical expense benefit?  Do
13   you recall what premium was attributable to that?
14       A.   I don't.
15       Q.   Again, that would have been less than $4?
16           MR. PINTO:  Objection.  She said she
17   didn't recall.
18           MR. DONIUS:  I know she didn't recall, but
19   she recalls, for instance, that it was less than
20   $100; true?
21           THE WITNESS:  I believe it was, but I
22   would be guessing.  I don't remember.

19 (Pages 70 to 73)

Joanna Ficklin

Page 86

1      A.  I do believe that there was a report that
2  provides this information.
3      Q.  What about the Subsection E that talked
4  about the number of enrollees that canceled their
5  enrollment?  Was an attrition report created?
6      A.  I believe that this is also accomplished
7  through the file exchange that I described earlier.
8      Q.  What about with respect to HealthExtras'
9  own evaluation of the success of this program?  Did
10  you create attrition reports to see, to summarize
11  how many people were leaving the program?
12      A.  There could be.  I don't remember.  There
13  aren't any reports that I can recall that provide
14  this exact information.
15      Q.  What about Subsection F that talks about
16  the claim report grouped by individual certificate
17  holder?  Was that a type of report created by
18  HealthExtras?
19      A.  No.
20      Q.  Did HealthExtras have access to the type
21  of information described in Subsection F?
22      A.  No.

Page 87

1      Q.  Do you know why it was listed here as a
2  part of the agreement?
3      A.  Again, from my recollection of this is
4  that Reliance National, the original underwriter of
5  the permanent total disability benefit for this
6  program, I think they had been agreeable to
7  providing this information to American Express, but
8  subsequent to this the insurance carriers were
9  changed to Federal Insurance Company, and Federal
10  did not provide this level of claim detail to
11  HealthExtras or American Express.
12      Q.  With respect to Subsection F, the last
13  part that talks about a report recapping in detail
14  the year-to-date loss ratio, did you ever have
15  access at HealthExtras to the loss ratio in
16  connection with this American Express disability
17  plan?
18      MR. PINTO:  At any time?  With either
19  underwriter?
20      MR. DONIUS:  Yeah.
21      THE WITNESS:  Not with respect to the
22  Accidental Disability Plan.

Page 88

1  BY MR. DONIUS:
2      Q.  When I say with respect to the Accidental
3  Disability Plan, for this question I'm referring
4  specifically to the disability component of it.  Did
5  you have any access to the loss ratio with respect
6  to the disability component of the plan?
7      A.  Permanent disability plan within the
8  American Express Accidental Disability Plan?
9      Q.  Yes.
10      A.  No.
11      Q.  I'm going to go ahead to Section 13,
12  Section 13B.  Do you see where it says "HealthExtras
13  represents, warrants and covens that the performance
14  of obligations under this agreement in connection
15  with the disability plan complies and will comply
16  with all applicable federal, state, local and
17  foreign laws, regulations, including, but not
18  limited to fair trade and advertising laws and
19  regulations."  Do you see that?
20      A.  Yes.
21      Q.  Did you understand it to be part of
22  HealthExtras' responsibility to comply with all such

Page 89

1  laws and regulations?
2      MR. PINTO:  Objection.
3      THE WITNESS:  I understood it was our
4  responsibility to make sure that we provided all
5  materials to the insurance carrier as was customary
6  to insure the materials were compliant with all the
7  applicable federal, state, local and foreign laws
8  and regulations and the fair trade and advertising
9  laws and regulations.
10  BY MR. DONIUS:
11      Q.  But with respect to HealthExtras'
12  performance of its obligations, did you understand
13  those, that HealthExtras' obligations were to be
14  performed in accordance with the laws and
15  regulations listed?
16      MR. PINTO:  Objection.
17      THE WITNESS:  Again, I think the intent is
18  that HealthExtras is responsible for insuring these
19  things, and we accomplish that through submitting
20  all the materials to the insurance company.  We were
21  required to do so.
22      MR. DONIUS:  Obviously, I saw her bring in

23 (Pages 86 to 89)

Joanna Ficklin

Page 114

1    A.  Correct.

2    Q.  What does the supplemental refer to?

3    A.  Supplemental benefits are what I described

4  earlier at the beginning of the deposition, that

5  they are programs of insured and uninsured benefits

6  marketed by various parties to their membership.

