UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10995-RCL

| | |
|---|---|
| ALTAGRACIA J. PEGUERO, )<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>AMERICAN EXPRESS COMPANY, and )<br>HEALTHEXTRAS, INC., )<br>    Defendants. )<br>_____) | **PLAINTIFF'S OPPOSITION<br>TO DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT** |

The Plaintiff, Altagracia J. Peguero ("Ms. Peguero"),
hereby opposes the Motion for Summary Judgment filed by the
Defendant, HealthExtras, Inc. ("HealthExtras") and joined by the
Defendant American Express Company ("American Express").

## I.  INTRODUCTION

This is a consumer protection action based upon the manner
in which American Express and HealthExtras advertised, marketed,
and sold to Ms. Peguero in July, 2002, an insurance product then
known as the "Accidental Disability Plan *from* American Express"
(the "American Express Plan").  American Express and
HealthExtras fraudulently, unfairly, and deceptively marketed
the American Express Plan in blatant disregard and defiance of
the applicable regulations pertaining to the marketing and
advertising of insurance products.

The unlawful and deceptive marketing methods used by the
Defendants are numerous, but include the use of promotional

materials which 1) highlight the threat of bankruptcy and financial tragedy if the consumer becomes disabled, 2) highlight the promise of financial security and the payment of $1.5 million to purchasers of the American Express Plan who become disabled, 3) do not disclose that the product sold was intended to supplement traditional disability insurance, not as a substitute for it, and 4) do not fully or conspicuously disclose the extraordinarily restrictive definition of "disability" under the Plan.

These promotional materials misled Ms. Peguero about the nature of the American Express Plan and reasonably led her to believe that if she enrolled in the plan, she would be paid $1.5 million if she became disabled and unable to work.  Had Ms. Peguero not been so misled, she would not have purchased the American Express Plan.

When Ms. Peguero, a dentist trained in the Dominican Republic working as a dental assistant in Boston, lost her right arm in an automobile accident, she had a reasonable expectation that she would receive the promised $1.5 million and initially was somewhat consoled that she had protected herself with disability insurance.  When informed that the American Express Plan would offer her only $500 for the loss of her arm, she was stunned and felt as though she had been tricked and cheated.

2

Summary judgment is inappropriate in this matter as factual disputes abound regarding, among other things, (1) whether American Express or HealthExtras advertised, marketed, and sold this product fraudulently and/or in a manner in violation of the Consumer Protection Act, (2) whether Ms. Peguero was fraudulently, unfairly and/or deceptively induced to purchase the American Express Plan, and (3) whether, and the extent to which, Ms. Peguero was harmed by the deceptive conduct.

## II.  STATEMENT OF FACTS

American Express first began selling the American Express Plan to its cardholders in October or November, 1999.  Ex. A, Ficklin depo., pp. 150-151.[1]  HealthExtras, which is in the business of "promoting, selling, and providing to consumers programs associated with disability and travel medical care insurance and non-underwritten program benefits," created and developed the American Express Plan and the promotional materials used to market it.  Ex. A, pp.65-67, 149, 171-172; Ex. B, Sklover depo. pp. 19-21, 27-28; Ex. C, Marketing Agreement dated September 17, 1999 between HealthExtras and American Express, p.1, §4(b).

The American Express Plan consists of four separate programs bundled by HealthExtras and American Express, and sold

---

[1] All Exhibits referred to herein are attached to the Affidavit of Kevin Donius, Esq. filed herewith.

3

by American Express to American Express customers:  1)
disability insurance underwritten at various times by Reliance
National, Federal Insurance, National Union Fire Insurance
Company and AMEX Assurance Co.; 2) Accidental Death &
Dismemberment benefits; 3) Emergency Accidental Sickness Medical
Expense Benefits; and 4) Medical Care Coordinated Benefits.  Ex.
A, pp. 34-35, 75, 135; Ex. D, Benefit Description Plan.  At the
time Ms. Peguero purchased the American Express Plan, the
disability insurance portion of it was underwritten by Federal
Insurance Company.  Ex. E, Plan Summary.

HealthExtras had separate contracts with American Express
and Chubb Group Insurance Company (which includes Federal
Insurance) and the Sklover Group ("Sklover"), an insurance
broker, pursuant to which the American Express Plan was created,
marketed and sold.  Ex. C; Ex. F, October 5, 1999 Letter
Agreement Between American Express, Federal and Sklover; Ex. G,
January 1, 2003 Administrative Marketing Services Agreement.
Pursuant to a letter agreement dated October 5, 1999, Federal
agreed to underwrite the disability programs developed by
HealthExtras and endorsed by Christopher Reeve and to be
marketed by financial institutions such as American Express.
Ex. F.  A further agreement was executed between Federal

4

Insurance and HealthExtras and the Sklover Group on January 1,

2003, in which the relationship of the parties was set forth:

> The relationship between the parties shall, at all
> times, remain that of independent contractors. No
> party is responsible for the debts or liabilities
> of any other party. Except as expressly permitted
> herein, no party shall have any authority to bind
> or represent the other. Nothing herein shall be
> deemed to create any form of partnership or joint
> venture relationship or insurance agent
> relationship between any of the parties or their
> respective Affiliates.

Ex. G, Article 13 "Relationship of Parties."

No contractual relationship ever existed between Federal

Insurance and American Express.

