UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10995-WGY

_____

ALTAGRACIA J. PEGUERO,            )
     Plaintiff,                   )
                                  )
                                  )
AMERICAN EXPRESS COMPANY, and     )   **JOINT PRE-TRIAL MEMORANDUM**
HEALTHEXTRAS, INC.,               )
     Defendants.                  )
_____)

The Plaintiff, Altagracia J. Peguero ("Ms. Peguero"), and

the Defendants, American Express Company ("American Express")

and HealthExtras, Inc. ("HealthExtras"), hereby submit their

Joint Pre-Trial Memorandum.

     I.    **SUMMARY OF EVIDENCE**

          A.   **Summary of Plaintiff's Evidence**

In July, 2002 American Express and HealthExtras

unfairly and deceptively advertised, marketed, and sold to Ms.

Peguero an insurance product then known as the "Accidental

Disability Plan from American Express" (the "American Express

Plan").   The evidence will show that American Express and

HealthExtras marketed the American Express Plan in violation of

M.G.L. c. 93A (the "Consumer Protection Act"), M.G.L. c. 175,

Section 110E  and the regulations governing the marketing of

such insurance products, including, but not limited to,  211 CMR

40.00 et seq. (the "Marketing Regulations").  American Express

1

and HealthExtras misled Ms. Peguero about the benefits payable and the losses covered by the American Express Plan and had she not been so misled, she would not have purchased it.

Based upon the Defendants' deceptive marketing, Ms. Peguero reasonably believed she would be entitled to a lump sum payment of $1.5 million if she became disabled.  Ms. Peguero became disabled when she lost her dominant arm in a car accident and is entitled to the $1.5 million payout she reasonably expected.

More specifically, the evidence will show HealthExtras, which is in the business of "promoting, selling, and providing to consumers programs associated with disability and travel medical care insurance and non-underwritten program benefits," created and developed the American Express Plan and the promotional materials used to market it.  American Express first began selling the American Express Plan to its cardholders in October or November, 1999.

The American Express Plan consists of four separate programs bundled by HealthExtras and American Express, and sold by American Express to American Express customers:  1) disability insurance underwritten at various times by Reliance National, Federal Insurance, National Union Fire Insurance Company and AMEX Assurance Co.; 2) Accidental Death & Dismemberment benefits; 3) Emergency Accidental Sickness Medical

2

Expense Benefits; and 4) Medical Care Coordinated Benefits.  At
the time Ms. Peguero purchased the American Express Plan, the
disability insurance portion of it was underwritten by Federal
Insurance Company.

        HealthExtras had separate contracts with American Express
and Chubb Group Insurance Company (which includes Federal
Insurance) and the Sklover Group ("Sklover"), an insurance
broker, pursuant to which the American Express Plan was created,
marketed and sold.  Pursuant to a letter agreement dated October
5, 1999, Federal agreed to underwrite the disability programs
developed by HealthExtras and endorsed by Christopher Reeve and
to be marketed by financial institutions such as American
Express.  A further agreement was executed between Federal
Insurance and HealthExtras and the Sklover Group on January 1,
2003, in which the relationship of the parties was explicitly
agreed to be that of independent contractors.

        No contractual relationship ever existed between
Federal Insurance and American Express.

        Today, there are approximately 140,000 American Express
cardholders enrolled in the American Express Plan.  Enrollees in
the American Express Plan each month pay American Express either
$9.95 or $12.95 (depending on whether they have enrolled for a
$1 million dollar benefit or $1.5 million dollar benefit).  Of

this amount, American Express retains fifty percent and
disburses the remaining fifty percent to an escrow account from
which HealthExtras, the current underwriter, and the current
insurance broker are paid.

Although 1) both American Express and HealthExtras describe
the American Express Plan as providing "supplemental benefits"
and both acknowledge it was intended as a supplement to, not a
substitute for, traditional disability insurance, and 2) the
master policy relating to the policy in question is titled
"Voluntary Accident Insurance," the American Express Plan was
originally marketed as the "Accidental Disability Plan *from*
American Express"; effective as January 1, 2005, it was re-named
the "Accident Protection Plan *from* American Express."    Nowhere
in any of the promotional materials is it disclosed that the
American Express Plan is intended to be supplemental insurance.