7    Q.  But just in the name of it supplemental,

8  why are they called supplemental benefits?

9    A.  I didn't personally label it as such, but

10  I would imagine it's because the types of benefits

11  that are included there are typically supplementing

12  other insurance products or noninsurance products

13  that you have there.

14    Q.  I'm going to show you a letter that's

15  dated October 5, 1999 and ask you again if you

16  recognize that.

17    A.  Yes.

18    Q.  What do you recognize that to be?

19    A.  This was a letter between Federal

20  Insurance Company HealthExtras and the Sklover Group

21  that generally outlined the intent of the working

22  relationship between the three parties.

Page 115

1    Q.  And, as far as you know, was this the

2  operative document with respect to that agreement,

3  or was it formalized in a more formal contract at

4  some point?

5    A.  It served as the basis for sometime, but

6  it was eventually formalized further.

7    Q.  Okay.  Now, with respect to this document

8  again the first paragraph talks about HealthExtras

9  developing a series of health and disability

10  programs endorsed by Christopher Reeve.  Do you see

11  that?

12    A.  I see it.

13    Q.  Okay.  And jumping down -- I'm sorry --

14  jumping down to paragraph five, it says, "An initial

15  deposit of 100,000 shall be paid to Chubb, and

16  future amounts due Chubb may be applied against this

17  deposit."

18    A.  Mm-hmm.

19    Q.  Do you have an understanding as to why

20  Chubb was getting a payment of $100,000?

21    A.  I believe it was a prepayment just

22  demonstrating the intent to partner with them that

Page 116

1  really served as the basis for the first payment of

2  enrollees that would be converted over from

3  Reliance.

4    Q.  And was it, in essence, to insure that

5  Chubb would receive premiums for at least a certain

6  amount of enrollees?

7    MR. PINTO:  Objection.

8    THE WITNESS:  Can you ask me the question

9  again?

10  BY MR. DONIUS:

11    Q.  Yes.  The only payments that Chubb was

12  going to get out of this disability plan program

13  were insurance premiums; is that right?

14    A.  Correct.

15    Q.  Was this, in essence, an advance payment

16  of the insurance premiums?

17    A.  Yes.

18    Q.  And if Chubb, if you didn't enroll enough

19  people to equal $100,000 premium, Chubb under this

20  agreement was not going to refund any money to you?

21    A.  I don't know because I was not personally

22  involved in the negotiation.

Page 117

1    Q.  But, in any event, if and when premiums

2  started to become due, it would, you would be

3  credited, HealthExtras and the other parties would

4  be credited for the amounts already paid?

5    A.  Yes.

6    MR. DONIUS:  Can we have that document

7  marked as the next exhibit, please?

8    (Ficklin Exhibit No. 11, 10/5/99 letter,

9  was marked for identification and retained by

10  counsel.)

11  BY MR. DONIUS:

12    Q.  Show you another document.  This one is

13  dated January 1, 2003 and it's entitled the

14  "Administrative and Marketing Services Agreement"

15  and ask you if you recognize that.

16    A.  Yes.

17    Q.  And was this the document that became the

18  more formal contract between Federal Insurance

19  Company, HealthExtras and Sklover Group from, I

20  guess as of January 1, 2003?

21    A.  Yes, although it is lacking a few

22  exhibits.

30 (Pages 114 to 117)

Joanna Ficklin

Page 126

1  Q.  Do you know who, if anyone, from
2  HealthExtras had any graphic design input on this
3  document?
4  A.  I don't believe we had a graphic designer
5  when this piece was developed.
6  Q.  In some of the documents I've seen people
7  refer to things as creative.  They kind of use it as
8  a noun as if it's a thing.  Would this come in as,
9  this document that's before you, is this something
10  that people would refer to as creative?
11  A.  It's possible, yes.
12  MR. PINTO:  I'd just like to note for the
13  record this document does have two sides.  The
14  witness has been answering all these questions from
15  the front of it, and I don't know to what extent her
16  answers apply to the entire document.
17  BY MR. DONIUS:
18  Q.  Did any of the answers you've had so far
19  with respect to this document differ with respect to
20  the back side?
21  A.  Yes.
22  Q.  How so?