Today, there are approximately 140,000 American Express

cardholders enrolled in the American Express Plan.  Ex. H,

Willis-Clarke depo., p. 29.  Enrollees in the American Express

Plan each month pay American Express either $9.95 or $12.95

(depending on whether they have enrolled for a $1 million dollar

benefit or $1.5 million dollar benefit).  Ex. A, pp.57-60, 102-

104; Ex. C, p. 2., sec. 2; . Ex. I, April 18, 2002 Letter of

Understanding.  Of this amount, American Express retains fifty

percent and disburses the remaining fifty percent to an escrow

account from which HealthExtras, the current underwriter, and

the current insurance broker are paid.  Ex. I; and Ex. A, p. 102

-104.

5

Both American Express and HealthExtras describe the American Express Plan as providing "supplemental benefits" and both acknowledge it was intended as a supplement to, not a substitute for, traditional disability insurance. Ex. A, p. 34-35, 92, 113-114; Ex. H, p.10-11. The master policy relating to the policy in question is titled "Voluntary Accident Insurance." Ex. J, Master Policy. Nonetheless, the American Express Plan was originally marketed as the "Accidental Disability Plan *from* American Express"; effective as January 1, 2005, it was re-named the "Accident Protection Plan *from* American Express." Ex. E; and Ex. K, Plan Summary Effective as of January 1, 2005. Nowhere in any of the promotional materials is it disclosed that the American Express Plan is intended to be supplemental insurance.

The promotion, marketing, and sale of the American Express Plan was controlled by a Marketing Agreement dated September 19, 1999 between American Express and HealthExtras (the "Marketing Agreement"), as amended by an Amendment dated April 18, 2002. Ex. C.; Ex. I. Pursuant to the Marketing Agreement "AMEX ... retain[ed] HealthExtras ... to provide the Accidental Disability Plan to Customers." Ex. C, p. 1. The Marketing Agreement further states:

> ...AMEX must approve all Promotional Materials, and in the event of a

6

> disagreement, AMEX shall have the final
> controlling rights on all marketing and
> promotion of the Accidental Disability Plan
> (including, but not limited to presentation,
> copy, format, design, script development,
> etc.), so long as such marketing and
> promotion do not violate any contracts, laws
> or regulations. Solely, AMEX will approve
> the timing and scope of all marketing
> activities hereunder (i.e., size and
> frequency of solicitations). [emphasis
> added.]

Ex. C, p. 3, §4(a).

The Marketing Agreement also provides that:

> ...HealthExtras shall prepare, at
> HealthExtras' expense, Promotional Materials
> for all services offered pursuant to this
> Agreement. Such materials shall be designed
> to solicit Customers to subscribe to the
> Accidental Disability Plan and become
> Enrollees ...

Ex. C, p. 4, §4(b).

and further that both American Express and HealthExtras

represent, warrant, and covenant that:

> ...the performance of its obligations under
> this Agreement in connection with the
> Accidental Disability Plan complies and will
> comply with all federal, state, local, and
> foreign laws and regulations, including but
> not limited to fair trade and advertising
> laws and regulations.

Ex. C, p. 10, §13(a); Ex. C, p. 11, §13(f).

In the Marketing Agreement HealthExtras further represents

that "it has the legal right to use Christopher Reeve's likeness

7

in marketing materials and will use Christopher Reeve's image

for promotion of the AMEX Plan at AMEX's discretion" and it is

agreed that if HealthExtras lost its right to use Christopher

Reeve's image, American Express could cancel the contract

without penalty.  Ex. C, p. 14, §18(v).  If the Marketing

Agreement was terminated for any reason, under its terms,

American Express no longer had the right to use Christopher

Reeve's image or endorsement.  Ex. C, p. 14, §18(v).

By a letter agreement dated July 17, 2000, between

HealthExtras and American Express, HealthExtras agreed that if:

1)    Chubb [Federal Insurance] declines the payment of
      benefits to any person under the Plan based upon
      a determination that the Accidental Bodily
      Injuries suffered by such person do not result in
      Permanent Total Disability (as such terms are
      defined in the Policy), and

2)    Such Accidental Bodily Injuries render such
      person unable to perform the material and
      substantial duties of such person's regular
      occupation, or a comparable occupation that is
      suitable for such person by reason of education,
      experience, training or other qualifications;

then HealthExtras shall promptly pay to such person an
amount equal to the benefit amount that such person would
have received from Chubb had Chubb approved such person's
claim.

Ex. L, July 17, 2000 Letter.

In June, 2002, American Express, based upon Ms. Peguero's

age, credit rating, and the likelihood that she would enroll as

determined by her history of responding to earlier

solicitations, targeted Ms. Peguero for receipt of a solicitation (the "Solicitation") relating to the American Express Plan. Ex. A, 104 -107, 110; Ex.H, p. 53. The Solicitation had been designed by HealthExtras and American Express and used by American Express prior to Federal Insurance's involvement in the plan. Ex. A, pp. 145-147, 150-151. HealthExtras provided the Christopher Reeve quote and picture used in the Solicitation. Ex. A, p. 123.

The "Compliance Department" at American Express reviews all marketing materials such as the Solicitation to look "at the content, how things are presented, brand image, any fair trade in advertising regulations . . ." Ex. H, p. 42. Such marketing materials are also reviewed by American Express' "Advertising Review Board" which reviews the entire document for "brand image ... trade advertising regulations ... font size ... content (and) terms and conditions." Ex. H, p. 43.