The promotion, marketing, and sale of the American Express
Plan was controlled by a Marketing Agreement dated September 19,
1999 between American Express and HealthExtras (the "Marketing
Agreement"), as amended by an Amendment dated April 18, 2002.
Pursuant to the Marketing Agreement "AMEX ... retain[ed]
HealthExtras ... to provide the Accidental Disability Plan to
Customers" and prepare promotional materials designed to solicit
customers to become enrollees of the plan.  The Marketing

4

Agreement further states that American Express "shall have the final controlling rights on all marketing and promotion of the Accidental Disability Plan (including, but not limited to presentation, copy, format, design, script development, etc.), so long as such marketing and promotion do not violate any contracts, laws or regulations."

In the Marketing Agreement HealthExtras further represents that "it has the legal right to use Christopher Reeve's likeness in marketing materials and will use Christopher Reeve's image for promotion of the AMEX Plan at AMEX's discretion" and it is agreed that if HealthExtras lost its right to use Christopher Reeve's image, American Express could cancel the contract without penalty. If the Marketing Agreement was terminated for any reason, under its terms, American Express no longer had the right to use Christopher Reeve's image or endorsement.

The evidence will also show that by a letter agreement dated July 17, 2000, between HealthExtras and American Express, HealthExtras agreed to pay $1.5 million to any person who does not qualify as permanently and totally disabled under the policy as defined in the policy but who is nonetheless unable to perform the material and substantial duties of such person's regular occupation, or a comparable occupation that is suitable

for such person by reason of education, experience, training or other qualifications.

In June, 2002, American Express, based upon Ms. Peguero's age, credit rating, and the likelihood that she would enroll as determined by her history of responding to earlier solicitations, targeted Ms. Peguero for receipt of a solicitation (the "Solicitation") relating to the American Express Plan. The Solicitation had been designed by HealthExtras and American Express and used by American Express prior to Federal Insurance's involvement in the plan. HealthExtras provided the Christopher Reeve quote and picture used in the Solicitation.

The "Compliance Department" at American Express reviews all marketing materials such as the Solicitation to look "at the content, how things are presented, brand image, any fair trade in advertising regulations . . ." Such marketing materials are also reviewed by American Express' "Advertising Review Board" which reviews the entire document for "brand image ... trade advertising regulations ... font size ... content (and) terms and conditions." The existing, previously-used Solicitation was presented to Federal for its review and included a proposed so-called "Important Disclosure" on the back of the Solicitation. The only changes requested by Federal related to the "Important

Disclosure" on the back, which caused the disclosure to increase in length which, in turn, caused the copy to be "tightened". The Solicitation, as created by HealthExtras and approved by American Express' Compliance Department and Advertising Review Board and modified at Federal Insurance's request, was mailed by American Express to Ms. Peguero in, June 2002.

The Solicitation received by Ms. Peguero had been mailed to her by American Express in an envelope with a picture of Christopher Reeve on it, with a quote from him stating "Instantly – an accident can change your life forever.  Don't let it bankrupt your family."  The Solicitation was a one-page document with printing on both sides.  In large letters on the top of the first page highlighted by blue or bold print, the Solicitation states "Financial Security.  You're covered with up to $1.5 Million if an accident leaves you permanently disabled."

The front side of the Solicitation also contained the following:

> The Accidental Disability Plan *from* American Express provides you with **$1 Million** in one lump sum if you are permanently disabled due to an accident and can't return to work. For just $9.95 a month, you can help guarantee your financial security now and in the future.  <u>And, as a special offer you can increase your coverage to **$1.5 Million for only $3.00 more per month**</u> ...

7

> With the Accidental Disability Plan *from* American Express you can prevent a personal tragedy from becoming a financial tragedy. Enroll now, and for as little as a $9.95 a month, you can rest assured that you are protected. [Bold type in original.]

The Solicitation was signed by "Anne Schepp, Insurance Officer."

On the bottom of the front side of the Solicitation is another picture of Christopher Reeve, with another quote from him: "Most people don't think about disability coverage until it's too late. Please don't put this off." Although Christopher Reeve was paid for his endorsement, this was not noted on the envelope or on the front side of the Solicitation. On the back side of the Solicitation, as part of a large block quote, written in small print containing 27 lines, 21 sentences and 601 words, is written "Payments made for endorsement." Also, contained in the same block quote is only a portion of the Plan's definition of "permanent disability" .

Ms. Peguero, a single mother of two boys, was a licensed and practicing dentist in her native country, the Dominican Republic, before coming to the United States in 1993. Before coming to the United States, Ms. Peguero did not speak or read English. After working for several

8

years cleaning office buildings and after a short stint at Macy's Department Store, Ms. Peguero found employment as a dental assistant for a local dentist.  Ms. Peguero intended to become a licensed dentist in Massachusetts and had begun to study for the tests she needed to take to begin the process of becoming licensed.