Page 127

1  A.  The important disclosure and the
2  additional benefit descriptions were dictated by the
3  insurance carrier, the benefit provider, so the
4  marketing agency would not have developed the
5  language included.
6  Q.  Now, we'll get into this a little bit
7  later, but was the important disclosure so-called
8  language that was utilized on this document, had
9  that been taken from other marketing programs?
10  A.  It is the disclosure provided to us by the
11  insurance carrier.
12  Q.  By Chubb in this case?
13  A.  For this particular mail piece this was
14  provided to us by Chubb, correct.
15  Q.  Well, I guess I'll ask you later.  All
16  right.  When -- did HealthExtras consider it
17  important that this document accurately describe the
18  plan being offered?
19  A.  Yes.
20  MR. PINTO:  Objection.
21  BY MR. DONIUS:
22  Q.  And, obviously, HealthExtras didn't intend

Page 128

1  or didn't wish to mislead any potential purchaser
2  regarding the nature of the product offered; true?
3  MR. PINTO:  Objection to the form of the
4  question.  I question whether the witness can speak
5  to the company's intent.  I understand she's here as
6  a 30(b)(6) witness, and she can certainly report
7  facts that the company knows.  I don't know about --
8  well, I think she answered.  Did she answer already?
9  She can answer, if she is able.
10  THE WITNESS:  Can you ask me the question
11  again?
12  BY MR. DONIUS:
13  Q.  Well, I didn't think it was controversial.
14  I assume you're going to take the position that
15  HealthExtras did not intend to mislead anybody
16  regarding the nature of the product that was being
17  offered in connection with this mailing?
18  A.  Correct.
19  Q.  With respect to the type size of the
20  important disclosure, did you have any concerns that
21  it would be difficult for purchasers to read the
22  print?

Page 129

1  A.  I believe that there are insurance
2  guidelines, insurance marketing guidelines that
3  Chubb adhered to in terms of things such as font
4  size which were not within our, our area.  They
5  reviewed the piece for things such as the one that
6  you just described.
7  Q.  American Express was also involved in
8  looking at font size; is that right?
9  A.  I would imagine so.  They reviewed the
10  piece, but I cannot tell you -- they would have
11  reviewed it for purposes of their branding and the
12  message to the customer.  I wouldn't be able to tell
13  you all the specific things that they may have
14  reviewed internally.
15  Q.  And do you believe that as written this
16  document effectively communicates the terms and
17  conditions of the policy to the potential purchaser?
18  MR. PINTO:  Objection to the form of the
19  question.  Could you read that back, please?
20  (The reporter read back as requested.)
21  THE WITNESS:  I'm sorry.  Can you repeat
22  the question again now?  I was reading.

33 (Pages 126 to 129)

Joanna Ficklin

Page 138

1    MR. DONIUS: Please. Thank you.
2    (Ficklin Exhibit No. 15, Accident
3  Disability Plan from American Express, Program
4  Summary, was marked for identification and retained
5  by counsel.)
6  BY MR. DONIUS:
7    Q.  Do you know why, how it came about that
8  Federal was going to be replaced by AIG?
9    A.  Yes.
10    Q.  How did that come about?
11    A.  My recollection is that Federal had
12  indicated a higher claims experience than that which
13  they had anticipated, and in order to continue with
14  Federal they would have had to increase the cost
15  efficiently that it would have impacted the
16  enrollees, and then the broker of record identified
17  a different carrier that could continue the program
18  in its current form.
19    Q.  It was a pricing issue, as you understood
20  it, from the insurance side?
21    A.  That's my recollection.
22    Q.  This is another document that was provided