The existing, previously-used Solicitation was presented to Federal for its review and included a proposed so-called "Important Disclosure" on the back of the Solicitation. Ex. A, 145-147, 150-151. The only changes requested by Federal related to the "Important Disclosure" on the back, which caused the disclosure to increase in length which, in turn, caused the copy to be "tightened". Ex. A, 163-165; Ex. M, Emails Between

9

American Express and HealthExtras..  The Solicitation, as
created by HealthExtras and approved by American Express'
Compliance Department and Advertising Review Board and modified
at Federal Insurance's request, was mailed by American Express
to Ms. Peguero in, June 2002. Ex. A, 110, 162-163.

The Solicitation received by Ms. Peguero had been mailed to
her by American Express in an envelope with a picture of
Christopher Reeve on it, with a quote from him stating
"Instantly – an accident can change your life forever.  Don't
let it bankrupt your family."  Ex.  N, Solicitation Envelope.
The Solicitation was a one-page document with printing on both
sides.  Ex. O, Solicitation.  In large letters on the top of the
first page highlighted by blue or bold print, the Solicitation
states "Financial Security.  You're covered with up to $1.5
Million if an accident leaves you permanently disabled."  Ex. O.

The front side of the Solicitation also contained the
following:

> The Accidental Disability Plan *from* American
> Express provides you with **$1 Million** in one
> lump sum if you are permanently disabled due
> to an accident and can't return to work.
> For just $9.95 a month, you can help
> guarantee your financial security now and in
> the future.  And, as a special offer you can
> increase your coverage to **$1.5 Million for**
> **only $3.00 more per month** ...
>
> With the Accidental Disability Plan *from*
> American Express you can prevent a personal

10

> tragedy from becoming a financial tragedy.
> Enroll now, and for as little as a $9.95 a
> month, you can rest assured that you are
> protected. [Bold type in original.]  Ex. O.

The Solicitation was signed by "Anne Schepp, Insurance
Officer."  Ex. O.

On the bottom of the front side of the Solicitation is
another picture of Christopher Reeve, with another quote
from him:  "Most people don't think about disability
coverage until it's too late. Please don't put this off."
Ex. O.  Although Christopher Reeve was paid for his
endorsement, this was not noted on the envelope or on the
front side of the Solicitation. Ex. A, p. 47; Ex. O.

On the back side of the Solicitation, as part of a
large block quote, written in small print containing 27
lines, 21 sentences and 601 words, is written "Payments
made for endorsement."  Ex. O.  Also, contained in the same
block quote is a portion of the Plan's definition of
"permanent disability" (Ex. O); a definition so restrictive
that Christopher Reeve himself would not have qualified for
benefits since he was capable of returning to work as an
actor and spokesmen for products such as the American
Express Plan.  Ex. P, Aff. of Timothy Ryles, Ph.D, p.8.
The definition of disability as provided on the back of the
Solicitation does not include a full disclosure of all

11

conditions contained in the Master Policy to qualify as
being disabled. Ex. P, p.7.

   Ms. Peguero, a single mother of two boys, was a
licensed and practicing dentist in her native country, the
Dominican Republic, before coming to the United States in
1993. Ex. Q, Peguero depo. p. 12. Before coming to the
United States, Ms. Peguero did not speak or read English.
Ex. Q, pp. 10-14. After working for several years cleaning
office buildings and after a short stint at Macy's
Department Store, Ms. Peguero found employment as a dental
assistant for a local dentist. Ex. Q, pp.17-23. Ms.
Peguero intended to become a licensed dentist in
Massachusetts and had begun to study for the tests she
needed to take to begin the process of becoming licensed.
Ex. Q, pp. 25-27.

   As the sole supporter of herself and her two boys,
Ms. Peguero was concerned about what would happen if she
became injured and unable to work. Ex. R, Peguero Aff., p.
2. When Ms. Peguero received the Solicitation in the mail,
she read the front side of the Solicitation, including the
portions highlighted by their size, color, and/or bold
print, and believed that if she paid $12.95 per month to
American Express, she would receive $1.5 Million if she

12

became injured and unable to return to her usual work. Ex. Q, pp. 67-71. Based upon her faith in American Express as a company, her recognition of Christopher Reeve and upon her desire for financial security in the event of a disabling injury, Ms. Peguero purchased the American Express Plan. Ex. Q, pp. 67-68, 71; Ex. R, p. 2, par. 3. Between July, 2002 and December 25, 2002, Ms. Peguero made six payments to American Express. Ex. R, p. 2, par. 4.

Ms. Peguero has no memory of receiving a so-called "Welcome Kit" consisting of another letter from "Insurance Officer" Anne Schepp, a plan summary, and Benefit Plan Description, which HealthExtras was obligated to send to her on behalf of American Express pursuant to the Marketing Agreement; Ex. R, pp. 2-3, par. 4 and 5. However, HealthExtras by Affidavit of Joanne Ficklin has asserted that the Welcome Kit was in fact sent to Ms. Peguero. Ex. S, Ficklin Aff. The Schepp letter included in the "Welcome Kit" states:

> No one likes to think about accidents. But, they can happen to anyone, at any time. That's why your decision to enroll in the Accidental Disability Plan *from* American Express was an exceptionally prudent one.
>
> You've taken an important step toward easily and economically protecting your assets. This plan will pay you a $1.5 Million lump sum benefit in the event that a catastrophic

13

> accident leaves you totally and permanently
> disabled, and unable to work.