As the sole supporter of herself and her two boys, Ms. Peguero was concerned about what would happen if she became injured and unable to work.  When Ms. Peguero received the Solicitation in the mail, she read the front side of the Solicitation, including the portions highlighted by their size, color, and/or bold print, and believed that if she paid $12.95 per month to American Express, she would receive $1.5 Million if she became injured and unable to return to her usual work.  Based upon her faith in American Express as a company, her recognition of Christopher Reeve and upon her desire for financial security in the event of a disabling injury, Ms. Peguero purchased the American Express Plan.  Between July, 2002 and December 25, 2002, Ms. Peguero made six payments to American Express.

Ms. Peguero has no memory of receiving a so-called "Welcome Kit" consisting of another letter from "Insurance

Officer" Anne Schepp, a plan summary, and Benefit Plan
Description, which HealthExtras was obligated to send to
her on behalf of American Express pursuant to the Marketing
Agreement.   However, HealthExtras by Affidavit of Joanne
Ficklin has asserted that the Welcome Kit was in fact sent
to Ms. Peguero.  The Schepp letter included in the "Welcome
Kit" states "[t]his plan will pay you a $1.5 Million lump
sum benefit in the event that a catastrophic accident
leaves you totally and permanently disabled, and unable to
work."

     This letter also contained a photograph of Christopher
Reeve, again accompanied by his quote "In an instant, an
accident can change your life.  Now it doesn't have to
bankrupt your family."  Again, only a portion of the
definition of disability was placed on the back of the
letter in small print as part of a large block quote.  On
May 21, 2001, an American Express employee reviewing this
disclosure of the definition in the block quote noted the
print was so small as to be "barley (sic) legible" but took
no action to make the disclosure less obscure.

     On December 25, 2002, Ms. Peguero, who is right
handed, suffered the traumatic amputation of her right arm
in an automobile accident.  Thereafter, Ms. Peguero made a

claim for the $1.5 Million benefit under American Express'
Plan, but was informed that under the Plan she was entitled
to only $500.00.  On June 8, 2004 and again on November 10,
2004, Ms. Peguero's counsel sent M.G.L. c. 93A demand
letters to American Express.  American Express never
responded to either Demand Letter.

On October 4, 2005, Ms. Peguero's attorney sent a
nearly identical M.G.L. c.93A demand Letter to
HealthExtras.  HealthExtras did not respond to the Demand
Letter within 30 days of its receipt of it.

### B.    Summary of Defendants' Evidence

HealthExtras, Inc. is Maryland-based company that works
with insurers and financial services companies to develop and
make available to consumers programs of useful insurance and
non-insurance benefits.  In the late 1990's, Christopher Reeve –
the actor who had become paralyzed after a horse-riding accident
– was an outspoken advocate for increasing the public's
awareness of the limitations of traditional insurance coverages,
and, particularly, for making available to consumers, at a
reasonable cost, coverage for catastrophic accidents that result
in permanent, total disability.  Reeve collaborated with
HealthExtras and insurance broker (and former defendant) The
Sklover Group, Inc. to identify the types of policies available

11

in the insurance marketplace to provide such coverage, and to begin to develop a program to make this coverage available to the public.

This initial collaboration led to a wider collaboration among Reeve, HealthExtras, Sklover, former defendant Federal Insurance Company, and the American Express Company. The result of this wider collaboration was the Accidental Disability Plan from American Express (the "Plan") that is at issue in this case. Reeve agreed to endorse the Plan, and entered into a contract with HealthExtras under which HealthExtras could use Reeve's image and quotes in the Plan's marketing materials. HealthExtras, Sklover and Federal entered into a contract under which Federal agreed to underwrite the permanent total disability insurance component of the Plan, and Sklover agreed to serve as the insurance broker of record for Federal's policy. Finally, HealthExtras entered into a contract with American Express under which American Express agreed to market the Plan to its cardholders.

In accordance with these agreements, Federal developed a permanent total disability insurance policy to be the centerpiece of the Plan, and pursued approval of this policy from the insurance regulators in all 50 states. In the

12

meantime, HealthExtras and American Express, with the assistance
of an outside marketing agency, developed print materials to
market the Plan to American Express cardholders.  Among these
materials was a one-page letter describing the Plan in general
terms and asking the recipient to sign up for the Plan on a
trial basis (the "Initial Letter").  The Initial Letter included
a detailed disclosure – provided by Federal – of the key terms
and conditions of Federal's permanent total disability coverage.