Page 139

1  me today that's a letter, a copy, I guess, of a
2  letter to Altagracia Peguero from Anne Schepp,
3  Insurance Officer, American Express. I ask you to
4  just take a moment to look at that.
5    A.  Yes.
6    Q.  Is that a copy of the document that you
7  believe would have been sent to Altagracia Peguero
8  with the so-called welcome kit?
9    A.  That is correct.
10    MR. DONIUS: Can we have that marked as
11  the next exhibit, please?
12    (Ficklin Exhibit No. 16, Letter to Ms.
13  Peguero from Ms. Schepp, was marked for
14  identification and retained by counsel.)
15    MR. PINTO: Can I ask for just three
16  minutes?
17    (Whereupon, a short recess was taken.)
18  BY MR. DONIUS:
19    Q.  I want to show you again what's been
20  marked as Exhibit 3 and just draw your attention to
21  the third page, and it talks of a trust. Do you
22  know why a trust was established in connection with

Page 140

1  this policy?
2    A.  I do not.
3    Q.  Do you know anything about the obligations
4  of the trustees?
5    A.  I do not. I believe that this was
6  something that was set up by Federal Insurance
7  Company.
8    Q.  When Reliance was the underwriter on this
9  policy, there was a similar trust?
10    A.  I don't remember.
11    Q.  Do you know if all the supplemental
12  accidental disability programs that HealthExtras has
13  been involved in involve a trust?
14    A.  I don't think so.
15    Q.  So I take it from an earlier answer you
16  don't know who the trust beneficiaries are, for
17  instance?
18    A.  No.
19    Q.  Or the role of trustees?
20    A.  No.
21    Q.  Do you know if trustees were compensated
22  for serving as trustees?

Page 141

1    A.  No, but I don't believe so.
2    Q.  To your knowledge, any payment to them
3  didn't come out of the escrow accounts that you're
4  aware of?
5    A.  No.
6    Q.  I'm just going to show you a document
7  that's, it's titled "Affidavit of Joanna Ficklin in
8  Support of Defendant, Federal Insurance Company's
9  Reply Memorandum." And could you take a moment to
10  review your affidavit?
11    A.  Okay.
12    Q.  On paragraph five and six you indicate
13  that, when a new member enrolls in our program, a
14  welcome packet is assembled and sent out to the
15  enrollee.
16    A.  Correct.
17    Q.  Who performs that function?
18    A.  We have an automated process in terms of,
19  when a new enrollee is entered into the enrollment
20  database, the system automatically selects what we
21  call a welcome packet record, and then we have a
22  fulfillment department that downloads the

36 (Pages 138 to 141)

Joanna Ficklin

Page 142

1  information daily, prints the materials and mails
2  them to the customers.
3      Q.  At some point, well, attached to your
4  affidavit there's some, looks like computer records,
5  one of which is, second page of Exhibit 1 indicates
6  that the welcome package was processed on 7/16/2002.
7      A.  Yes.
8      Q.  Do you see that?
9      A.  Yes.
10     Q.  And who would make the entry indicating
11  that it had been processed?
12     A.  I believe it's the person who has
13  downloaded and processed the file.
14     Q.  And that person downloads it and literally
15  puts the materials in an envelope and mails it?
16     A.  Correct.
17     Q.  I guess you also indicated there was some
18  process that was supposed to be followed if a
19  package was returned?
20     A.  Right.
21     Q.  As undelivered?
22     A.  Correct.  We have a process for that.