Ex. T, Welcome Kit Letter from Anne Schepp.
This letter also contained a photograph of Christopher
Reeve, again accompanied by his quote "In an instant, an
accident can change your life. Now it doesn't have to
bankrupt your family." Ex. T. Again, only a portion of
the definition of disability was placed on the back of the
letter in small print as part of a large block quote. Ex.
T. On May 21, 2001, an American Express employee reviewing
this disclosure of the definition in the block quote noted
the print was so small as to be "barley (sic) legible" but
took no action to make the disclosure less obscure. Ex. U,
Email Regarding Font Size.

On December 25, 2002, Ms. Peguero, who is right-
handed, suffered the traumatic amputation of her right arm
in an automobile accident. Ex. R, Peguero Aff., p. 4, par.
9. Thereafter, Ms. Peguero made a claim for the $1.5
Million benefit under American Express' Plan, but was
informed that under the Plan she was entitled to only
$500.00. Ex. R, p. 4, par. 9.

On June 8, 2004 and again on November 10, 2004,
Ms. Peguero's counsel sent M.G.L. c. 93A demand letters to
American Express. Ex. V, June 8, 2004 Demand Letter; Ex.

14

W, November 10, 2004 Demand Letter.   In the Demand Letters

Ms. Peguero notified American Express, among other things,

that it had violated (M.G.L. c.93A the "Consumer Protection

Act") and M.G.L. c.175, §110E "by minimizing, obscuring,

and rendering ambiguous the definition of disability; by

falsely, deceptively, and unfairly advertising and

marketing its policy; and by intentionally or negligently

misleading Ms. Peguero and other consumers to believe the

policy provided them with financial security in the amount

of $1.5 Million if they became disabled."   Ex. V; Ex. W.

The Demand Letters further identified the violations

of the Consumer Protection Act by stating:

More specifically, by, among other things,

1)   the use of a misleading policy name;

2)   emphasizing in oversized, bold letters "Financial
     Security" and stating "You're covered with up to
     $1.5 Million if an accident leaves you
     permanently disabled" and disclosing the
     limitations on the back of the solicitation in
     small print;

3)   failing to provide a conspicuous, unambiguous
     definition of disability;

4)   failing to provide a Plan Summary and Policy to
     Ms. Peguero and, upon information and belief,
     other Massachusetts consumers;

5)   stating in promotional materials, without
     qualification or further definition, that "This
     plan will pay you a $1.5 million lump sum benefit
     in the event that a catastrophic accident leaves

15

you totally and permanently disabled, and unable to work";

6) use of other false and misleading statements in promotional materials; and

7) selling an insurance policy with illusory coverage.

The Defendants unfairly and deceptively induced Ms. Peguero and other consumers to purchase the policy and to continue to pay for it each month.

Ex. V; Ex. W.

American Express never responded to either Demand Letter. Affidavit of Kevin Donius., par. 3.

On October 4, 2005, Ms. Peguero's attorney sent a nearly identical M.G.L. c.93A demand Letter to HealthExtras. Ex. X, October 4, 2005 Demand Letter. HealthExtras did not provide a timely response to the Demand Letter. Affidavit of Kevin Donius, par. 3.

Ms. Peguero filed claims against Federal Insurance, Sklover, American Express, and HealthExtras asserting causes of action for fraud/deceit, violation of M.G.L. c.175, §110E, violation of M.G.L. c.93A, §§2 and 9, breach of contract, and promissory estoppel. Ms. Peguero has entered into settlements with Sklover and Federal Insurance and signed separate Releases with each former defendant. Affidavit of Kevin Donius, par. 4. Each Release specifically and unequivocally states that the Release will

16

not in any way affect Ms. Peguero's right to pursue any and all claims she may have against any other party. Affidavit of Kevin Donius, par. 4.

As of May 2, 2007, Ms. Pequero's attorney has spent 235 hours prosecuting her claims against American Express and HealthExtras, yielding reasonable attorney fees of \$82,250, exclusive of costs. Affidavit of Kevin Donius, par. 5.

## III. STATEMENT OF DISPUTED MATERIAL FACTS

The material, genuine factual disputes in this matter are numerous. In general, there are factual disputes regarding American Express' and HealthExtras' roles and responsibilities with respect to the promotional materials and the use of Christopher Reeve's endorsement and regarding the relationship, between and among Federal Insurance, HealthExtras and American Express.

There are also numerous disputes involving the applications of fact to law to determine whether American Express and/or HealthExtras fraudulently, unfairly, or deceptively marketed the American Express Plan and whether, and the extent to which, Ms. Peguero was harmed thereby. These disputed issues include, but are not limited to, the following:

1. Whether American Express and/or HealthExtras advertised, marketed, and sold the American

17

Express Plan fraudulently and/or in violation of the Consumer Protection Act.

2. Whether American Express and/or HealthExtras advertised, marketed, and sold the American Express Plan fraudulently and/or in violation of the Consumer Protection Act and M.G.L. c. 176D, Sec. 3(1) by using a misleading policy name;

3. Whether American Express and/or HealthExtras advertised, marketed, and sold the American Express Plan fraudulently and/or in violation of the Consumer Protection Act by emphasizing in oversized, bold letters "Financial Security" and stating, without qualification, "You're covered up to $1.5 Million if an accident leaves you permanently disabled" on the front of its solicitation, while disclosing only a portion of the limited definition of disability in small print on the back of the Solicitation.