Before the Initial Letter and the other marketing materials
were sent to American Express cardholders, they were reviewed
for compliance with law in a two-level process.  The first level
was a review by American Express.  This review was conducted by
two separate groups within American Express:  its Advertising
Review Board and its Compliance Department.  Both groups
reviewed the Initial Letter and the other materials for
compliance with laws and regulations governing advertising in
general.  The second level of was a review by Federal.  As
Federal is in the business of insurance, its review was focused
specifically on compliance with laws and regulations governing
insurance and insurance advertising.  HealthExtras and American
Express at all times relied on Federal to ensure that the
Initial Letter and the other marketing materials were fully

compliant with all such laws and regulations.  Once American
Express and Federal had reviewed and approved the Initial Letter
and other materials, American Express began marketing the Plan
to its cardholders.

In July, 2002, Ms. Peguero received the Initial Letter from
American Express.  Before receiving the Initial Letter, Ms.
Peguero did not know that disability insurance existed.  She had
never thought about buying disability insurance and had never
talked about it with her family or friends.

Ms. Peguero read most of the front of the Initial Letter,
including the paragraph indicating that within 10 days she would
receive a Plan Summary and a complete Benefit Plan Description
for her review, after which she could, within 90 days, cancel
her enrollment and receive a full refund.  She also read the
words, "For more plan details and additional benefits, please
see reverse side."  She turned the document over and read the
heading at the top of the page, which concerned additional
benefits included with the Plan, but then abruptly stopped
reading.  She did not read the bolded heading "IMPORTANT
DISCLOSURE" set off in the middle of that page, or any of the
language under that heading.  She decided to enroll in the Plan

14

and, that same day, signed and returned the tear-off enrollment form.

As of July, 2002, HealthExtras' role with respect to the Plan was limited to receiving completed enrollment forms, sending "Welcome Packets" to the new enrollees, and providing ongoing customer service and support.  HealthExtras received Ms. Peguero's signed enrollment form and enrolled her in the Plan on July 15, 2002.  On July 16, 2002, HealthExtras mailed a "Welcome Packet" – including a detailed description of Federal's permanent total disability insurance coverage – to Ms. Peguero at her longstanding address of One Shandon Road, Dorchester, Massachusetts.  Ms. Peguero claims that she did not receive this Welcome Packet.  However, HealthExtras makes an entry in its customer service database if the U.S. Postal Service returns any mailing as undeliverable, and there is no record that Ms. Peguero's Welcome Packet was returned to HealthExtras.

Before enrolling in the Plan, Ms. Peguero had experience obtaining other types of insurance, including auto, health and credit protection insurance.  She understood that insurance is a contract between an insurance company and its insured, and that the parties' obligations are spelled out in a written agreement. With regard to the Plan in particular, Ms. Peguero understood

15

that the Initial Letter was not the entire agreement, and that, apart from that document, there was an insurance policy containing detailed provisions defining the circumstances in which she would receive $1.5 million and the circumstances in which she would not.  Although she understood this, and although she knew that she was supposed to receive detailed written materials about the Plan within 10 days, and that she had 90 days to review those materials and decide whether to cancel her enrollment and receive a refund, Ms. Peguero never looked in her mail for any further information about the Plan, and never called American Express to request the more detailed information referenced in the Initial Letter or to ask any questions about the Plan.  She "[did not] want to know" how the insurance policy defined "permanent disability."

On Christmas Eve, 2002, Ms. Peguero attended a party at her brother's house in New Bedford, Massachusetts.  She drove herself to the party in her own car, with her boyfriend, Hector Amador, and her two children as passengers.  Ms. Peguero and Mr. Amador left the party together around 2:00 a.m.  Ms. Peguero had consumed 6-10 beers and was unable to drive, so Mr. Amador, who also had been drinking, got behind the wheel, with Ms. Peguero in the passenger seat.  As Mr. Amador drove back to Ms.

16

Peguero's house in Boston, Ms. Peguero fell asleep.  Mr. Amador

was driving on Route 128 in Braintree, "possibly" speeding, when

he realized he was about to miss the left-hand exit into Boston.

He tried to quickly maneuver towards the exit, but lost control

of the car and it left the pavement, rolling over at least once.

As a result of this accident Ms. Peguero's right arm was severed

above the elbow.  She was taken by ambulance to the emergency

room at Massachusetts General Hospital.

Between the time of the accident and the time the

investigating police officer arrived at the emergency room, Ms.

Peguero and Mr. Amador had decided to say that Ms. Peguero had

been driving her own car that night.  The purpose of this lie

was to "protect" Mr. Amador, who was an illegal alien and did

not have a driver's license.  As a result, the official police

report concerning the accident lists Ms. Peguero as the

operator, and states that "the operator stated that she lost

control of the vehicle, struck the guardrail on the right,

flipped over and skidded into the guardrail on the left."