Page 143

1      Q.  And what's that process?
2      A.  The, any return mail is dispersed amongst
3  the different customer service and fulfillment
4  staff, and they enter a note into what we call the
5  F9 notes.  It's a portion of the database that
6  provides notes for a particular enrollee's record,
7  and they enter a notation, a return mail.  They then
8  attempt to file -- I'm sorry -- to find a new
9  address for that individual.  They try to make an
10  outbound call.  They make attempts to try to
11  redirect the mail.
12     Q.  Now, in any of the welcome materials,
13  welcome kit materials, are there any phone numbers
14  listed to call if you have any questions or problems
15  that you recall?
16     A.  Yes.
17     Q.  And those numbers, if one were to dial
18  that number, it would ring where?
19     A.  To the HealthExtras Customer Service
20  Center.
21     Q.  But, when the HealthExtras Customer
22  Service Center answers the phone in connection with

Page 144

1  this plan, they identify themselves as being
2  American Express?
3      A.  I believe they answer thank you for
4  calling the American Express Accidental Disability
5  Plan or something of the like.
6      Q.  But, in other words, they don't identify
7  themselves as HealthExtras?
8      A.  Only if somebody were to ask do you work
9  for American Express.  Then they would explain that
10  they worked for a company that services the American
11  Express Accidental Disability Plan.
12     Q.  But, unless asked, the only reference is
13  to American Express?
14     A.  I believe it's an automated greeting that
15  includes the name of the program.  Otherwise, they
16  just identify themselves by name.
17     Q.  In fact, can we have the affidavit marked
18  as the next exhibit, please?
19         (Ficklin Exhibit No. 17, Affidavit of
20  Joanna Ficklin, was marked for identification and
21  retained by counsel.)
22  BY MR. DONIUS:

Page 145

1      Q.  All right.  I'm going to show you a large
2  packet of materials.  These were provided to me by
3  your attorney, and they are numbered 1 through 91.
4  Just ask you to just quickly flip through those and
5  see if you generally recognize those.  I'll ask you
6  more specifically about them.
7      A.  Okay.
8      Q.  All right.  The first page is a letter
9  dated November 5, 1999 from Rona Leffler to Miss
10  Camille Hoffmiller?
11     A.  Yes.
12     Q.  Is that right?  What was Rona Leffler's
13  position at HealthExtras?
14     A.  I believe in 1999 she was the Director of
15  Supplemental Benefits.
16     Q.  And you had just started working there a
17  few months before; is that right?
18     A.  Correct.
19     Q.  In this it says, "I've enclosed a variety
20  of HealthExtras marketing materials that have been
21  updated to reflect the Chubb language disclosure."
22  Do you see that?

37 (Pages 142 to 145)

Joanna Ficklin

Page 146

1    A.   Yes.
2    Q.   Do you recall what marketing materials
3  she's talking about?
4    A.   It would likely be different direct mail
5  pieces and things of that nature.
6    Q.   Now, Chubb was at this time just starting
7  its involvement in the Accidental Disability Plan
8  from American Express; right?
9    A.   This is before they were involved specific
10 to American Express. They were just starting to be
11 involved with HealthExtras in general as a whole.
12   Q.   Okay. It says that "Enclosed are inserts,
13 direct mail pieces, telemarketing scripts and a
14 website printout."
15   A.   Correct.
16   Q.   So it appears these were things that
17 HealthExtras already had in place before Chubb got
18 involved?
19   A.   Correct.
20   Q.   If you turn to the next page, it appears
21 to be, well, it's a copy of the document that has
22 "Financial Security" at the top. Do you see that?

Page 147

1    A.   Yes.
2    Q.   It's hard for me to tell, but does this
3  appear to be one of the enclosures to the
4  November 5, '99 letter?
5    A.   It was.
6    Q.   It was?
7    A.   Mm-hmm.
8    Q.   That's a yes. So this document had been
9  created in advance of November 5 of 1999?
10   A.   Correct.
11   Q.   Okay. And this is, we talked earlier
12 about the document that's marked as --
13       MR. PINTO:  Four.
14 BY MR. DONIUS:
15   Q.   -- Exhibit 4. Is this the same as
16 Exhibit 4, as far as you know?
17   A.   I would have to do a thorough comparison,
18 but they are generally similar.
19   Q.   Okay. They are generally similar, but I
20 can see differences in the enrollment form, for
21 instance.
22   A.   Correct.