4. Whether American Express and/or HealthExtras advertised, marketed, and sold the American Express Plan fraudulently and/or in violation of the Consumer Protection Act by failing to clearly and conspicuously disclose that Christopher Reeve was paid for his endorsement.

5. Whether American Express and/or HealthExtras advertised, marketed, and sold the American Express Plan fraudulently and/or in violation of the Consumer Protection Act by using an endorsement from Christopher Reeve even though Mr. Reeve would not qualify as being disabled under the Defendants' interpretation of the definition of disability under the policy.

6. Whether American Express and/or HealthExtras advertised, marketed, and sold the American Express Plan fraudulently and/or in violation of the Consumer Protection Act by failing to disclose that the American Express Plan was intended to supplement traditional disability insurance, not serve as a substitute for it.

18

7.   Whether American Express and/or HealthExtras
     advertised, marketed, and sold the American
     Express Plan fraudulently and/or in violation of
     the Consumer Protection Act by failing to provide
     a Plan Summary or Policy to Ms. Peguero.

8.   Whether American Express and/or HealthExtras
     violated 211 CMR 40.04 and the Consumer
     Protection Act by failing to clearly and
     conspicuously disclose in the Solicitation the
     extent and nature of the coverage offered.

9.   Whether American Express and/or HealthExtras
     violated 211 CMR 40.04 and M.G.L. c.175, §110E
     and the Consumer Protection Act by failing to
     clearly identify the name of the carrier in the
     Solicitation.

10.  Whether American Express and/or HealthExtras are
     liable to Ms. Peguero under M.G.L. c.175, §110E
     for violation of its terms and acting as insurers
     without authority to do so in Massachusetts.

11.  Whether American Express and/or HealthExtras
     violated 211 CMR 40.05 and the Consumer
     Protection Act by failing to disclose the
     restrictive definition of disability
     "conspicuously and in close conjunction with the
     statements to which such information relates or
     under appropriate captions of such prominence
     that it shall not be minimized, rendered obscure
     or presented in an ambiguous fashion or disclosed
     in any manner as to be confusing or misleading."

12.  Whether American Express and/or HealthExtras
     violated 211 CMR 40.07(j) and the Consumer
     Protection Act by utilizing a marketing method
     "in such a way as to invite the purchase of an
     insured health plan for emotional rather than
     functional reasons."

13.  Whether the failure to disclose conspicuously the
     definition of disability in the Solicitation had
     the capacity or tendency to mislead consumers
     such as Ms. Peguero.

19

14.   Whether Ms. Peguero's belief that, as a trained
      dentist working as a dental assistant, the loss
      of her dominant arm would render her disabled
      under the American Express Plan was reasonable.

15.   Whether Ms. Peguero would likely have purchased
      traditional disability insurance had she not
      purchased the American Express Plan.

16.   Whether Ms. Peguero received the so-called
      "Welcome Kit" that HealthExtras was obligated to
      mail on behalf of American Express.

17.   Whether American Express and/or HealthExtras knew
      or should have known that the promotional
      materials relating to the American Express Plan
      were misleading.

18.   Whether American Express had "final controlling
      rights on all marketing and promotion of the
      [American Express Plan]" as set forth in the
      Marketing Agreement.

19.   Whether HealthExtras had final controlling rights
      as to how Christopher Reeve's image and
      endorsements would be used to promote the
      American Express Plan.

20.   Whether American Express and HealthExtras
      advertised, marketed, and sold the American
      Express Plan fraudulently and/or in violation of
      the Consumer Protection Act by soliciting the
      sale of insurance without a license to do so in
      violation of M.G.L. c.175, §162.

21.   Whether Ms. Peguero is a third-party beneficiary
      of HealthExtras' agreement to pay certain denied
      claims as set forth in the July 17, 2000 letter
      agreement between Federal and HealthExtras.

22.   Whether American Express and/or HealthExtras are
      joint tortfeasors with Federal Insurance and
      Sklover with respect to the damages suffered by
      Ms. Peguero.

23.  Whether any relationship exists between Federal
     and American Express and/or HealthExtras such
     that a settlement with Federal would discharge
     claims against American Express or HealthExtras.

## IV.  LEGAL ARGUMENTS

### IVA.  STANDARD FOR SUMMARY JUDGMENT MOTIONS

A party moving for summary judgment cannot prevail without

a showing that "there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R.C.P. 56(c). A genuine dispute exists if

the "evidence is such that a reasonable jury could return a

verdict for the non-moving party." Anderson v. Liberty Lobby,

Inc., 477 U.S.242, 248 (1986). Further, in deciding whether a

genuine issue exists, the court must view any reasonable

inferences drawn from the evidence in the light most favorable

to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith

Radio, 475 U.S. 574, 587 (1986).

Here, there is overwhelming evidence upon which a

reasonable jury could find that the Defendants fraudulently

and/or unfairly and deceptively advertised, marketed and sold

the American Express Plan in violation of the Consumer

Protection Act and the applicable regulations; likewise, there

is ample evidence to support a finding for breach of contract,

21

given the manner in which the plan was marketed, and to support

a finding of promissory estoppel.

### IVB. FACTUAL DISPUTES EXIST AS TO WHETHER THE DEFENDANTS VIOLATED G.L. C.93A AND/OR FRAUDUENTLY MARKETED THE AMERICAN EXPRESS PLAN

### 1. The Solicitation Violates the Consumer Protection Act And Numerous Regulations Pertaining To The The Marketing and Advertisement of Insurance.

The Consumer Protection Act, which declared unfair or

deceptive acts or practices in the conduct of any trade or

business unlawful,

> ... is a "statute of broad impact," which forms a
> 'comprehensive substantive and procedural
> business and consumer protection package."
> [citation omitted.] "Technicalities are not to be
> read into the statute in such a way as to impede
> the accomplishment of substantial justice."
> [citation omitted.]
>
> Leardi v. Brown, 394 Mass. 151, 159, 474 N.E.2d
> 1094, 1101 (1985).

Moreover, the Consumer Protect Act provides remedy to

consumers such as Ms. Peguero who have been induced to

purchase products by unfair or deceptive advertisements.

Under Massachusetts law and regulations, "an advertisement

is deceptive when it has the capacity to mislead consumers,

acting reasonably under the circumstances, to act

differently from the way they would otherwise have acted

(i.e., to entice a reasonable consumer to purchase the

product). Aspinall v. Philip Morris Companies, Inc., 422

22

Mass. 381 N.E.2d 476, 487 (2004); G.L. c.175, §110E; 211
CMR 40.00 (entitled "Marketing of Insurance Health Plans"
hereinafter the "Marketing Regulation").

In this case, there is ample evidence upon which a
jury could reasonably conclude that the Solicitation,
Christopher Reeve Endorsement, and Welcome Kit[2] did not
conspicuously, clearly, or fully disclose the restrictive
definition of "disability" and that these promotional
materials therefore had the capacity to mislead a
reasonable consumer.

The mere fact that some of the materials had language
on them describing a portion of the limited definition of
disability does not mean they were not misleading. To the
contrary, the relative conspicuousness and size of the
print highlighting, on the one hand, the threat of
bankruptcy if the consumer did not purchase the American
Express Plan and her "financial security" and the payment
of $1.5 million if she did, and the conspicuousness and
size of the print disclosing, on the other hand, a portion
of the limited definition of disability, may lead to

_____

[2] While Ms. Peguero has no memory of receiving the Welcome Kit, HealthExtras
has proffered evidence that it was sent to Ms. Peguero and a reasonable
inference from such evidence is that she did receive and review the Welcome
Kit, was misled by it, and simply no longer remembers being so misled.

reasonable inferences that the Defendants intended to
deceive consumers about the nature of its product.

In Leardi v. Brown, 394 Mass. 151, 156-157, 474 N.E.2d
1094, 400 (1985), which involved an unfair and deceptive
lease, the court noted that "[t]he conjunction of boldface
and small print suggests, as the judge recognized, 'a clear
and calculated effort to further mislead tenants'."
Accordingly, here a jury could reasonably conclude not only
that the promotional materials were misleading but that
were intentionally so.

In addition to the protection afforded by the Consumer
Protection Act, Massachusetts consumers of health insurance
products, including the American Express Plan, are
protected by G.L. c.175, §110E, G.L. c.176D, and the
Marketing Regulation, each of which limit the manner in
which insurance products may be marketed, advertised and
sold.

The Marketing Regulation is intended "to assure
truthful and adequate disclosure of all material and
relevant information and to identify certain misleading or
misrepresentative practices in the marketing of health
plans . . . and to establish . . . certain minimum
standards and guidelines of conduct in the advertising and

24

marketing of insurance health plans . . . ." 211 CMR
40.01. Under the Marketing Regulations, "it shall be
deemed misleading to solicit an offer to contract for
health plans without a clear and conspicuous disclosure of
. . . the extent and nature of the coverage offered . . ."
211 CMR 40.02. Whether the Defendant did so here is a
question of fact.

    The Marketing Regulations and G. L. c. 176D establish
that it is a misleading marketing practice:

    1) to fail to clearly identify the carrier
    (211 CMR 40.04);

    2) to invite the purchase of an insured health plan
    for emotional rather than functional reasons
    (211 CMR 40.07(j));

    3) to fail to disclose that the person endorsing the
    product is being paid, if applicable (211 CMR
    40.09(2);

    4) to use a marketing method which is not sufficiently
    complete and clear to avoid deception or the capacity
    or tendency to deceive or mislead (211 CMR 40.06(1));
    or

    5) to use a misleading name for an insurance policy
    (G. L. c. 176D, sec. 3 (1)(e)).

Whether the Solicitaion (Ex.O) complies with these
regulations are questions of fact.

25

## 2.   HEALTHEXTRAS AND AMERICAN EXPRESS ARE LIABLE FOR THE MISLEADING PROMOTIONAL MATERIALS.

The Defendants suggest that they should escape liability because 1) Federal alone was legally responsible for the promotional materials, and 2) any liability imposed upon them would be vicarious and therefore were extinguished by the settlement with Federal. Not so. HealthExtras and American Express are each both factually and legally responsible for the misleading nature of the promotional materials.

HealthExtras is in the business of "promoting, selling, and providing to consumers" disability plans such as the American Express Plan; HealthExtras developed the American Express Plan and created and reviewed the promotional materials used to advertise it; HealthExtras controlled the use of the Christopher Reeve endorsement; and HealthExtras received a portion of the enrollment fees generated by the sale of the American Express Plan.

American Express sold the American Express Plan to its customers; American Express determined which of its customers it would target with the Solicitation; American Express used its brand name and image to promote the American Express Plan; American Express had "final

26

controlling rights on all marketing and promotion of the Accidental Disability Plan"; American Express' Compliance Department and Advertisement Review Board reviewed the promotional materials for content, brand image, trade advertising regulations, font size, and terms and conditions; American Express was aware, as was HealthExtras, that the disclosure of the definition of disability in its promotional materials was barely legible, but did nothing to make it more conspicuous ; American Express mailed the Solicitation to its customers; and American Express retains 50% of the enrollment fees. Accordingly, both HealthExtras and American Express are in fact responsible for the form and content of the disputed promotional materials. They are legally responsible as well.

As the creators of the deceptive promotional materials and developers, promoters, and marketers of the American Express Plan, sold by American Express to the American Express customers it chose to target, it is nonsensical to suggest American Express and HealthExtras are not liable for violations of the Consumer Protection Act associated with the promotional materials and the marketing of the plan.

27

By its express terms, the Marketing Regulation applies
to any marketing or marketing methods . . . used by any
person with the intent of soliciting an offer to contract
for an insured health plan . . .." [Emphasis added.] 211
CMR 40.03. "Person," under the Marketing Regulation,
"shall mean any individual, carrier, or any other legal
entity engaged in the marketing and/or advertising of a
policy, including agents, brokers, and advisors." 211 CMR
40.03. Accordingly, by its terms, the Marketing
Regulations are not limited in application to insurers and
clearly apply to American Express and HealthExtras and
their promotion and sale of the American Express Plan.

### 3. THERE IS NO EVIDENCE TO SUPPORT A FINDING THAT EITHER AMERICAN EXPRESS OR HEALTHEXTRAS WERE RELEASED BY THE SETTLEMENT WITH FEDERAL.

HealthExtras and American Express cannot rightfully
escape responsibility for their own deceptive conduct by
claiming that the release of claims against Federal which
had a very limited role in the creation of the deceptive
promotional materials, somehow released them also.
Interestingly, in Campoli v. Chubb Insurance Group, the
Sklover Group, and HealthExtras, Inc., 2006 U.S.Dist. 1564
(D. Conn 2006), HealthExtras sought and was granted summary
judgment dismissing plaintiff's claims that it was

28

vicariously liable for Federal's breach of contract.   The
identical Marketing Agreement was reviewed by the Court
which noted the parties' relationship thereunder as
independent contractors and that each had responsibility
for managing its own functions and duties.  Accordingly,
the Campoli court ruled that as a matter of law
HealthExtras could not be found vicariously liable for the
actions of Federal.

        Here, HealthExtras now argues that its relationship
with Federal under the same agreement was such as to create
vicarious liability and thus the release of Federal
released it as well.

        There is in fact no evidence of a relationship between
HealthExtras and American Express upon which to base a
finding that a Release of claims against Federal also
released HealthExtras and American Express.  To the
contrary, as noted in Campoli, the contract between
HealthExtras and Federal specifically states that
relationship is that of independent contractors and not of
partnership, joint venture, or agency; and no contractual
relationship exists between American Express and Federal
Insurance.  Moreover, the Release of claims against Federal
specifically states that it will not affect any rights

against other parties. Accordingly, there is no basis for

a finding that the release of Federal released either

American Express or HealthExtras.

In any event, assuming any such basis existed, whether

or not a relationship existed between Federal and

HealthExtras or American Express to warrant a finding that

the release of Federal also released the other defendants

is a disputed factual issue. The question of vicarious

liability is a factually driven inquiry. Hopper v.

Callahan, 408 Mass. 621, 634, 562 N.E.2d 822 (1990).

### IVC. WHETHER THE DEFENDANTS' MARKETING OF THE AMERICAN EXPRESS PLAN CONSTITUTES ACTIONABLE FRAUD IS A QUESTION OF FACT.

Under Massachusetts law . . .

> [t]o prevail on a claim of fraudulent
> misrepresentation . . ., the plaintiff must show
> the defendant made a false representation of
> material fact with knowledge of its falsity for
> the purpose of inducing the plaintiff to act, and
> that the plaintiff reasonably relied upon the
> misrepresentation as true and acted upon it to
> his damage.

Pearce v. Duchesneau Group, Inc., 392 F.Supp.2d 63, 72
(2005).

Here, the same analysis applies as discussed above

regarding the consumer protection claims. Sufficient

evidence exists, by reference to the Solicitation alone, to

warrant the reasonable inference that the Defendants

intended to mislead Ms. Peguero. Leardi v. Brown, 394
Mass. 151, 159, 474 NE.2d 1094, 1101 (1985). Moreover,
there is evidence (Ex. U) these Defendants knew that the
so-called "Important Disclosure" was barely legible. These
facts, without more, support a finding of intentional
misrepresentation. A factual dispute exists as to whether
Ms. Peguero's reliance was reasonable. Accordingly,
summary judgment is inappropriate

### IVD. FACTUAL DISPUTES EXIST AS TO WHETHER THE DEFENDANTS' PROMISE TO PAY $1.5 MILLION SHOULD BE ENFORCED UNDER THE THEORY OF PROMISSORY ESTOPPEL.

Under Massachusetts law, a promise will be enforced
under the theory of promissory estoppel, if

> 1) a promisor makes a promise which he should
> reasonably expect to induce action of a definite and
> substantial character on the part of the promisee, 2)
> the promise does induce such action . . ., and 3)
> injustice can be avoided only by enforcement of the
> promise.

Loranger Constr. Corp. v. E.F. Hausermann Co.,
6 Mass.App.Ct. 152,154, 374 N.E.2d 306 (1978)

Here, the promise sought to be enforced is found both in
the Solicitaion (Ex. O) and the Anne Schepp Letter (Ex. T):

> The Accidental Disability Plan from American Express
> provides you with **$1 Million** in one lump sum if you
> are permanently disabled due to an accident and
> can't return to work. And as a special offer, you can
> increase your coverage to **$1.5 Million for only $3**

**more per month.**   (Ex. O).

This promise was re-iterated in the Anne Schepp Letter:

> This plan will pay you $1.5 Million lump sum benefit
> in the event that a catastrophic accident leaves you
> totally and permanently disabled and unable to work.
> (Ex. T).

Whether the Defendants should have expected the promise to

pay $1.5 million to induce action, whether the promise was

of a definite and substantial character, and whether

injustice can be avoided only the enforcement of the

promise, are factual inquiries for the jury.

### IVE.   A FACTUAL DISPUTE EXISTS AS TO WHETHER
### AMERICAN EXPRESS WAS ACTING AS AN INSURER
### WITHOUT AUTHORITY TO DO SO IN MASSACHUSETTS.

Pursuant to M.G. L. c. 175, Sec. 110E,

> [a]n insurer not authorized to do business in the
> Commonwealth shall be subject to the requirements of
> this section and may be made a defendant . . . in an
> action at law by any person damaged by its failure to
> abide by the regulations.  The measure of damages in
> such an action shall be the amount the person damaged
> could reasonably have anticipated
> He would have received had the advertising or the
> policy provisions not been contrary to the regulations
> plus reasonable costs and attorney fees.

Here, a factual dispute exist as to whether American

Express was acting as an insurer;  it is undisputed that

American Express was not authorized to do business as an

insurer in Massachusetts.  American Express marketed and

32

sold the American Express Plan in Massachusetts and
collected 100% and retained 50% of the enrollment fees.
While a portion of the insurance product being sold  --
the American Express Plan - was underwritten by Federal,
the product itself was sold by American Express.  Under
these circumstances, a reasonable jury could find that
American Express was acting as an insurer without authority
to do so.

## IVF. A FACTUAL DISPUTE EXISTS AS TO WHETHER THE MARKETING METHODS RENDERED THE INSURANCE CONTRACT MISLEADING.

As set forth in Cody v. Connecticut General Life
Insurance Co., 382 Mass. 142, 149, (1982), "[a] company's
marketing techniques may make a completely unambiguous
insurance contract misleading."  Similarly, in Kates v. St.
Paul Fire & Marine Ins. Co., 509 F.Supp. 477 (D.Mass 1981),
the Court held an insurance contract to be violative of
public policy due to misleading marketing practices and
accordingly refused to enforce its literal terms.  Here, a
factual dispute exists as to whether Ms. Peguero was ever
provided a summary of the terms of the American Express
Plan:  Ms. Peguero has filed an affidavit and testified in
her deposition that she never received a summary, while
HealthExtras has produced an affidavit purporting to show

33

that a summary was mailed to her.  This dispute is critical

to the analysis of the marketing techniques and whether

they rendered the insurance contract -- which it is

undisputed was never provided to Ms. Peguero - ambiguous.

It is axiomatic that ambiguous terms in an insurance

contract will be construed in favor of the insured.  Here,

the promotional materials and marketing techniques,

including the alleged failure to provide either the policy

or a summary of it to Ms. Peguero, may be deemed to have

rendered the policy ambiguous with respect to the

definition of disability and under what circumstances the

insured is entitled to the payment of $1.5 million.

Accordingly, a factual dispute exists as to the proper

reading of the contract and the manner in which it ought to

be enforced.

### IVG. A FACTUAL DISPUTE EXISTS AS TO WHETHER MS. PEGUERO IS A THIRD-PARTY BENEFICIARY OF THE JULY 17, 2000 LETTER AGREEMENT BETWEEN AMERICAN EXPRESS AND HEALTHEXTRAS.

By a letter agreement dated July 17, 2000, between

HealthExtras and American Express, HealthExtras agreed that if:

3)   Chubb [Federal Insurance] declines the payment of
     benefits to any person under the Plan based upon
     a determination that the Accidental Bodily
     Injuries suffered by such person do not result in
     Permanent Total Disability (as such terms are
     defined in the Policy), and

34

4) Such Accidental Bodily Injuries render such person unable to perform the material and substantial duties of such person's regular occupation, or a comparable occupation that is suitable for such person by reason of education, experience, training or other qualifications;

then HealthExtras shall promptly pay to such person an amount equal to the benefit amount that such person would have received from Chubb had Chubb approved such person's claim.

Ex. L, July 17, 2000 Letter.

Under New York law, which controls this agreement, whether

Ms. Peguero is a third-party beneficiary of this letter

agreement is dependent upon, among other things, the intent

of the parties.  Accordingly, summary judgment is

inappropriate.

##### V.    CONCLUSION

For all the foregoing reasons, Defendants' Motion For summary judgment should be denied.

THE PLAINTIFF,
ALTAGRACIA J. PEGUERO,
By her Attorney,

Kevin Donius, Esquire
Law Offices of Kevin Donius, P.C.
424 Adams Street, Suite 100
Milton, MA 02186
TEL (617) 296-4900
FAX (617) 296-4990
BBO#: 551298

Dated:  May 3, 2007

### CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand

Date: 5/3/07