In early 2003, Ms. Peguero, through her present counsel,

submitted to Federal a claim for the $1.5 million permanent

total disability benefit.  Neither HealthExtras nor American

Express had any knowledge of the claim that Ms. Peguero

17

submitted or any involvement in Federal's handling and
determination of her claim.  Apparently because her injury did
not meet the physical threshold requirement for a "permanent
total disability," Federal denied Ms. Peguero's claim.    In
March, 2005, Ms. Peguero sued Federal, The Sklover Group and
American Express.  In September, 2005, Ms. Peguero settled with
Federal and voluntarily dismissed all of her claims against
Federal with prejudice.  In January, 2006, after American
Express brought HealthExtras into the case as a third-party
defendant, Ms. Peguero filed a set of "direct claims" against
HealthExtras.  In June, 2006, Ms. Peguero settled with Sklover
and voluntarily dismissed her claims against Sklover with
prejudice.

## II.  <u>AGREED FACTS</u>

1.  The Plaintiff, Altagracia J. Peguero ("Peguero"), is an
individual who resides at 1 Shandon Road, Apartment 215,
Dorchester, Massachusetts.

2.  The Defendant, American Express Company ("American
Express"), is a corporation duly organized and existing under
the laws of the State of New York, which has at all times
material hereto maintained its principal place of business at
200 Vesey Street, New York, New York.

3.    The Defendant, HealthExtras, Inc. ("HealthExtras"), is a corporation duly organized and existing, upon information and belief, under the laws of the State of Maryland, which has at all times material hereto maintained its principal place of business at 800 King Farm Boulevard, Rockville, Maryland.

4.    On June 8, 2004, the Plaintiff sent the Defendant American Express a Demand for Relief pursuant to M.G.L. c.93A.

5.    On November 10, 2004, the Plaintiff sent the Defendant American Express a second Demand for Relief pursuant to M.G.L. c.93A.

6.    On October 4, 2005, the Plaintiff sent the Defendant HealthExtras a Demand for Relief pursuant to M.G.L. c.93A.

### III.  CONTESTED ISSUES OF FACT

#### III.A.  PLAINTIFF'S STATEMENT OF CONTESTED FACTS

1.    Whether the Defendants' marketing, advertisement, and sale of the Accidental Disability Policy from American Express was unfair and deceptive.

2.    Whether the Defendants' marketing, advertisement and sale of the Accidental Disability Plan from American Express violated M.G.L. c.175, §.110E.

3.    Whether the Defendants violated M.G.L. c.93A by utilizing a misleading policy name.

4.    Whether the Defendants' marketing, advertisement, and sale of the Accidental Disability Plan for American Express had the capacity or tendency to deceive a reasonable consumer as to the extent of any policy benefit payable, loss covered or premium payable.

19

5.    Whether the Defendants conspicuously disclosed the policy benefits payable, losses covered, and premium payable under the Accidental Disability Plan from American Express.

6.    Whether the Defendants' marketing, advertisement, and sale of the Accidental Disability Plan from American Express had the capacity or tendency to deceive a reasonable consumer regarding the identity of the insurer.

7.    Whether the solicitation in fact contained a "special offer" as stated therein.

8.    Whether the Defendants clearly and conspicuously disclosed the premium rate for the Accidental Disability and Accidental Loss of Life Insurance Component of the Accidental Disability Plan from American Express.

9.    Whether the Defendants clearly and conspicuously disclosed the limited nature of the Accidental Disability Plan from American Express.

10.    Whether the Defendants' marketing of the Accidental Disability Plan from American Express invited the purchase of the plan for emotional rather than functional reasons.

11.    Whether the Defendants clearly and conspicuously disclosed the exceptions, reductions, and limitations of the Accidental Disability Plan from American Express.

12.    Whether the Defendants clearly and conspicuously disclosed that Christopher Reeve was paid for his endorsement.

13.    Whether the application form completed by the Plaintiff clearly and unambiguously disclosed the Plan's elimination period and the premium payable.

14.    Whether the Defendants were acting as insurers and/or insurance agents in connection with the sale of the Accidental Disability Plan for American Express.

15.    Whether the Defendants have or should have known of their violations, if any, of M.G.L. c.93A in connection with the marketing, advertisement or sale of the Accidental Disability Plan from American Express.

16.   Whether, and to the extent to which, Ms. Peguero was harmed by the manner in which the Accidental Disability Policy from American Express was marketed, advertised, and sold.

17.   Whether American Express ever responded to the Demand for Relief dated June 8, 2004.

18.   Whether American Express ever responded to the Demand for Relief dated November 10, 2004.

**III.B.  DEFENDANT'S ISSUES OF FACT**

1.   Whether the Plaintiff received the "Welcome Packet" that HealthExtras contends it mailed to her.

**IV.   <u>JURISDICTIONAL ISSUES</u>**

There are no jurisdictional issues.

**V.   <u>QUESTIONS RAISED BY PENDING MOTIONS</u>**

There are no pending motions.  The Plaintiff intends to file numerous motions in limine and Defendants intend to move in limine to preclude testimony by the plaintiff's three proposed experts.  <u>See</u> Section VI below.

**VI.   <u>ISSUES OF LAW</u>**

**A.  <u>PLAINTIFF'S ISSUES OF LAW</u>**

a.   Whether the Defendants will be permitted to introduce any evidence that they relied on Federal Insurance to ensure that the solicitation was not unfair and deceptive.  Reliance upon others is not a defense to a Consumer Protection Claim.

b.   Whether the Defendants will be permitted to introduce any evidence that the Plaintiff entered into settlements with Federal Insurance and Sklover.  Such evidence is not admissible under Massachusetts law.

21

c.    Whether the Defendants will be permitted to argue that Ms. Peguero's conduct is unreasonable.  Proper analysis is whether solicitations had the capacity or tendency to deceive a reasonable consumer.

d.    Whether the Defendants will be permitted to introduce evidence regarding Ms. Peguero's actions as a consumer after her purchase of the American Express Plan.  Any such evidence is irrelevant to inquiry of whether solicitation was unfair and deceptive.

e.    Whether the Defendants will be permitted to introduce any evidence regarding Ms. Peguero's or Mr. Amador's conduct on the night Ms. Peguero lost her arm.  Such evidence is not relevant to any issue in this case.

f.    Plaintiff will move to preclude any witness who had not been identified as a potential witness.

**B.    DEFENDANTS' ISSUES OF LAW**

a.    Whether either M.G.L. c. 175, § 110E or 211 CMR 40.00 et seq. applies to the defendants.  The defendants contend that the statute and regulations apply only to entities engaged in the "business of insurance," such as insurers, agents and brokers.

b.    Whether, in light of the plaintiff's deposition testimony, the plaintiff can establish any causal connection between the defendants' alleged unfair and deceptive acts and practices and her alleged harm.

c.    Whether, in light of the court's dismissal of the plaintiff's "fraud/deceit" claim, the plaintiff's deposition testimony, and her failure to adduce any evidence demonstrating any intent to deceive on the part of the defendants, the plaintiff is entitled to "benefit of the bargain" damages that are tantamount to re-writing Federal's policy to provide for a $1.5 million benefit for any type of injury that prevents the plaintiff from returning to the job she held at the time of her accident, or to any other damages.

d.    Whether the plaintiff's proposed expert Timothy Ryles should be permitted to testify.  The defendants contend that Ryles' proposed testimony is inadmissible for the following reasons:

22

　　　　1.    Expert testimony is not ordinarily admissible on the issue of whether alleged conduct violates a statute or regulation.  That is for the jury to decide.  <u>Perry v. Medieros</u>, 369 Mass. 836, 842 (1976).

　　　　2.    Ryles does not have, or claim, any familiarity with, or expertise in, Massachusetts insurance advertising statute or regulations.  The National Association of Insurance Commissioners (NAIC) Model Regulation that Ryles claims familiarity with was not adopted in Massachusetts.  The Massachusetts regulation differs substantially from the NAIC model, although portions of it are based on the model.

　　　　3.    Ryles was not made available for deposition before the deadline for expert discovery.  Under the Court's scheduling order as most recently amended, the latest date for expert discovery was July 12, 2007, three months after the April 12, 2007 close of fact discovery.  HealthExtras first requested dates for Ryles' deposition in early May, and was told that the earliest he could be available was late June.  The deposition was scheduled for Tuesday, June 26, 2007.  On Friday afternoon, June 22, 2007, plaintiff's counsel left a voicemail message stating that Ryles had "lost his voice" and was unable to attend the scheduled deposition the following week.  HealthExtras sought a new date shortly thereafter, and was told that the next date Ryles was available was July 18, 2007.  Because that date was two days before the final pretrial conference and after the close of expert discovery, HealthExtras declined the offer to depose Ryles on that date.

　　e.    Whether the plaintiff's proposed expert Glendon Nickerson should be permitted to testify.  The defendants contend that Nickerson's proposed testimony is inadmissible for the following reasons:

　　　　1.    Nickerson has admitted that he is not an expert in the subjects on which he proposes to opine, including insurance underwriting, the regulation of insurance advertising and the effect of the marketing documents at issue in this case on a "reasonable consumer."

　　　　2.    Expert testimony is not ordinarily admissible on the issue of whether alleged conduct violates a statute or regulation.  That is for the jury to decide.  <u>Perry v. Medieros</u>, 369 Mass. 836, 842 (1976).

23

f.     Whether the plaintiff's proposed expert Paul Blatchford should be permitted to testify.  The defendants contend that Blatchford's proposed testimony is inadmissible for the following reason:

1.     Blatchford is a vocational expert who proposes to testify about the plaintiff's injury, her rehabilitation efforts, and the effects – both mental and physical – that her injury has had on her life.  This testimony is irrelevant to any issue in the case.  The nature and severity of the plaintiff's injury is not now, and never has been, disputed.  Because it is irrelevant, the only purpose of this proposed testimony could be to unduly arouse the sympathy the jury.

g.     Whether the plaintiff's settlement with Federal, which under Massachusetts law is solely responsible for all marketing content and methods concerning its policy, bar her claims against the remaining defendants.

h.     Whether the letter agreement between HealthExtras and American Express dated July 17, 2000 is admissible.  The defendants contend it is not, because:  (1) it concerns a category of potential claims under Federal's policy that the plaintiff's claim does fall within, namely, claims in which the insured meets the policy's physical threshold requirements, but cannot return to their former occupation or any occupation for which they are suited by education, experience, etc.; (2) the plaintiff cannot establish that she is an intended third-party beneficiary of this private agreement between HealthExtras and American Express; and (3) even if the plaintiff could establish that she was an intended third-party beneficiary of this agreement, any right to payment has been nullified by the plaintiff's settlement with, and dismissal with prejudice of her claims against, Federal.

24

### VI.    PROBABLE LENGTH OF TRIAL

The parties estimate that the trial will take between two

and four full trial days.

### VII. WITNESSES

#### A.    Plaintiff's Witness List

1.    Altagracia J. Peguero
      1 Shandon Road, Apt. 215
      Dorchester, MA  02124

2.    Hector Amador (current address unknown);

3.    Timothy Ryles, Ph.D.
      Timothy Ryles Consulting
      3646 Churchwell Court
      Tucker, GA  30084

4.    Glendon B. Nickerson, Jr., CLU
      G.B. Nickerson Insurance Agency
      321 Boston Post Road, Suite 4C
      Sudbury, MA  01776

5.    Paul M. Blatchford
      85 Audubon Drive
      Chestnut Hill, MA 02167

5.    Joanna Ficklin
      HealthExtras, Inc.

6.    Janice Willis-Clarke
      American Express Company

7.    Anne Schepp
      American Express Company

8.    Andrew Sklover
      69 Mather Road
      Stamford, CT 06903

The Plaintiff reserves the right to call any witness listed by
the Defendants as a witness at trial.

25

B.   **Defendants' Witnesses**

Altagracia Peguero
1 Shandon Road
Dorchester, MA

Hector Amador
address unknown

Joanna Ficklin
HealthExtras, Inc.
800 King Farm Boulevard
Rockville, MD

Lisa D'Souza
HealthExtras, Inc.
800 King Farm Boulevard
Rockville, MD

Keeper of Records
HealthExtras, Inc.
800 King Farm Boulevard
Rockville, MD

Janice Willis-Clarke
American Express Company
200 Vesey Street
New York, NY

Todd Oberstein
American Express Company
200 Vesey Street
New York, NY

Anne Schepp
American Express Company
200 Vesey Street
New York, NY

Edwin E. Creter
Federal Insurance Company
15 Mountain View Road
Warren, NJ

Jay Hamilton
Federal Insurance Company
15 Mountain View Road
Warren, NJ

Andrew Sklover
The Sklover Group, Inc.
800 Summer Street
Stamford, CT

Daniel Judson, Esq.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA
(expert witness on compliance of marketing materials
with Massachusetts statutes and regulations)

**VIII.**     **<u>EXHIBITS</u>**

     **A.**    **<u>Plaintiff's Proposed Exhibits</u>**

     1.    M.G.L. c.175,§110E (Standards for Disclosure of Contents and Advertising of Policies);

     2.    M.G.L. c. 176D;

     3.    211 CMR 40.00 et esq. (Marketing of Insurance Health Plans);

     4.    M.G.L. c. 175, §162;

     5.    Definition of "Conspicuous" from Webster's New Universal Unabridged Dictionary;

     6.    Solicitation Envelope;

     7.    Solicitation;

     8.    Welcome Kit Letter from Insurance Officer Anne Schepp;

     9.    Plan Summary Effective as of August 1, 2002;

     10.    Accidental Disability Plan from American Express Benefit Description Plan;

11. Master Policy;

12. Plan Summary effective as of July 1, 2005;

13. Marketing Agreement dated September 17, 1999 between HealthExtras and American Express;

14. Letter Agreement dated October 5, 1999 between American Express and Federal Insurance and the Sklover Group;

15. July 17, 2000 Letter Agreement;

16. April 18, 2002 Letter of Understanding between HealthExtras and American Express;

17. Administration and Marketing Services Agreement dated January 7, 2003;

18. Emails between American Express and HealthExtras regarding Solicitation;

19. HealthExtras 2001 Form 10-K;

20. HealthExtras 2002 Form 10-K;

21. HealthExtras 2003 Form 10-K;

22. HealthExtras 2004 Form 10-K;

23. M.G.L. c.93A Demand Letter dated June 8, 2004 sent to American Express (with proof of delivery);

24. M.G.L. c.93A Demand Letter dated November 10, 2004 sent to HealthExtras (with proof of delivery);

25. M.G.L. c.93A Demand Letter dated October 4, 2005 sent to HealthExtras (with proof of delivery).


**B.  Defendants' Objections to Plaintiff's Proposed Exhibits**

28

The defendants object to proposed exhibits 1-4 on the ground that statutes and regulations are not evidence but are the law as to which the court will instruct the jury.

The defendants object to proposed exhibit 5 on the ground that a single dictionary definition does not establish the meaning of "conspicuous" intended by the legislature in using that term in M.G.L. c. 175, or the Commissioner of Insurance in promulgating 211 CMR 40.00 et seq., or even the common and accepted meaning of that term.

The defendants provisionally agree to proposed exhibits 6-14, subject to their reviewing the documents themselves to confirm that they are complete, accurate and authentic.

The defendants object to proposed Exhibit 12 as irrelevant.

The defendants object to proposed exhibit 15 on the ground that it is irrelevant for the reasons set forth in Section VI.h. above.

The defendants provisionally agree to proposed exhibits 16 and 17, subject to their reviewing the documents themselves to confirm that they are complete, accurate and authentic.

29

The defendants object to the proposed exhibits referenced in item 18 on the grounds that this item refers, potentially, to scores of e-mails exchanged among many individuals from the two companies.  Many of those e-mails are irrelevant to any issue in this case, may constitute inadmissible hearsay, and may have other flaws that render them inadmissible.  The defendants cannot evaluate these proposed exhibits without knowing which e-mails the plaintiff proposes to introduce, and to what issue the plaintiff claims they are relevant.

The defendants object to proposed exhibits 19-25 on relevancy and hearsay grounds.

### C.    Defendants' Proposed Exhibits

In addition to Plaintiff's proposed exhibits to which the defendants do not object, the defendants intend to introduce monthly statements sent to Ms. Peguero (marked in discovery as AE148-315).  The plaintiff objects to these as irrelevant.

**IX.    OBJECTIONS TO EVIDENCE**

See Sections IV and XI above.

Deleted: B. American Express' Proposed Exhibits¶
C. HealthExtras' Proposed Exhibits¶
[TO BE DONE]¶

Deleted: ¶

Formatted

Formatted

THE PLAINTIFF,                          THE DEFENDANT,
Altagracia J. Peguero,                  AMERICAN EXPRESS COMPANY,
By her Attorney,                        By their attorney,


/s/ Kevin Donius                        /s/ John F. Farraher, Jr.
Kevin Donius, Esquire                   John F. Farraher, Jr., Esq.
Law Offices of Kevin Donius, P.C.       Greenberg Traurig, LLP
424 Adams Street, Suite 100             One International Place
Milton, MA 02186                        Boston, MA  02110
TEL (617) 296-4900                      TEL:   (617) 310-6000
FAX (617) 296-4990                      FAX: (617) 310-6001
BBO#:  551298                           BBO#:  568194


THE DEFENDANT,
HEALTHEXTRAS, INC.,
By their attorney,


/s/ Donald R. Pinto, Jr.
Donald R. Pinto, Jr., Esq.
Rackemann, Sawyer & Brewster, P.C.
One Financial Center
Boston, MA  02111
BBO#:  548421

Dated:  July 20, 2007

31