Page 148

1    Q.   So this, so this document had been in the
2  works before Chubb got involved?
3    A.   Correct.
4        MR. PINTO:  Objection to the form.
5  BY MR. DONIUS:
6    Q.   And do you recall, were you even here at
7  HealthExtras when this document was first created?
8    A.   Yes.
9    Q.   You were here?
10   A.   Yes.
11   Q.   So some, to me that indicates that
12 somewhere between July of 1999 and November of 1999
13 this document was created?
14   A.   Correct.
15   Q.   And, at that point in time, had you
16 entered, had HealthExtras entered into the agreement
17 with American Express?
18   A.   Yes.
19   Q.   Okay. The marketing agreement we looked
20 at earlier was signed on the 17th of September,
21 1999. Had efforts been made to create documents,
22 potential promotional materials prior to the signing

Page 149

1  of the marketing agreement?
2    A.   Not that I recall. It started with the
3  marketing agreement.
4    Q.   Okay. So just so -- I'm sorry if I asked
5  it before. Just so the record is clear, this
6  document which is under the Number 2 of this latest
7  group of documents would have been created before
8  Federal had come on board?
9    A.   Correct.
10   Q.   Had this document, a document like this or
11 a very similar document been used with respect to
12 any programs with Reliance National that you know
13 of?
14   A.   Yes.
15   Q.   It had?
16   A.   Yes.
17   Q.   And that would have been with a different
18 financial institution other than American Express?
19   A.   And with American Express.
20   Q.   With American Express? Had you worked
21 with American Express before this Accidental
22 Disability Plan?

38 (Pages 146 to 149)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALTAGRACIA J. PEGUERO | ) | |
| | ) | CIVIL ACTION No. 05-10995-RCL |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN EXPRESS COMPANY, | ) | RULE 26(a)(2)(B) REPORT OF |
| And HEALTHEXTRAS, INC. | ) | TIM RYLES, Ph.D. |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**A. Complete Statement of all opinions to be expressed and the basis and reasons therefor.**

My name is Tim Ryles and I have personal knowledge of the matters set forth in this report filed on behalf of Plaintiff Altagracia J. Peguero. Counsel for Plaintiff asked me to review certain documents and express opinions as to whether defendants American Express Company and HealthExtras, Inc. acted contrary to certain sales and advertising standards in marketing and administering the accidental disability policy purchased by the Plaintiff.  The opinions stated in this report are based upon my

EXHIBIT D

District of Columbia, the model has been adopted by all jurisdictions except Hawaii, Minnesota, and Montana. The Massachusetts version appears at 211 Code of Massachusetts Regulations Sections 40.1 to 40.16 "Marketing of Insured Health Plans." Where the Little FTC acts apply to insurance, as in Massachusetts, the NAIC Model reinforces and provides additional guidelines for insurers and regulators.

Under the Model Regulation, "Advertisement" includes descriptive literature used in direct mail solicitation (as in this case). Irrespective of the source of an advertisement, regulators hold insurers liable for compliance with the regulation.

HOW DEFENDANTS DECEIVED PEGUERO

The Trust Arrangement. Plaintiff Peguero signed up for an accidental disability policy in response to a mail solicitation from American Express on or about the time of August, 2002. It is labeled "Accidental Disability Plan *from* American Express." (Italics appear in original copy.) The Master Policy under which Mrs. Peguero enrolled is issued to Citizens Bank of Rhode Island, as Trustee for G.A.R.D. Trust for the Account of Health Extras /American Express. The Bank of Newport became trustee on 1/1/02. According to the Master Policy, the Master Policyholder is the entity responsible for "the collection and remittance of premium." Billing for the premium, however, is direct by American Express as part of the monthly credit card statement. There is no indication that any funds flow through the trust or that the trust satisfies the legal conditions for a legitimate trust. This raises an important issue as to whether the trust actually exists or whether this marketing scheme is just another bogus trust arrangement, not uncommon to some insurer marketing practices. Should future evidence show that the trust is, indeed, bogus, I would characterize the marketing scheme as fraudulent and deceptive from the outset.

The Solicitation. In the sample solicitation provided to me, Anne Schepp, the Insurance Officer for American Express, highlights in bold print at the upper right hand side of the advertisement, the following representation: